# EXHIBIT E

MEMORANDUM

DEPARTMENT OF HEALTH AND HUMAN SERVICES
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
CENTER FOR DRUG EVALUATION AND RESEARCH

DATE: May 7, 1990

TO: Director, Division of Anti-infective Drug Products (HFD-520)

SUBJECT: Accutane as an "imminent hazard"

FROM: Section Chief, Epidemiology Branch (HFD-733)

The draft document describing the view of a majority of the Accutane Monitoring Group does not describe in much detail certain areas which I believe are important to recognize. Both Drs. Nelson and Anello have suggested that I write to express this position.

I have worked intensively on the topic of maternal exposure to Accufane for nearly three years and have a comprehensive understanding of the epidemiology of Accutane use and pregnancy exposure to it. The most recent report produced on this subject leads to the conclusion that Accutane cannot safely be given to women of childbearing age or potential. All such women are at risk of becoming pregnant, and despite the most intensive efforts to eliminate this exposure, 3% of women treated thus far have experienced first trimester pregnancy exposure to this drug.

The experience of the past two years shows that intensive regulation has not, cannot and will not achieve the Agency's goal of eliminating pregnancy exposure to Accutane. I believe that the only way to achieve the Agency's goal and protect the public health is to withdraw the NDA for Accutane immediately.

Accutane poses an imminent hazard to the public health, and as such should be withdrawn immediately from the market. The Secretary of Health and the Agency are empowered to do this if the Secretary determines that an imminent hazard to the public health exists (FD&C Act, Section 505(e)). 21 CFR 2.5 describes further that "an imminent hazard to the public health is considered to exist when the evidence is sufficient to show that a product or practice, posing a significant threat of danger to health, creates a public health situation (1) that should be corrected immediately to prevent injury and (2) that should not be permitted to continue while a hearing or other formal proceeding is being held. The "imminent hazard" may be declared at any point in the chain of events which may ultimately result in harm to the public health. The occurrence of the final anticipated injury is not essential to establish that an "imminent hazard" of such occurrence exists."

21 CFR continues "(b) In exercising his judgement on whether an "imminent hazard" exists, the Commissioner will consider the number of injuries anticipated and the nature, severity, and duration of the anticipated injury."

When the data known to date were presented to the Commissioner in March 1988, he said that pregnancy exposure, abortions and birth defects with Accutane "had to stop." The interventions adopted by the Agency to achieve its publicly'stated goal of eliminating pregnancy exposure to Accutane were shown to be failing in an April 1989 report, and the report just completed by us shows again the failure of these interventions.

The courts have upheld the following criteria to be considered in evaluating whether an imminent hazard exists:

1. The severity of the harm that could be caused by the drug during the completion of customary administrative proceedings to withdraw the drug from the general market.
2. The likelihood that the drug will cause such harm to users while the, administrative process is being completed.
3. The risk to patients currently taking the drug that might be occasioned by the immediate removal of the drug from the market, taking into account the availability of other therapies and the steps necessary for patients to adjust to these other therapies.
4. The likelihood that, after the customary administrative process is completed, the drug will be withdrawn from the general market.
5. The availability of other approaches to protect the public health.

I believe that the situation with Accutane qualifies as an imminent hazard by these criteria.

1. What is the severity of harm that could be caused by Accutane during the completion of customary administrative proceedings to withdraw the drug from the general market?

The severity of harm has been recognized and undisputed from early in Accutane's pre-marketing history. The drug is a potent teratogen capable of causing severe disabling or fatal birth defects in offspring of women who take it in the first trimester of pregnancy. In recognition of this, Accutane was *one* of the first drugs to receive FDA pregnancy category X classification. As our data on drug use and contraceptive failure show, there probably have been between 15,000 and 18,000 pregnancy exposures to Accutane since its appearance on the market in 1982. The magnitude of fetal injury and death has been great and permanent, with 11,000 to 13,000 Accutane-related abortions and 900 to 1,100 Accutane-related birth defects.

With biologic and mathematical determinism, these exposures have continued relentlessly despite repeated intensive, extraordinary and unprecedented regulatory efforts to solve the problem. During the past year, while the Agency waited for more complete data *on* the effect of its interventions to accumulate, an additional 1,900 pregnancy exposures occurred with 1,500 abortions and 117 children with birth defects.

2. What is the likelihood of harm while the administrative process is being completed?

Customary administrative proceedings to withdraw Accutane from tine general market would probably take over two years. During this time, many thousands of women would needlessly experience pr egnancv exposure to Accutane, with its disastrous consequences. Pregnancy exposure to Accutane occurs in about 3% of --women treated with the drug. This is predicted by models incorporating current knowledge of contraceptive practices and pregnancy rates, and details of current use of Accutane in women. In four separate populations, high levels of pregnancy exposure consistent with that predicted by the model have been observed. The likelihood of harm is great.

3. What risk to patients currently taking Accutane might be occasioned by its immediate removai from the market?

Over 90% of women currently treated with Accutane do not have the disease for, which the drug is approved. All of these patients could be treated with other, safer therapies. This is detailed in the product labeling which specifies that other therapies first be exhausted before using Accutane.

For the fewer than 10% of women taking Accutane, who have severe recalcitrant cystic acne unresponsive to other therapies, there would be no other treatment that is totally effective, although partial improvement would probably be obtained from other existing treatments. However, severe cystic acne is not a fatal or life-threatening disease, and so the actual risk incurred by these patients because of removal of Accutane from the market is non-existent. Also, Accutane carries a pregnancy category X classification which indicates that pregnancy exposure to it is not justifiable or acceptable. The issue of "benefit" in a "risk-benefit" equation is not a consideration. "The use of the drug in pregnant women clearly outweighs any possible benefit. The drug is contraindicated in women who are or may become pregnant." As we have shown by modeling and with data from four different populations, all women of childbearing potential are at risk anc "may become pregnant" while cn drug.

