**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

|  |  |
|---|---|
| IN RE:<br><br>ACCUTANE® PRODUCTS<br>LIABILITY LITIGATION | )<br>)<br>)<br>)  **MDL DOCKET NO. 1626 ALL**<br>)  **CASES**<br>)<br>)  **CASE NO. 8:04-MD-2523-T-30TBM**<br>) |

**U.S. DEFENDANTS' MOTION FOR RELIEF**
**FROM PSC COUNSEL'S IMPROPER DEPOSITION CONDUCT**

Pursuant to Federal Rule of Civil Procedure 30(d)(3), Defendants Hoffmann-La Roche Inc. and Roche Laboratories Inc. ("Roche") hereby move the Court to enjoin PSC counsel—including lead counsel Paul Smith—from improperly coaching deponents and otherwise disrupting depositions of Plaintiffs' witnesses.

In the very first expert deposition taken as part of this MDL, Defendants deposed Dr. Alan Moshell on November 2, 2006. During this deposition, Mr. Smith improperly coached the expert, interrupted deposing counsel's questions, and inappropriately instructed the expert not to answer certain questions. Mr. Smith's has used the same tactics in other Accutane cases, and has been rebuked by the Court in one of those cases:

> **Mr. Smith, let me be blunt. You were coaching him.**
> **Don't do it again. . . .**
>
> **Mr. Smith, don't do it again. All right? I -- I have to**
> **tell you I read the transcript and you went too far. You**
> **went way too far.**

88559v1

Transcript of Hearing before the Honorable Francine A. Schott, dated November 28, 2005, at 22:10-23:13 (Ex. A).  Mr. Smith was deterred neither by this reprimand from the Court in *Palazzolo* nor by deposing counsel's repeated warnings about improper coaching.  Because Mr. Smith has displayed a pattern of improper deposition conduct and because prior court warnings have not altered his conduct, Roche respectfully asks this Court to intervene and make clear that such tactics cannot be tolerated in federal court.

## BACKGROUND

Mr. Smith's conduct in this recent deposition reflects a pattern of improper coaching.  Prior judicial warnings have failed to correct his conduct.

### A.     The Court Reprimands Mr. Smith For Improper Coaching in *Palazzolo*.

In *Palazzolo v. Hoffmann-La Roche Inc.*, a case pending in New Jersey state court, Mr. Smith defended the October 24, 2005 deposition of Plaintiffs' general causation expert, Dr. Douglas Bremner.  Mr. Smith repeatedly coached Dr. Bremner and, as the record reflects, influenced Dr. Bremner's testimony on core, material issues.  The following example—in which Mr. Smith induced the witness to reverse his sworn answer on a question about his expert methodology—illustrates one of many of Mr. Smith's successful attempts to influence the deponent's testimony:

> Q:     Did you have to hire or seek out a statistician that you wouldn't normally have on your team to satisfy the criteria?
>
> A:     Well, there is a statistician that is part of the Emory conti [ph] center that I'm part of, so we have a statistician that is a paid faculty member on grants at Emory that I can utilize.

> Q: That's not something you did with respect to your publication on Accutane?
>
> A: No.
>
> ***Mr. Smith: I thought you did. I thought you said you did.***
>
> Q: Okay, enough testifying.
>
> ***Mr. Smith: I misunderstood what he said. Was the Accutane paper reviewed by a statistician?***
>
> *Q:* He said no. He's answered the question.
>
> A: *The Accutane paper was reviewed by an epidemiologist.*

Bremner Dep. at 160:16 – 161:12 (emphasis added) (Ex. B).

After Roche presented this and other examples to the Court in *Palazzolo*, the Court rebuked Mr. Smith:

> THE COURT: -- I guess what I'm trying to say is this. ***Mr. Smith, let me be blunt. You were coaching him. Don't do it again.*** All right? The rules in New Jersey are very clear -- I don't know if it's different in Texas.
>
> . . .
>
> Mr. Smith, don't do it again. All right? ***I -- I have to tell you I read the transcript and you went too far. You went way too far.*** You're not his lawyer. Okay?