4. What is the likelihood that after the customary administrative process is completed, that the drug will be withdrawn from the general market?

The likelihood is great because the level of public health risk is extremely high. Over 1% of the nation's women of childbearing age having been treated with Accutane thus far and a woman's reproductive-lifetime risk of exposure to the drug is almost 3%. Of those treated with Accutane, 3% will have pregnancy exposure to the drug. The magnitude of harm which has already occurred, and which will continue to occur in the future is high.

Furthermore, over 90% of the women experiencing pregnancy exposure to Accutane did not have the severity of disease for which Accutane was approved. The only way to protect these women and their offspring is by immediate withdrawal of Accutane from the market.

5. Are there other approaches available to protect the public health?

The answer is no. Accutane cannot safely be administered to women of childbearing age or potential regardless of the setting in which it is used. This is clearly demonstrated by the occurrence of first trimester pregnancy exposure in 5% of women participating in IND studies, despite intensive, counselling, signed informed consent and contraception. The use of Accutane cannot be rendered safe for women even by such a controlled setting.

The regulatory history for Accutane is extensive and to quote Dr. Tabor, former Director of the Division of Anti-Infective Drug Products, it has been "truly extraordinary." Multiple advisory committee meetings, "Dear Doctor" letters, FDA Drug Bulletin articles, articles and editorials in professional journals, intensive labeling and relabeling with highlighted warnings, physician seminars. and educational programs, and much more have been done. No other drug in recent history has been the subject of such intensive regulatory effort. Despite this, the problem of pregnancy exposure to Accutane has continued virtually unchanged.

The efforts of the most recent two years saw use of signed informed consent forms, and special packaging of the product in an effort to eliminate pregnancy exposure and solve the problem. Signed informed consent did not prevent the 5% of women treated with Accutane during its pre-marketing clinical trials from experiencing pregnancy exposure to it, and it has not worked now.

Restricting Accutane to use only by dermatologists will not eliminate the problem because over 90% of all Accutane currently dispensed is prescribed by dermatologists:

Contraindicating the use of Accutane in women, but leaving Accutane on the market, will not eiiminate the problem because physicians will still prescribe the drug fcr them. This is clearly shown by the experience with the most recent regulatory interventions in which "Accutane is contraindicated in women unless all of the following conditions apply' (May 1988 action letter from FDA to Roche) The letter specified five criteria that must be met in full before the drug is prescribed. As described in recent meetings and written communications, etc; [illegible] sponsor demonstrate that most of the Accutane prescribed to women in 1989 was contraindicated because the five criteria were not met in full. The majority of women did not have severe recalcitrant cystic acne, many (perhaps most) did not receive an initial pregnancy test and a sizable number did not receive written warnings. Contraindicating the use of the drug has not altered physician behavior very much and has not achieved the Agency's goal. Another problem created by contraindicating the use of Accutane in women but leaving it on the market is that physicians could prescribe the drug for men who do not have severe recalcitrant cystic acne with the understanding that it would be given to women, or other deceptive means could easily be taken to give Accutane to women. In this situation, the Agency would lose all ability to document and quantitate the persistence of the problem.

Restricted distribution, limited to regional university-based centers would also. fail to achieve an environment where Accutane could safely be given to women of childbearing age or potential. This message is clear from the substantive body

of data showing that if Accutane is given to women, pregnancy exposure to it will occur 3% of the time, regardless of what is done to avoid it. The only way to eliminate pregnancy exposure to Accutane is to ensure that it is not available for or given to women. Restricting the distribution of Accutane as above and permitting only men to be prescribed the drug would also not be effective at removing the imminent hazard . The reasons are several. First, to design and implement such a system might take two or more years, during which time women would continue to be subject to the public health risks of this drug. Second, the potential for diversion of Accutane to women because of men giving it to them is probably high. It would be difficult or impossible to detect and quantitate this.

There is no alternative to immediate withdrawal of Accutane from the market. To delay only compounds the body count. All previous efforts by FDA to achieve its goal of eliminating pregnancy exposure to Accutane have failed. Only the immediate withdrawal of Accutane from the market will work.

To put things in context, the level of occurrence of most severe and life-threatening adverse reactions to prescription drugs is on the order of 1 per 20,000 to 1 per 100,000 or less. Among drugs approved in the United States and subsequently withdrawn (usually "voluntarily") from the market, the level of risk for serious harm was probably in the range of 1 per 1,000 to 1 per 10,000. With Accutane, the risk is known with biologic certainty to be around 3 *per* 100, one to two orders of magnitude greater than with these other drugs. The problem is made worse by the fact that cystic acne itself is not a life-threatening disease, and by the fact that more than 90 of every 100 women treated with Accutane don't'even have the severity of disease for which the drug was originally approved.

Therefore, to permit Accutane to remain on the market would contradict the Agency's commitment to the public health as well as its goal to eliminate pregnancy exposure.

David J. Graham, MD, MPH

cc:
    Peck (HFD-001)
    Bilstad\Burlington (HFD-500)
    Nelson (HFD-003)
    Evans/Huene/Bostwick (HFD-520)
    Faich/Anello (HFD-700)
    Stadel/Graham (HF'D-733)
    DRU 1.7 Isotretinoin