Ex. A at 22:10 – 23:14.

**B. Mr. Smith Improperly Coaches Dr. Moshell at a Deposition in *Owensby*.**

Roche deposed Dr. Moshell for the first time in *Owensby v. Tiefenbrunn*, an Accutane case that had been pending in Missouri state court. Though he had been warned by the Court in *Palazzolo*, Mr. Smith continued to coach the witness. As the

3

following example illustrates, Mr. Smith's coaching again appeared to influence the witness's answers:

> Q:   Do you believe there is evidence in the literature of a proven scientific link between the use of Isotretinoin and psychiatric adverse events?
>
> Mr. Smith:   *Objection. Speculative as to what is scientific causation.*
>
> By Mr. Imbroscio:
>
> Q:   You can answer.
>
> A:   *I don't know what you mean by scientific causation.*

Moshell Dep. I at 185:11-20 (emphasis added) (Ex. C).

Mr. Smith also improperly prevented Dr. Moshell from answering two distinct types of questions. First, though Mr. Smith disclaimed reliance on any privilege, he instructed Dr. Moshell not to answer questions about his preparation with Mr. Smith for the deposition:

> Q:   Fair enough. Do you recall discussing Dr. Best's recent testimony with Mr. Smith yesterday?
>
> A.   I recall discussing some aspects of what Dr. Best has done in relation to Accutane, whether -- but I think that was more in relation to one of the documents rather than in relation to his testimony. But that material --
>
> *MR. SMITH: Excuse me. Again, I would caution you about giving him any information that you and I specifically discussed.*
>
> MR. IMBROSCIO:   Are you invoking privilege for communications with this witness about what he discussed to prepare for this deposition?

4

> MR. SMITH: Not about the deposition. Any discussions that he and I had yesterday in connection with preparation of this deposition, I'm not going to allow him to testify to.
>
> *MR. IMBROSCIO: You're invoking privilege?*
>
> *MR. SMITH: Not the privilege.*
>
> *MR. IMBROSCIO: You're instructing him not to answer.*
>
> *MR. SMITH: You're not entitled to know what he and I discussed in connection with preparation of his deposition.*

*Id.* at 154:17-155:19 (emphasis added). Later in the deposition, Mr. Smith withdrew his objection to this line of inquiry, but he reasserted it again in Dr. Moshell's next deposition, discussed below.

Even more remarkably, Mr. Smith instructed Dr. Moshell not to answer a question where the basis for the objection was the form of the question:

> Q: And if someone in the medical profession or as a dermatologist uses the phrase 'side effect,' does it mean they are concluding there is a definite scientific causal -- proven causal connection?
>
> **MR. SMITH:** Objection. *That calls for speculation.* Object to the form. That's absolutely objectionable.
>
> By Mr. Imbroscio:
>
> Q: You can answer that.
>
> **MR. SMITH:** *Don't have to answer that. It causes him to conclude on what somebody else is might [sic] be thinking.*
>
> **MR. IMBROSCIO:** He's an expert witness, Mr. Smith. If you want to instruct him not to answer this

5

> question, you do so at your own peril. *Are you instructing him not to answer the questions?*
>
> MR. SMITH: *Yes. Y-e-s, yes.*

*Id.* at 177:15-178:9

### C. Mr. Smith Coaches Dr. Moshell at the November 2 MDL Deposition

On November 2, 2006, Roche again deposed Dr. Moshell, this time in connection with his opinions in the MDL. Mr. Smith's improper conduct persisted.

#### 1. *Coaching Begins Early*

After just a few questions, Mr. Smith began to coach the witness:

> Q. What I'm sensing is that you have additional emails that you did not bring, or you may have only brought the attachments, is that what I'm hearing?
>
> . . .
>
> MR. SMITH: I'll speak up. I did not understand him to say that.

Moshell Dep. II at 23:11-19 (Ex. D).

Counsel for Roche immediately warned Mr. Smith that such witness coaching was improper: "Mr. Smith, we are in Federal Court . . . . I will not tolerate today speaking objections or coaching of the witness that occurred quite extensively in the *Owensby* deposition. Its not going to happen." *Id.* at 24:16-24:21. Though he had been clearly rebuked for similar conduct in *Palazzolo*, Mr. Smith insisted that he "was certainly not doing anything outside of the bounds of propriety." *Id.* at 25:17-18. He dismissed the relevance of his prior conduct and invoked what he curiously described as, "my own rules": "***But hey, I am well aware of my rules***, and what my ground work is

here. And whatever occurred in the *Owensby* deposition, it's absolutely of no relevance or importance at this time." *Id.* at 25:19-22 (emphasis added).

        2.     *Quibbling with the Questions' Wording*

Indeed, Mr. Smith's coaching continued, as he repeatedly quibbled over deposing counsel's choice of words. Each time, Roche's counsel attempted to stop Mr. Smith; each time, Mr. Smith was undeterred.

- When Roche's counsel asked Dr. Moshell whether there had been a "fundamental change" in his opinions, Mr. Smith interrupted: "MR. SMITH: We object to that question as being – we object to the form of that question being vague. Whatever is a fundamental change – MR. IMBROSCIO: You can say vague, that's all you can say." *Id.* at 45:22 – 46:5.

- "Q. . . . But I wanted to just make sure that you didn't have some revelation or expansion of opinions since you did those reports to get to your report that's at issue in this case. MR. SMITH: We object to the form of that question. Certainly time has elapsed. MR. IMBROSCIO: After the first part you've got to stop, Mr. Smith. MR. SMITH: You're the one that used the term 'revelation,' and we're going to object to the term 'revelation.'" *Id.* at 48:15 – 49:3.

- "Q. And so to carry forth what you said, essentially there's a risk that, because at least in some patients it appears to develop very rapidly, even the best monitoring may not be sufficient to identify this – MR. SMITH: Object to the form of the question. BY MR. IMBROSCIO: Q. – this decline as you say. MR. SMITH: Object to the form of the question. 'Best monitoring,' 'decline,' all of that is vague and ambiguous." *Id.* at 161:2-13.

- "Q: Neither of those two risk factors, the mother's note or the – what was the other one? . . . MR. SMITH: Object to the form of that as to consider those risk factors." *Id.* at 299:17 – 300:1.

        3.     *Mr. Smith's Coaching Affects Dr. Moshell's Answers.*

Mr. Smith's coaching repeatedly influenced Dr. Moshell's answers. In a question about a document issued by the FDA, Mr. Smith stated on the record that the

7

88559v1

document did not reflect all available data. Dr. Moshell immediately added Mr. Smith's supposition into his answer:

> Q: And at least as of November 2005, it was FDA's position that causality has not been established for Isotretinoin is [sic] psychiatric events; correct?
>
> MR. SMITH: Object to the form of the question. *It does not include all data summary information, and as such misstates what the FDA position is.*
>
> . . .
>
> THE WITNESS: That is certainly what is written there. Without being completely familiar with FDA's operations, the suicidal thought or actions in the FDA alert first page dates it 7 of 2005. *Whether or not any additional data was in the process of being evaluated in those four months, I don't know, and certainly there may be additional data since then.*

*Id.* at 71:6 – 72:18 (emphasis added).

Likewise, when Dr. Moshell was asked whether he had reviewed the reports upon which he based part of his opinion, Mr. Smith reminded Dr. Moshell of his personal experience with a patient. Dr. Moshell's answer reflected Mr. Smith's feedback:

> Q: And how many of the challenge -- dechallenge-rechallenge cases have you personally reviewed, Dr. Moshell?
>
> A: Related to depression?
>
> Q: Relating to Accutane and any psychiatric adverse event.
>
> Mr. Smith: *Including his own experience?*
>
> MR. IMBROSCIO: Mr. Smith, Mr. Smith? That's coaching. You know it is. Please stop. Dr. Moshell doesn't need that coaching.

8

88559v1

> By Mr. Imbroscio:
>
> Q: Please continue, sir.
>
> A: I haven't seen any of the case reports or any of the FDA case reports. I do have, as we've discussed I believe in my other deposition, in the *Owensby* deposition, ***I do have one patient who falls into that situation***.

*Id.* at 276:18-277:13 (emphasis added).

> 4. *Mr. Smith Coaches Dr. Moshell as He Reviews His Own Documents*.

Mr. Smith was particularly resourceful during a series of questions in which deposing counsel asked Dr. Moshell to identify the specific documents that he believed Roche had improperly withheld from the FDA:

1. <u>Directing Dr. Moshell to Additional Documents</u>

   > Q. I'm not talking about the general points, Doctor. I'm asking you a very specific question. And that is what judgment of a medical professional about the psychiatric issue do you believe exists in the record, and it has been presented to you and should have been presented to the FDA but was not?
   >
   > . . .
   >
   > MR. SMITH: . . . Why don't you give him all the data, including the marketing data? Unless –
   >
   > MR. IMBROSCIO: Mr. Smith.
   >
   > MR. SMITH: Separate the marketing data. *Id.* at 180:21 – 181:20.

2. <u>Attempting to Expand the Scope of the Question</u>

   > Q. Can you select the ones, Doctor, that go to the issue of what you think should have been submitted to the FDA but was not, and therefore led the FDA to conclude – oh,

9

> you're going to tell me you don't know what should have been submitted to the FDA; correct?
>
> MR. SMITH: Object to the form of the question. Why do you keep limiting? I thought you wanted this information. *Id.* at 192:10-18.

3. <u>Attempting to Narrow the Question</u>.

   > Q. Well, yes, Doctor, because remember the exercise you're going through is to identify what internal Roche documents you believe should have been sent to the FDA that would have materially effected the FDA's position on the labeling or the risk communication materials that you think were withheld.
   >
   > MR. SMITH: Specifically on spontaneous suicide – spontaneous psychotic reactions. *Id.* at 197:17 – 198:3.

4. <u>Otherwise Attempting to Change the Question</u>.

   > Q. Doctor, You're going to have to help me here. Because I asked you to point out in the documents that you have before you internal Roche opinions as to causation. How does this document, Exhibit 13A reflect an internal position as to causation on this issue that was not presented to the Food & Drug Administration?
   >
   > MR. SMITH: Object to the form of the question. I don't think that was the original question. *Id.* at 201:10-19.

5. <u>Pointing Dr. Moshell to Specific Portions of Documents</u>

   > Q.    Are you speculating, Dr. Moshell, as to the committee – ***Mr. Smith, so the record is clear, pointed out to you a portion of the document to shape your testimony.*** Are you confident that the slides that were referenced in Exhibit 13A are what is being referenced in Exhibit 13B, or is that your supposition, Doctor?
   >
   > A:    It's my supposition. *Id.* at 203:21 – 204:6 (emphasis added).

   > 5.    *Mr. Smith Coaches Dr. Moshell About The Creation of His Report.*

10

88559v1

Towards the end of the deposition, counsel for Roche sought to ask Dr. Moshell a series of questions about the process by which his report was generated—including questions about the near-identical wording of Dr. Moshell's report and the report of another labeling expert that has testified on behalf of plaintiffs in other Accutane cases. Mr. Smith again interrupted repeatedly and sought to inject his own answers.

| **The Question to Dr. Moshell** | **The Answer from Mr. Smith** |
|---|---|
| "Q. The question was how was this report created?" *Id.* at 236:12-13. | "MR. SMITH: Object to the form. He's entitled to a more specific question. It was probably created by computer." *Id.* at 236:14-16. |
| "Q. And then 19, which is what started this adventure, is an email from Ms. Dollar in Mr. Smith's office to you that reads as follows: 'Subject, Revised Affidavit.' She writes, 'Dr. Moshell attached is a revised affidavit . . . .'" *Id.* at 244:10-18. | "MR. SMITH: I think that is for something else." *Id.* at 244:19-20. |
| "Q. You certainly wouldn't – *it's pretty clear that Dr. Fann didn't write this report of his own volition*, he – " *Id.* at 255:19-21 (emphasis added). | "MR. SMITH: Object to the form of the question. *Not clear*." *Id.* at 255:22 – 256:1 (emphasis added). |
| "Q. *It's clear that Dr. Fann used the same exact* – or virtually the same exact words as you used in your affidavit of 2004; correct?" *Id.* at 256:4-6 (emphasis added). | "MR. SMITH: Object to the form of the question. *It's not clear*." *Id.* at 256:7-8 (emphasis added). |

      6.     *Mr. Smith Challenges Defense Counsel to Alert the Court*

Relatively early in the deposition, Mr. Smith invited counsel to alert the Court:

"Q. And you recall giving that testimony; correct?

A. I do.

Q. And that's still your opinion today? That's a true statement?

11

88559v1

>A. Yes.
>
>Q. And it accurately reflects the potential relationship between Accutane and the psychiatric effects listed there?
>
>MR. SMITH: Object to the form of the question. It misstates what it – my reading of this – MR. IMBROSCIO: Ho. MR. SMITH: Misstates what it says. It –
>
>MR. IMBROSCIO: That's it, you're done. MR. COHEN: That's enough. MR. IMBROSCIO: That's it, we're calling the judge. You cannot do that.
>
>MR. SMITH: Go ahead, call him. You cannot read something and say it's not there. You are simply asking him – " *Id.* at 64:14 – 65:14.

As the deposition continued, Mr. Smith continued to urge defense counsel to alert the Court:

>Q. . . . Are you aware of any scientific information in the company's possession that was not provided to the FDA? MR. SMITH: We would object to that, the form of that question and again –
>
>MR. IMBROSCIO: That's fine. You can object to the form of the question.
>
>MR. SMITH: Let me –
>
>MR. IMBROSCIO: You can answer, Doctor. [To Mr. Smith:] Stop.
>
>MR. SMITH: Let me finish my objection, please.
>
>MR. IMBROSCIO: Okay.
>
>MR. SMITH: The definition of scientific information is your definition, and we'd object to you giving evidence or limiting that to your definition of scientific information.
>
>MR. IMBROSCIO: Mr. Smith, I think you're digging yourself a bigger hole with Judge McCowen [*sic*].

12

> MR. SMITH:  You want to call Judge McCowen [*sic*]?  I'm tired of these threats, counselor.  If you want to call him, let's get this straightened out.
>
> MR. IMBROSCIO:  Don't worry, Mr. Smith.  We will address your conduct before Judge McCowen [*sic*] in short order after this deposition.  What I'd like to happen is that you not – stop influencing the testimony of this witness.

*Id.* at 176:14 – 177:20.

> 7. *Mr. Smith Inappropriately Invokes Work-Product Privilege As To The Preparation Of A Paid Expert Witness.*

In addition to repeatedly interrupting counsel's questions and coaching the witness, Mr. Smith invoked work-product privilege as to the contents of the expert's preparation for the deposition:

> MR. SMITH:  Dr. Moshell, I'll caution you, any conversation between you and I would be work product.  And I will instruct you not to give him any details in connection with specifics of our conversations.  Obviously, you can relate to him generally what we spoke.  But, other specific conversations, I'll instruction you not to answer.
>
> Mr. IMBROSCIO: I just want the record to be clear because we're going to call the judge right now, are you going to instruct Dr. Moshell not to discuss what you and he talked about?
>
> MR. SMITH:  No, I'm not going to let him tell you specifically what I said or what he said.
>
> MR. IMBROSCIO: Okay. We're going to call the judge, because that's not privileged under Federal law, and you know that.
>
> MR. SMITH:  I don't know that.  And I think that that certainly would be work product what he and I discussed.
>
> MR. IMBROSCIO: I'm now going to give you --
>
> MR. SMITH:  I mean, the materials we covered and things like that.  But I don't think you can ask him -- okay, what

13

88559v1

> did Mr. Smith say to you about the deposition of Julie Bishop, for instance. You know, I think that's work product.
>
> MR. IMBROSCIO: I know that's your opinion.

*See id.* at 12:14 – 13:20.

## ARGUMENT

Under the Federal Rules, "any objection during a deposition must be stated concisely and in a non-argumentative and non-suggestive manner." Fed. R. Civ. P. 30(d)(1). In applying this rule, courts have been blunt: "The attorney also may not object to questions in such a way as to 'coach' the witness or suggest an answer." *Odone v. Croda Int'l, PLC*, 170 F.R.D. 66, 68 n.3 (D.D.C. 1997) (citation omitted).

Mr. Smith's successive, suggestive objections could not present a clearer violation of this maxim. Indeed, courts in this circuit have specifically noted the problems with the types of tactics employed by Mr. Smith:

> Counsel for Micromeritics asserts that on one occasion a witness was mistaken in stating that he had seen a document before and that therefore counsel had to interject to correct the witness. The Court cannot fathom a better example of coaching than counsel's telling a witness, "No, you are incorrect. The correct answer is . . . ."

*Quantachrome Corp. v. Micromeritics Instrument Corp.*, 189 F.R.D. 697, 700 (S.D. Fla. 1999).

Mr. Smith's conduct is especially inappropriate when, as here, the deponent is a well-educated and well-compensated expert witness. Dr. Moshell is a sophisticated witness who has testified before, and thus is unlikely to be misled by questioning from Roche's counsel. *See id.* ("The witnesses in this case are scientists and engineers who

work with and create complex technology.  Surely they are intelligent enough to know when they do not understand a question."). Moreover, the limits on speaking objections are necessary to ensure that the testimony is "completely that of the deponent, not a version of the testimony which has been edited or glossed by the deponent's lawyer." *Id.* Given that the PSC is paying Dr. Moshell $600 an hour for his work in these cases, there is a heightened need to ensure that the witness's opinions are truly his own.

The disruptive and obstructionist deposition conduct outlined above easily would support monetary sanctions. *See* Fed. R. Civ. P. 30(d)(3) ("If the court finds that any impediment, delay, or other conduct has frustrated the fair examination of the deponent, it may impose upon the persons responsible an appropriate sanction, including the reasonable costs and attorney's fees incurred by any parties as a result thereof."); *Quantachrome Corp.*, 189 F.R.D. at 701 (after finding that counsel "improperly instructed witnesses not to answer question and improperly made speaking objections," ordering that witness be produced for second deposition and that defending party pay costs of sanctions motion and costs of second deposition).  While this Court is of course well within its discretion to impose sanctions, Roche seeks only that the Court reiterate to Mr. Smith (and to his PSC colleagues) that when "he must make a objection, the objection should briefly be made for the record, and the deposition should continue with the testimony being taken subject to the objection," *Quantachrome Corp.*, 189 F.R.D. at 700, and that further violations will be met with sanctions.

15

During last week's deposition of Dr. Stephen Billick, another PSC expert, Mr. Smith's behavior was better. But as the following examples (and others) illustrate, Mr. Smith still made improper speaking objections:

- "Q. Doctor, do you think it's petty that Mr. Bishara was arrested for assaulting a Mr. Walsh with force and violence and intent to rob or steal from him, is that petty? MR. SMITH: Let me lodge an objection as to the form of the question and, additionally let me lodge an objection to the use of any – any use of this document in this deposition. It's not been properly authenticated. There's no evidence whatsoever that this pertains to, A, either Charles Bishara, that is the father of Charles Bishop, or there's any relation to it whatsoever. . . ." Billick Dep. 77:20 – 78:10 (Ex. E).

- "Q. And she has a somewhat lengthy psychiatric history, does she not? MR. SMITH: Object to the form of the question, somewhat lengthy -- " *Id.* at 82:11-14.

- "Q. – do I understand that you feel that you could disregard Charles's psychiatric history in coming to an opinion about what caused his death? MR. SMITH: Object to the form of the question, mischaracterizes what he said. He didn't say he could disregard Charles's psychiatric history." *Id.* at 134:14-21.

- "Q. Is there anything else that you disagree with in Dr. Kaplan's report, other than his psychiatric diagnosis on Page 25? MR. SMITH: Object to the form of the question. That's not what he – he said he disagreed with the Summary and Impressions also." *Id.* at 167:6-11.

Roche also worries that a failure to address Mr. Smith's conduct now will invite the suggestion that Roche sat on its rights if Mr. Smith (or one of his co-counsel) were again to act inappropriately in a future deposition and Court relief sought. Given the number and importance of expert depositions that will take place in the next few months—and the failure of prior court reprimands to alter Mr. Smith's conduct—Mr. Smith is no longer entitled to the benefit of the doubt. At bottom, counsel should not have to exert energy or otherwise police the deposition conduct of opposing counsel; it is

both distracting and substantively prejudices the examining lawyer and the answers obtained from the expert.

## CONCLUSION

For the preceding reasons, Roche's motion should be granted and PSC counsel enjoined from further inappropriate deposition conduct.

        Respectfully submitted,

        s/Rafael Cruz-Alvarez
        Edward A. Moss
        Florida Bar No. 057016
        emoss@shb.com
        Rafael Cruz-Alvarez
        Florida Bar No. 989861
        ralvarez@shb.com
        SHOOK, HARDY & BACON L.L.P
        Miami Center, Suite 2400
        201 South Biscayne Boulevard
        Miami, Florida 33131-4332
        Phone:  305-358-5171
        Fax:     305-358-7470

        Mary M. Sullivan
        Colleen M. Hennessey
        Michael J. Griffin
        mmsullivan@peabodyarnold.com
        PEABODY & ARNOLD, LLP
        30 Rowes Wharf
        Boston, MA 02110
        Phone:     617-951-2100
        Fax:         617-951-2125

        Michael X. Imbroscio
        COVINGTON & BURLING
        1201 Pennsylvania Avenue NW
        Washington, D.C. 20004-2401
        PH:  202-662-6000
        FX:  202-662-6291

        **ATTORNEYS FOR DEFENDANTS**

88559v1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 15, 2006, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all attorneys of record.

## SERVICE LIST

| | |
|---|---|
| James Keller, Esq.<br>Keller & Keller<br>2850 N. Merician St.<br>Indianapolis, IN 46208 | Cori Suzanne Parobek<br>Kirkland & Ellis LLP<br>200 E. Randolph Dr., Ste. 6100<br>Chicago, IL 60606 |
| Victoria J. Maniatis, Esq.<br>Weltz & Luxenberg, P.C.<br>180 Maiden Lane<br>New York, N.Y. 10038 | Diane Reed, Esq.<br>604 Water St.<br>Waxahachie, TX 75165 |
| Joseph J. Sansone, Esq.<br>Covington & Burling<br>1330 Avenue of Americas<br>New York, N.Y. 10019 | Dana W. Tucker<br>Fox Galvin, LLC<br>One Memorial Drive, 8th fl.<br>St. Louis, MO 63102 |
| Christine Davenport, Esq.<br>Office of General Counsel<br>U.S. House of Representatives<br>219 Cannon House Office Bldg.<br>Washington, D.C. 20515 | Daniel N. Gallucci, Esq.<br>Roda & Nast PC<br>801 Estelle Drive<br>Lancaster, PA 17601 |
| Michael E. Withey, Esq.<br>Stritmatter Kessler, et al<br>200 Second Avenue West<br>Seattle, WA 98119-4204 | Rebecca Barrett Phalen, Esq.<br>Nelson Mullins, et al.<br>999 Peachtree St. N.E.<br>Atlanta, GA 30309-3964 |
| Jennifer F. Sherrill, Esq.<br>Federman & Sherwood<br>120 N. Robinson Avenue, Ste. 2720<br>Oklahoma City, OK 73102 | |

88559v1