# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

IN RE:
ACCUTANE PRODUCTS
LIABILITY LITIGATION

_____/

CASE NO. 8:04-MD-2523-T-30TBM
MDL 1626 – PSYCHIATRIC CASES
PSYCHIATRIC TRACK LITIGATION


(APPLICABLE TO ALL
PSYCHIATRIC TRACK CASES)

---

## F. HOFFMANN LA-ROCHE LTD AND ROCHE HOLDING LTD'S MOTION FOR SUMMARY JUDGMENT

---

# TABLE OF CONTENTS

INTRODUCTORY STATEMENT................................................................1

STATEMENT OF UNDISPUTED FACTS.....................................................5

STANDARD FOR SUMMARY JUDGMENT...................................................7

ARGUMENT.................................................................................8

I.    THE SWISS DEFENDANTS HAD NO INDEPENDENT DUTY TO
WARN ABOUT ACCUTANE'S ALLEGED RISKS.......................................8

    A.    The FDA Regulatory Scheme....................................................8

    B.    The Failure To Warn For An FDA Approved Pharmaceutical
Product Does Not Extend Beyond the NDA Marketer......................10

II.    THERE IS NO BASIS FOR CREATING A NEW THEORY OF DIRECT
LIABILITY OR FOR IMPUTING LIABILITY TO THE SWISS DEFENDANTS..............14

    A.    No Record Evidence Exists To Support The Imputation Of
Liability To The Swiss Defendants............................................23

        i.    There Is Absolutely No Record Evidence That
The Swiss Defendants Have Committed Fraud or
Wrongdoing Through the U.S. Defendants...........................22

        ii.  Piercing The Corporate Veil Would Not Serve To Prevent
Unjust Loss Or Injury To Plaintiffs................................24

        iii. The Domestic Defendants Are Not The Mere
Instrumentalities/Alter Egos or Agents Of The Swiss
Defendants For Liability Purposes...................................25

III.   SUMMARY JUDGMENT SHOULD BE ENTERED AS TO ROCHE HOLDING
LTD AS IT HAS NO INVOLVEMENT IN THE MANUFACTURE OR SALE
OF ACCUTANE AND MERE OWNERSHIP IS INSUFFICIENT TO
IMPUTE LIABILITY............................................................31

CONCLUSION..............................................................................33

CASES

*Abdel-Fattah v. Pepsico, Inc.*, 948 S.W.2d 381
(Tex. App. Houston 14th Dist. 1997)...............................................................1
*American Intern. Airways, Inc. v. Kitty Hawk Group, Inc.*, 834 F.Supp.
222 (E.D.Mich.1993).......................................................................................28
*American Intern. Group, Inc. v. Cornerstone Businesses, Inc.*,
872 So. 2d 333 (Fla. 2d DCA 2004)......................................................25, 26, 28
*Anderson v. Liberty Lohhy, Inc.*, 477 U.S. 242 (1986)......................................8
*AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586 (9th Cir. 1996)..................13
*Banegas v. United Brands Co.*, 663 F.Supp. 198 (D.S.C. 1986)............................30
*Bellomo v. Pennsylvania Life Co.*, 488 F.Supp. 744 (D.C.N.Y.1980)......................28
*Berger v. Columbia Broadcasting System, Inc.*, 453 F.2d 991
(5th Cir.1972)...............................................................................................30
*Berkey v. Third Avenue Ry. Co.*, 244 N.Y. 84, 155 N.E. 58 (1926).......................29
*Brown v. Margrande Compania Naviera, S. A.*, 281 F.Supp. 1004
(D.C.Va.1968)........................................................................................28, 29
*Calvert v. Huckins*, 875 F.Supp. 674, 679 (E.D.Cal.1995)..................................28
*Cannon Mfg. Co. v. Cudahy Co.*, 267 U.S. 333, 45 S.Ct. 250 (1925)......................32
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).................................................7
*Clark v. Matsushita Elec. Indus. Co., Ltd.*, 811 F. Supp. 1061
(M.D.Pa. 1993)..............................................................................................13
*Cook v. Smith*, 2006 WL 580991 (M.D. Fla. 2006)......................................23, 27
*Daimler-Benz Aktiengesellschaft v. Olson*, 21 S.W.3d 707
(Tex.App.-Austin, 2000).............................................................................3, 29
*Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114 (Fla. 1984)...............11, 25
*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003)..................................24, 28
*Dorfman v. Marriott Int'l Hotels, Inc.*, 2002 WL 14363 (S.D.N.Y.
2002)..........................................................................................................3, 29
*Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc.*,
262 F.Supp.2d 1334 (S.D. Fla. 1999).........................................................27, 28
*F. Hoffmann-La Roche Ltd. v. Superior Court of Santa Clara County*,
130 Cal. App. 4th 782 (Court Cal. App. 6 Dist. 2005)...................14, 26, 31, 33
*Federated Title Ins., Inc. v. Ward*, 538 So.2d 890 (Fla. 4th DCA 1989)..........25, 27, 28
*Felix v. Hoffmann*, 513 So. 2d 1319 (Fla. 3d DCA 1987)....................................4
*Fotenot v. Upjohn Co.*, 780 F.2d 1190 (5th Cir. 1986)........................................7
*Future Technology Today, Inc. v. OSF Healthcare Systems*, 218 F.3d 1247
(11th Cir. 2000).........................................................................................2, 3
*Haves v. City of Miami*, 52 F.3d 918 (11th Cir. 1995)........................................7
*Hillsborough Holdings Corp.*, 166 B.R. 461 (Bankr. M.D. Fla. 1994)....................26
*Hilton Oil Transp. v. Oil Transp. Co.*, 659 So. 2d 1141 (Fla. 3d DCA 1995)..............25
*Holman v. Ford Motor Company*, 239 So. 2d 40 (Fla. 1st DCA 1970)......................12
*Homart Development Co. v. Sigman*, 868 F. 2d 1556 (11th Cir. 1989)......................2
*In re Techtronics Pacing Sys., Inc.*, 953 F. Supp. 909 (S.D. Ohio 1997)..................3

*In re TMJ Implants Products Liability Litigation*, 872 F.Supp. 1019
(D.Minn. 1995).................................................................................12
*International Union, UAW v. Aguirre*, 410 F.3d 297 (6th Cir. 2005)...................……..24
*Jazini v. Nissan Motor Co.*, 148 F.3d 181 (2d Cir.1998)......................................13
*Joiner v. Ryder System Inc.*, 966 F.Supp. 1478 (C.D. Ill. 1996)...........................……33
*Katz v. N.Y. Tint Taxi Corp.*, 213 A.D.2d 599 (N.Y.A.D. 1995)..............................24
*Keys Jeep Eagle, Inc. v. Chrysler Corp.*, 897 F. Supp. 1437 (S.D. Fla. 1995)...........…...29
*Kramer v. Piper Aircraft Corp.*, 520 So.2d 37 (Fla. 1988)...................................34
*Kingston Dry Dock Co. v. Lake Champlain Transportation Co.*, 31 F.2d 265
(2nd Cir. 1929)..........................................................................……...29
*Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899 (2d Cir. 1981).......................3, 4
*MeterLogic, Inc. v. Copier Solutions, Inc.*, 126 F. Supp. 2d 1346 (S.D. Fla. 2000)........29
*Phonometrics, Inc. v. Choice Hotelv In'l*, 117 F. Supp. 2d 1341 (S.D. Fla. 2000)...........7
*Potash v. Port Authority of New York and New Jersey*, 279 A.D.2d 562
(2d Dept. 2001)..........................................................................……...24
*Prieto v. City of Miami Beach*, 190 F. Sup. 2d 1340 (S.D. Fla. 2002).......................…..3
*Rollins Burdick Hunter of So. Cal., Inc. v. Alexander & Alexander Servs., Inc.*,
206 Cal.App.3d 1 (Cal.Rptr. 1998)........................................................…...28
*Shell Oil Co. v. Harrison*, 425 So. 2d 67 (Fla. 1st DCA 1982)..............................12
*Smith v. United Recovery, Inc.*, 2007 WL 869065 (C.A.4 (W.Va.)..........................22
*Sokoloski v. American Home Products*, 2003 WL 1875113 (Pa.Com.Pl. 2003)........11, 12
*Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523
(Cal. App. 5 Dist. 2000)...........................................................…...27, 32, 33
*Sovereign Metal Corporation v. Ciraco*, 210 A.D.2d 75 (N.Y.A.D 1 Dept.
1994)...........................24
*Spence v. Zirmmerman*. 873 F.2d 256 (11th Cir. 1989)....................................7
*St. Petersburg Sheraton Corp. v. Stuart*, Fla., 242 So.2d 185
(Fla. 2d DCA 1970)......................................................................…...30, 32
*Steiner v. Bell Telephone Co.*, 358 Pa.Super. 505, A.2d 1348 (Tex.
1986)..........................................................................……...11
*Unijax Inc. v. Factory Insurance Association*, 328 So. 2d 448
(Fla. 1st DCA 1976)....................................................…...25, 27, 28, 29, 30
*USA Interactive v. Dow Lohnes & Albertson, P.L.L.C.*,
328 F.Supp.2d 1294 (M.D. Fla.2004)................................................…...26, 28
*United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876 (1998)...................…...10, 15, 28
*United States v. Swiss American Bank, Ltd.*, 274 F.3d 610 (1st Cir. 2001)..................3
*White v. Weiner*, 562 A.2d 378 (Pa. 1989).................................................11

**STATUTES**

21 U.S.C.A § 325..........................................................................8
21 U.S.C.A. § 355(a).....................................................................8

**RULES**

Fed. R. Civ. 56(c)..................................................................7

**REGULATIONS**

21 C.F.R. § 312...................................................................8
21 C.F.R. § 312.23(a)(1)(ix).................................................9
21 C.F.R. §314.102.............................................................9
21 C.F.R. §314.5(a)(5).........................................................9
21 C.F.R. § 314.50(c)(2).......................................................9
21 C.F.R. § 314.70..............................................................9
21 C.F.R. § 314.80.........................................................9, 14
21 CFR § 314.80(a)............................................................19
21 C.F.R. § 314.80(b)..........................................................9
21 C.F.R. § 314.80(j).........................................................10
21 C.F.R. § 314.81..............................................................9
21 C.F.R. § 314.81(b)(3).......................................................9
21 C.F.R. § 314.81(d)........................................................10
21 C.F.R. § 333(a)...........................................................10
21 C.F.R. § 331(d)...........................................................10

## INTRODUCTORY STATEMENT

This is a products liability lawsuit involving allegations that the prescription medication Accutane contained inadequate warnings and proximately caused Plaintiff, Charles Bishop, to commit suicide on January 5, 2002 by flying a small plane into a skyscraper in Tampa, Florida while under the belief that he was on a terrorist mission from Osama Bin Laden.[1] The Plaintiffs filed this lawsuit in 2002 naming the two U.S. affiliates that manufacture and market Accutane, Hoffmann-La Roche Inc. and Roche Laboratories Inc.,[2] as well as two of their affiliated Swiss corporations, F. Hoffmann-La Roche Ltd and Roche Holding Ltd.[3] Plaintiffs' claims against F. Hoffmann-La Roche Ltd and Roche Holding Ltd ("the Swiss Defendants") apparently arise out of the purported involvement of these companies [undifferentiated] as the head of a monolithic international organization called "The Roche Group" that includes, but is not limited to Defendants, Hoffmann-La Roche Inc. and Roche Laboratories Inc. Plaintiffs allege the Swiss Defendants – which do not market Accutane in the United States (or in any other country) - had an independent duty to Plaintiffs to "properly and adequately warn of the true nature of Accutane." *See* Plaintiffs' First Amended Complaint, DE 39 at ¶ 36. However, Plaintiffs' pertinent experts have not even been asked to define, much less establish a breach of, this purported independent duty.

---

[1] The Swiss Defendants have not been served in the *Stupak* case.

[2] Although currently two separate corporate entities, Roche Laboratories Inc. was previously subsumed within Hoffmann-La Roche Inc. Technically, Hoffmann-La Roche Inc. is the NDA sponsor for Accutane. Since its spin-off, Roche Laboratories Inc. has continued to play an important role in the operational marketing of approved pharmaceutical products in the United States.

[3] Roche Holding Ltd is a holding company and does not engage in operating activities such as the formulation, design, manufacturing, labeling, promotion, marketing, distribution, sale or placement of any product into the stream of commerce and is organized under the laws of Switzerland with its principal place of business in Basel, Switzerland. Its business consists of holding shares. Eisenring Cert. at ¶ 3, Ex. C.

The Plaintiffs allegations against the Swiss Defendants fail to differentiate between the two Swiss entities, F. Hoffmann La-Roche Ltd and Roche Holding Ltd, which are in fact two distinct corporations - Roche Holding is a passive holding company with ultimate ownership of the U.S. affiliates; F. Hoffmann is a direct subsidiary of Roche Holding, which has no ownership interest in the U.S. affiliates, and performs certain international functions related to Roche pharmaceutical operations.

This Court previously denied the Swiss Defendants' Motion to Dismiss in 2004, where it had been alleged that the Swiss Defendants had exerted a high degree of "control" in connection with the labeling and sale of Accutane in the United States. Taking Plaintiffs' jurisdictional allegations as true, this Court found the U.S. Defendants to be the "agents" of the Swiss Defendants, "at least on Accutane."[4] (DE 186). Importantly, this jurisdictional ruling, however, could not (and did not purport to) resolve the Swiss Defendants' substantive vicarious liability. This jurisdictional ruling does not preclude, and in fact noted the future possibility of, summary judgment for the Swiss Defendants.[5]

Motions to dismiss for lack of personal jurisdiction are subject to a more lenient standard than motions for summary judgment. Specifically, in motions to dismiss for lack of personal jurisdiction, allegations in the complaint are to be taken as true, whereas mere allegations carry no weight at all in a summary judgment proceeding. *Future*

---

[4] *See* DE 186 at 11. The Plaintiffs also raised an alter-ego allegation which the Court did not address.
[5] The Swiss Defendants would note this Court explicitly refused to convert its consideration of the respective pleadings filed related to jurisdiction , including arguments the Complaint failed to state a cause of action, to Rule 56 motions. *See, e.g., Homart Development Co. v. Sigman*, 868 F. 2d 1556, 1561 (11th Cir. 1989)(noting the mere perusal of material tendered in connection with a Rule 12 motion does not automatically covert that motion to a Rule 56 motion.).

*Technology Today, Inc. v. OSF Healthcare Systems*, 218 F.3d 1247, 1249 (11th Cir. 2000) (per curiam); *see also United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001) ("When a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, as in this case, the 'prima facie' standard governs its determination.").

By contrast, Plaintiffs' burden in resisting a summary judgment motion under Rule 56 is more rigorous. *See Prieto v. City of Miami Beach,* 190 F. Sup. 2d 1340, 1350 (S.D. Fla. 2002). District courts are careful to note that attributing a subsidiary's contacts to a foreign parent for purposes of personal jurisdiction at the motion to dismiss stage does not prejudge the issue of parent liability for the acts of its subsidiary. *See, e.g., In re Techtronics Pacing Sys., Inc.*, 953 F. Supp. 909, 921 (S.D. Ohio 1997)("The Court finds that these facts create an inference that the absent parent and the subsidiary are in fact a single legal entity, at least for the purposes of exercising jurisdiction.")(emphasis added, internal quotation omitted); *Daimler-Benz Aktiengesellschaft v. Olson,* 21 S.W.3d 707, 721 (Tex.App.-Austin, 2000)("Although many of the factors relevant to our analysis may also be relevant in determining whether a parent corporation should be liable for the actions of its subsidiary, the determination whether two corporate entities are one and the same for jurisdictional purposes is distinct."); *see also Dorfman v. Marriott Int'l Hotels, Inc.*, 2002 WL 14363 at *11 n.13 (S.D.N.Y. Jan. 3, 2002) ("The finding that Otis Felvonó functions as a mere department of Otis Elevator is made for jurisdictional purposes only. Different standards apply when evaluating whether or not to pierce the corporate veil for liability purposes.")(citing cases); *cf. Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899,

904 (2d Cir. 1981) (applying a "less onerous standard" to the personal jurisdiction analysis than is applied at the liability stage).

These Plaintiffs make general allegations which are undifferentiated as between all defendants as to the sale of Accutane in the United States. These allegations are demonstrably untrue with respect to the Swiss Defendants. It is now April of 2007, and after nearly four years of fact and expert discovery - including the production of over 700,000 pages of documents by the Swiss Defendants and 1,400 pages of testimony of Swiss witnesses; this Court need no longer accept these Plaintiffs' allegations as true.

While Plaintiffs' Complaint purports to assert causes of action in negligence, strict liability, breach of warranty, design defect, and misrepresentation, each count is fundamentally premised on the theory that the Defendants failed to provide adequate warnings to Plaintiffs regarding the risks associated with the use of Accutane, and this alleged failure to warn was the proximate cause of Plaintiffs' injuries. *See generally, Felix v. Hoffmann,* 513 So. 2d 1319, 1320 (Fla. 3d DCA 1987)("If the warning given to the medical community is sufficient, then the drug manufacturer is not liable for injuries sustained by the physician's patients as a result of the side effects of the drugs."). This duty – to provide adequate warnings to U.S. physicians - applies solely to (and consequently can be breached solely by) the U.S. Defendants, for they have exclusively manufactured, marketed, and labeled Accutane in the United States.

Generalized arguments of "control" carry no weight when viewed in connection with the now fully developed factual record related to Accutane. Specifically, Plaintiffs have not, and cannot, demonstrate that the Swiss Defendants in any manner "controlled"

the warnings at issue in this case. It is one thing for the Plaintiffs to have argued at the initial pleading stage that the Swiss entities maintain a "veto" power over Accutane's labeling in the United States; it is another thing entirely to prove it, and these Plaintiffs have not. There is simply no evidence in this case establishing a basis for imputing vicarious liability to the Swiss Defendants for this drug sold in this country with this label. Because Plaintiffs cannot establish either a direct duty or a basis for imputing vicarious liability as to the Swiss Defendants, summary judgment is warranted.

### STATEMENT OF UNDISPUTED FACTS

Hoffmann-La Roche Inc. is a corporation organized and existing under the laws of New Jersey, with its principal place of business in Nutley, New Jersey. *See* Declaration of Gerald Bohm, Esq. ¶ 2, attached at Ex. A. Hoffmann-La Roche Inc. is a wholly-owned subsidiary of Roche Holdings, Inc., a Delaware company. *Id.* Roche Laboratories Inc. is a wholly-owned subsidiary of Hoffmann-La Roche Inc. *See* Declaration of Dr. Beat Krahenmann at ¶ 6, attached at Ex. B.

Roche Holding Ltd is a Swiss holding company with its principal place of business in Basel, Switzerland. *See* Certification of Peter Eisenring at ¶ 3, attached at Ex. C. Roche Holding Ltd does not engage in operating activities such as the formulation, design, manufacturing, labeling, promotion, marketing, distribution, sale or placement of Accutane, or any other product into the stream of commerce. *Id.* at ¶ 5.

F. Hoffmann-La Roche Ltd is a wholly owned subsidiary of Roche Holding Ltd. *Id.* at ¶ 4. The Swiss Defendants have separate corporate officers and Boards of Directors from the U.S. Defendants, which meet separately. *See* Declaration of Rene

Kissling, dated July 15, 2003 at ¶ 7, attached at Ex. D. The Swiss Defendants also maintain corporate records and financial and accounting books and records separately from the U.S. Defendants. *See* Kissling Decl. at ¶ 8. Neither of the Swiss Defendants pay the salaries or other day-to-day expenses of the U.S. Defendants and no director or employee of either Swiss Defendants is a signatory to any bank account of the U.S. Defendants. *See* Kissling Decl. at ¶¶ 8, 9.

Furthermore, neither of the Swiss Defendants are approved by the FDA to manufacture or market Accutane in the United States, and they do not in fact do so. *See* Kissling Decl. at ¶ 11. Rather, Accutane is exclusively sold, manufactured, packaged, and distributed by the U.S. Defendants. *See* Declaration of Martin Huber at ¶ 3, at Ex. E. Accutane's attendant labeling, treatment information, and product brochures were published and distributed exclusively by the U.S. Defendants. The U.S. Defendants have always maintained sole responsibility for reporting safety data to the FDA, and at all times U.S. local drug safety personnel have been responsible for reviewing case data for FDA submission, including the preparation of the requisite periodic reports. *See* Huber Dep. (Owensby, January 13, 2004), Ex. F at 100:10-13). The U.S. Accutane label has contained language regarding a possible association between Accutane and psychiatric disorders since 1984, and explicit warnings of the events alleged to be at issue in this case – psychosis, suicidal ideation, and suicide – since 1998. *See* Accutane Package Insert (1984 ed.), attached at Ex. G.; Accutane Package Insert (1998 ed.), attached at Ex. H.

Despite the enormous amount of discovery taken as to the Swiss Defendants, Plaintiffs' experts have not even been asked to proffer any opinions regarding purported duties, or breach thereof, of either of the Swiss Defendants. (Blume: 443:6-443:10 at Ex. I; Moshell: 327:1-9, at Ex. J).

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where, as here, the "pleadings, depositions, answers to interrogatories, and admissions on file, together, with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. 56(c); *Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir. 1995); *Phonometrics, Inc. v. Choice Hotelv In'l,* 117 F. Supp. 2d 1341, 1343 (S.D. Fla. 2000). A defendant is entitled to summary judgment when it demonstrates either that the plaintiff, after adequate time for discovery, failed to set forth evidence sufficient to establish an element of his claim, or by conclusively disproving any element of the plaintiff's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Fotenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir. 1986). Once the movant informs the court of the basis of its motion and identifies the parts of the record it believes show the absence of a genuine issue of material fact, the nonmovant has the burden of coming forward with evidence establishing each of the challenged elements of its case upon which he bears the burden of proof. *Celotex Corp.,* 477 U.S. at 323. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment .... if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Spence v.*

*Zirmmerman,* 873 F.2d 256, 257 (11th Cir. 1989) (emphasis deleted)(quoting *Anderson v. Liberty Lohhy, Inc.,* 477 U.S. 242, 247-48, 250-51 (1986)). Here, the case law and attendant factual record clearly establish that summary judgment is warranted in favor of the Swiss Defendants.

**ARGUMENT**

### I. THE SWISS DEFENDANTS HAD NO INDEPENDENT DUTY TO WARN ABOUT ACCUTANE'S ALLEGED RISKS[6]

#### A. *The FDA Regulatory Scheme*

A drug's labeling is deemed an integral component of the "drug." In other words, because the drug cannot be sold without the warnings, it is not possible to separate a pharmaceutical product itself (*e.g.,* the tablet) from its attendant packaging and labeling when analyzing a drug's approvability or continued utility. *See* 21 U.S.C.A. § 325. The FDA places the duty to demonstrate the safety and efficacy of a prescription drug, including the duty to provide adequate warnings about potential dangerous propensities, **exclusively** on the approved holder of the New Drug Application. *See* 21 U.S.C.A. § 355(a). It is undisputed that the U.S. Defendants – and not the Swiss Defendants – have acted as the exclusive FDA approved marketer of Accutane at all pertinent times.

In order to market a new drug in the United States, a drug manufacturer must obtain approval of both an Investigational New Drug application ("IND") followed by a New Drug Application ("NDA"). *See* 21 C.F.R. §§ 312 et seq., 314 et seq. As required by law, the Accutane IND was filed in 1973 by U.S. Defendant, Hoffmann-La Roche Inc.

---

[6] The PSC, in its response to the Swiss Defendants' Motion for Summary Judgment filed in the Track II IBD litigation, expressly conceded, "Plaintiff Does not Contend the Swiss Defendants are Liable Based on an Independent Duty to Warn." The Swiss Defendants raise these arguments herein in an abundance of caution, in the event the PSC attempts to take a contrary approach for this track of cases.

*See* 21 C.F.R. § 312.23(a)(1)(ix). Thereafter, the Accutane NDA was filed in 1981 by the U.S. Defendant, Hoffmann-La Roche Inc. *See* 21 C.F.R. §314.5(a)(5).[7] The NDA approval process can take years to accomplish requiring regular and continual contact between the NDA sponsor and the FDA. All discussions with, and submissions to, the FDA were facilitated and executed **exclusively** by the U.S. Defendants, as required by federal law. *See* 21 C.F.R. §314.102; Report of J. Paul Waymack, M.D., Sc.D. ¶ 11, at Ex. K.

The FDA-approved marketer must continuously provide updated post-approval data, including, but not limited to: a yearly summary of distribution data, labeling, clinical and preclinical data (21 C.F.R. § 314.81); submission of any advertising or promotional material (21 C.F.R. § 314.81(b)(3)); and periodic reporting of post-marketing adverse event drug experience reports (21 C.F.R. § 314.80). *See also,* 21 C.F.R. § 314.70 (governing supplements and other changes to an approved application). The duties placed upon the FDA-approved marketer extend beyond the geographic boundaries of the United States, and the manufacturer must submit both domestic and foreign reportable adverse event reports. To this end, FDA guidelines require pharmaceutical companies to "establish effective mechanisms to ensure rapid information transfer from their foreign affiliates." (Dept. Health & Human Services, FDA, Guidance for Industry: Guideline for Postmarketing Report of Adverse Drug Experiences (Mar.

---

[7] The NDA contains, in pertinent part, information relating to (1) the proposed labeling; (2) the pharmacologic class of the drug and a discussion of the scientific rationale for the drug; (3) the marketing history outside the United States; (4) chemistry, manufacturing, and controls; (5) nonclinical pharmacology and toxicology; (6) the human pharmacokinetics and bioavailability; (7) microbiology; (8) clinical data, including the results of statistical analyses of the clinical trials; and (9) a concluding discussion of the benefit and risk considerations related to the drug. 21 C.F.R. § 314.50(c)(2).

1992) p.4); *see also* 21 C.F.R. § 314.80(b)(stating that the manufacturer must "develop written procedures for the surveillance, receipt, evaluation, and reporting of post-marketing adverse drug experiences to the FDA.").

Significant penalties can be imposed on the FDA-approved marketer for failure to comply with the pertinent regulations in the post-approval setting, including the withdrawal of a drug from the market (which has never occurred as to Accutane). *See* 21 C.F.R. §§ 314.80(j), 314.81(d), 331(d); 333(a).

### B. *The Failure To Warn For An FDA Approved Pharmaceutical Product Does Not Extend Beyond the NDA Marketer*

Plaintiffs' lawsuit challenges the Accutane psychiatric warnings as inadequate. Central to resolving these claims is the question of what entity has the legal duty to provide adequate warnings for pharmaceuticals sold in the United States. For the Plaintiffs to maintain a viable claim against the Swiss Defendants, they must be able to demonstrate either (1) a direct duty to warn, or (2) a valid basis for imputing liability to the Swiss Defendants for the U.S. Defendants' warnings. In considering the issue of liability, this Court must begin with the presumption that the Swiss Defendants are distinct foreign corporations and separate legal entities from the U.S. Defendants. *See generally, United States v. Bestfoods,* 524 U.S. 51, 61;118 S.Ct. 1876 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation...is not liable for the acts of its subsidiaries...[T]he existence of the parent-subsidiary relationship under state corporate law is simply irrelevant to the issue of direct liability."); *First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 625, 103 S.Ct. 2591 (1983); *Dania Jai-Alai Palace, Inc. v. Sykes,*

450 So. 2d 1114 (Fla. 1984); *Abdel-Fattah v. Pepsico, Inc.,* 948 S.W.2d 381 (Tex. App.

Houston 14th Dist. 1997)(holding since the parent corporation generally has no duty to

control its subsidiaries, courts will not lightly disregard corporate fiction and hold the

parent corporation liable for torts of its subsidiaries).

The pharmaceutical industry is one of the most heavily regulated industries in the

United States. Cognizant of the nature of this industry – which allows for the marketing

of products in the United States only if specific and detailed rules and regulations are

complied with and FDA approval is obtained - courts have repeatedly declined to extend

liability in failure to warn cases to those other than the FDA-approved manufacturer. *See*

*White v. Weiner,* 562 A.2d 378, 385 (Pa. 1989)(holding that, in light of federal law,

requiring a separate warning from parties other than the final manufacturer would be

duplicative);[8] *see also Sokoloski v. American Home Products,* 2003 WL 1875113

(Pa.Com.Pl. 2003)("It is clear that a determination of manufacturers, distributors or

sellers status is critical under the FDA regulatory scheme, not just for the initial approval

of the drug, but also for the continuing monitoring of the safety and efficaciousness of the

drug."). The *Sokoloski* court noted that in light of this rigorous federal regulatory

scheme, once one company "has been determined to be the **exclusive** manufacturer,

distributor, and seller of the drug at issue, it follows *a priori* [another company] cannot be

identified as a manufacturer, distributor, or seller of the drug here at issue, and that it

---

[8] In *White,* the court reasoned:

"This general reluctance to expand tort liability within the distribution chain is consistent with our position that [i]t is illusory to believe the public does not pay for tort recoveries, or that resources for such are limitless. As it is with everything, a balance must be struck-certain limits drawn ... A sound and viable tort system-generally what we now have--is a valuable incident of our free society, but we must protect it from excess lest it becomes unworkable (*citing Steiner v. Bell Telephone Co.,* 358 Pa.Super. 505, 522, 517 A.2d 1348, 1357 (Tex. 1986) (en banc), *aff'd without opinion,* 518 Pa. 57, 540 A.2d 266 (1988))." *Id.* at 123- 124, 540 A.2d 266, 562 A.2d at 385.

must be precluded from the class of companies to be held liable for said manufacturing, distribution or sale of the drug." *Id.* at *6. (emphasis supplied).

Here, the Plaintiffs have sued the U.S. manufacturer with the acknowledged duty to provide adequate labeling and from whom any recovery would be appropriate. *See generally, In re TMJ Implants Products Liability Litigation*, 872 F. Supp. 1019 (D. Minn. Jan 17, 1995)(holding Defendant-supplier of materials used in TMJ implants did not have independent duty to warn where the "sophisticated purchaser" (the FDA approved medical device "manufacturer") had the duty to provide attendant warnings to the final product; where the "manufacturer" was required by FDA regulations to assure the safety of its product, it was reasonable for the supplier to rely on the manufacturer to provide the necessary warnings");[9] *see also, Shell Oil Co. v. Harrison,* 425 So. 2d 67, 70 (Fla. 1st DCA 1982, *rev. denied*, 436 So. 2d 98 (Fla. 1983)(declining to extend duty to warn beyond the product manufacturer; noting federal regulatory system provided for EPA approval and oversight of labeling, and labeling requirements would necessarily differ depending upon particular formulation). It is undisputed that the U.S. Defendants have held themselves out as the manufacturers of Accutane (as required under the governing federal regulatory scheme), and have in fact exclusively manufactured, distributed, and sold the drug in the United States at all pertinent times. *See Holman v. Ford Motor Company*, 239 So. 2d 40 (Fla. 1st DCA 1970)(noting final "manufacturer" cannot shirk its responsibility to stand behind its product by arguing a defective component was

---

[9] The court also noted that, "Defendants would be entitled to summary judgment in those cases in which the law of the following states applies: Alabama, Florida, Georgia, Illinois, Kansas, Louisiana, Ohio, Oregon, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, and Wisconsin. The courts of these states either have adopted or would follow these rules precluding a finding of liability."

manufactured by a supplier); *Favors v. Firestone Tire & Rubber Company,* 309 So. 2d 69 (Fla. 4th DCA 1975).

Limitations on liability hold especially true when considering the putative liability of non-manufacturer foreign corporations. *See generally, Clark v. Matsushita Elec. Indus. Co., Ltd.,* 811 F. Supp. 1061, 1069 (M.D.Pa. 1993)(dismissing Japanese parent corporation in products liability action concerning lantern marketed and distributed by the U.S. subsidiary); *AT&T Co. v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 591 (9th Cir. 1996)(dismissing case against former parent corporation of a company whose operations caused environmental contamination in California); *Jazini v. Nissan Motor Co.,* 148 F.3d 181, 185 (2d Cir.1998).

Through its comprehensive regulatory scheme the FDA recognizes <u>one entity</u> as the approved marketer of any drug, including Accutane. Should FDA have concerns regarding the labeling of a product, FDA has discussions with (and if necessary takes action against) the marketer. The inquiry ends there. FDA has full and final authority to take any actions against a marketer which it believes are warranted in order to ensure patient safety, including the authority to order a product withdrawn from the U.S. market. As there is only one approved marketer of a product, FDA shall have no doubt of the appropriate entity with which to engage in discussions, make suggestions, and take punitive actions when appropriate; physicians shall have no doubt of the appropriate resource to obtain information related to safety and efficacy to assist in their practice of medicine; and patients shall have no doubt of the appropriate target when they allege harm and seek redress under the law. The Swiss Defendants would submit the PSC

certainly does not have broader authority in these matters than the FDA; their (unfounded) complaints can and have been taken up with the FDA-approved marketer.

These Plaintiffs, and others, can seek and obtain full and complete redress from domestic drug companies in failure to warn cases under existing law. Accordingly, since the Plaintiffs have failed to provide any factual evidence or legal bases demonstrating that the Swiss Defendants had an independent duty to warn about the potential risks associated with Accutane, the Swiss Defendants cannot be held liable for a breach of this duty, and are, therefore, entitled to judgment as a matter of law.

**II. THERE IS NO BASIS FOR CREATING A NEW THEORY OF DIRECT LIABILITY OR FOR IMPUTING LIABILITY TO THE SWISS DEFENDANTS**

Plaintiffs seek to create a new theory of liability in this U.S. failure to warn case. Plaintiffs cannot cite to any law to support this contention, and there is no justification for expanding putative direct liability for alleged deficiencies in the FDA-approved labeling for Accutane beyond the entity that has manufactured the drug, submitted its labeling, and has been and continues to be ultimately responsible for the product.

Some facts are beyond dispute: F. Hoffmann-La Roche Ltd plays a role in cataloguing basic scientific and medical information relating to Roche products, including Roaccutane/Accutane, as memorialized in the Core Data Sheet. This centralization and collaboration is not only necessary to ensure compliance by the U.S. manufacturer with the U.S. regulations (*See, e.g.,* 21 C.F.R. 314.80 et. seq.), but also plays an important role in ensuring worldwide public safety, including that of patients in the United States. *See generally, F. Hoffman-La Roche Ltd. v. Superior Court of Santa Clara County,* 130 Cal. App. 4th 782, 800 (Court Cal. App. 6 Dist.

2005)("Pharmaceutical companies worldwide operate within governmental regulatory schemes for the benefit and protection of the public health and welfare"...[and recognizing] the U.S. Roche defendants, in cooperation with other Roche-affiliated entities worldwide, established a global and centralized drug safety reporting system 'to ensure optimal compliance with...today's regulatory requirements.'")(cit. omit.). Multinational affiliated pharmaceutical companies should be encouraged to centralize and coordinate drug safety efforts, and this general oversight and cooperation should not result in the creation of a new legal duty of these companies, including the Swiss Defendants. *See generally U.S. v. Bestfoods,* 524 U.S. at 67 (noting, for purposes of determining purported direct liability of parent corporation under CERCLA for clean up of a chemical facility, "[t]he question is not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary.").

In the past four years, PSC has done essentially nothing to attempt to establish any basis, factual or legal, for extending liability to the Swiss in this U.S. failure to warn case. The Plaintiffs have disclosed four experts in this cases: Dr. Douglas J. Bremner (general causation), Dr. Steven Billick (specific causation – psychiatric), Dr. Alan Moshell (labeling adequacy), Cheryl Blume, PhD. (regulatory activities[10]). The opinions of Dr. Bremner and Dr. Billick deal solely with whether Accutane can and/or did "cause"

---

[10] Cheryl Blume, PhD describes her role in these cases as providing opinions relating to the adequacy of the ongoing regulatory activities conducted with respect to Accutane and the emergence of various psychiatric-related adverse events. (Report of Cheryl Blume, PhD @ p.8) Although Dr. Blume has offered numerous opinions in the field of drug safety/pharmacovigilence, the Defendants would contend she is not qualified to render those opinions and have filed a *Daubert* brief on those and other points. In any event, Dr. Blume has not considered any issues – relating to regulatory activities, pharmacovigilence, or any other matters – as they relate to the purported duties of the Swiss Defendants, as alleged in Plaintiffs' First Amended Complaint.

Charles Bishop's death by suicide, and, inherently, those "scientific" opinions make no distinction between the various Defendants. Dr. Moshell and Dr. Blume, whose opinions go to the heart of the liability determinations in this failure to warn case, *i.e.,* what duties existed vis-à-vis product labeling and whether those duties were breached, have **no opinions** relating to the Swiss Defendants. Testimony elicited at Dr. Blume's December, 2006 deposition[11] – over four (4) years after the filing of the first of these lawsuits - could not be more telling as to the absolute dearth of any evidence that the Swiss Defendants have any *duty* vis-à-vis U.S. labeling, either as an abstract legal matter or as applied to the facts of these cases:

- Dr. Blume could not identify the number of Swiss Defendants, or properly identify them. (418:7-419:6)

- Dr. Blume did not know who was responsible for monitoring safety aspects of Accutane/Roaccutane. (422:8-423:1)

- Dr. Blume did not know what role the Swiss entities played in the marketing of Accutane in the U.S. (423:12-423:16)

- Dr. Blume did not know what entity or department was responsible for drafting the Core Data Sheet. (425:3-425:7)

- Dr. Blume had heard that Swiss depositions had been "attempted." She could not answer whether she had reviewed the testimony of any Swiss employees in forming her opinions. (439:22-441:8). None were identified in her report. *See* Report of Cheryl D.

- Blume, Ph.D., at Ex. L.

- Dr. Blume did not know if the Swiss entities report directly to the FDA. (441:9 to 441:13)

---

[11] Dr. Blume's November 17, 2006 deposition in the psychiatric track was improperly terminated by counsel and the Court granted Defendants' request for additional time. Dr. Blume was subsequently deposed in the IBD track, at which time counsel was provided an opportunity to ask Dr. Blume general (i.e. non-IBD specific) questions as to the scope of her retention and attendant opinions. Dr. Blume did not refute this testimony at the continuation of her psychiatric-track deposition.

- **Dr. Blume had not been asked to provide any distinct opinions as to the Swiss entities. (443:6-443:10)**, Ex. I.

Similarly, **Dr. Moshell testified that he had not been asked to render any opinions as to the Swiss Defendants.** (327:1-9), attached at Ex. J.

Additional testimony of Swiss witnesses reveals no evidence of *actual* Swiss involvement – certainly nothing rising to a level that could be defined of as "control" – in regards to Accutane's U.S. labeling. Dr. Surendra Gokhale, a manager in the Drug Regulatory Affairs Department for F. Hoffmann-La Roche Ltd with former "global" responsibility for Roaccutane, testified that compliance with local regulatory requirements, including those relating to adverse event reporting and current/proposed labeling, are the duty of the local affiliate, not the Swiss:

- If there is a serious adverse event, there's a certain reporting procedure that this information needs to be reported to the authorities in certain time, and I get information to be submitted to the affiliates so that they, in turn, inform the health authorities. Gokhale Dep., Ex. M at 58:23-59:5.

  - Q: Did you ever communicate directly, that is on your signature, with the FDA concerning Accutane?
  - A: No, that's not part of my responsibility.
  - Q: That would be done by the U.S. affiliate, right?
  - A: That's correct. Gokhale Dep., Ex. M at 84:22-85:3

- The global team would be the contact person and the negotiations with the affiliates for the information exchange happens with the global team if there is a need the information, but it's the responsibility of the local Roche affiliate for their label. Gokhale Dep., Ex. M at 93:7-93:15.

- The Core Data Sheet is the company position, but [Roche] tries to put the language such in a way that this can be used by [their] affiliates to create their local label which is required for the local submissions. Gokhale Dep., Ex. M at 48:19-48:24.

*See also,* testimony of Dr. Bart Vanhauwere, Former Head of Medical Evaluation Group for F. Hoffmann-La Roche Ltd: "labeling in the United States is handled by the regulatory by Roche United States." Vanhauwere Dep., Ex. N at 96:2-96:3.

The U.S. affiliates are responsible for the initial collection and reporting of adverse events to the FDA, including the preparation of the requisite periodic reports. *See* Huber Dep. (Owensby, January 13, 2004), Ex. F at 100:10-13) The U.S. Defendants have operated with autonomy in the marketing of Accutane including the provision of product information support to prescribers, and there is no evidence the Swiss Defendants have exerted any control over the sale or distribution of Accutane in the United States. *See* testimony of Ulf Wiegand, PhD., Roaccutane International Medical Manager for F. Hoffmann-La Roche Ltd: (medical inquiries from the U.S. were handled by U.S. physicians; he did not have an interest in the "business" end of Accutane sales in the United States.) (Wiegand Dep., Ex. O at 62:23-63:16).

The Plaintiffs artfully attempt to conflate the Swiss Defendants' role in developing the company's Core Data Sheet – defined at times as its core medical opinion on the efficacy/safety profile of its products – and the U.S. Defendants' role in developing the U.S. market's proposed labeling. Because Roche affiliates market products in more than seventy (70) countries, a "Core Data Sheet" is created to provide one uniform medical opinion regarding the basic safety and efficacy attributes of its products. The Core Data Sheet is not a Roche construct, but rather a document designed by the International Conference on Harmonization ("ICH"), whose usage has been encouraged by FDA for all U.S. pharmaceutical companies to assist in the reporting of

labeled and unlabeled adverse events. *See* Safety Reporting Requirements for Human Drug and Biological Products, Proposed Rules, 68 Fed. Reg. 12,406, 12,422 (Mar. 14, 2003)(proposing amendments to 21 CFR § 314.80(a)). The Core Data Sheet operates in practice at the local level as the starting point for discussions between the local affiliate and its governing health authority as to the contents of an appropriate local label, which is to be drafted in light of prevailing environmental factors such as local patient population and prescribing practices, particularized geographic or societal cofounders, colloquial grammar, and (ultimately) the health authority's opinions as to approvable labeling.

**It cannot tenably be asserted that the pertinent U.S. labeling under which Charles Bishop was prescribed Accutane was "controlled" by the Swiss Defendants.** Psychiatric warnings in the United States have been the subject of considerable discussion between the FDA and the U.S. Defendants, and the pertinent U.S. labeling contained language specifically dictated and approved by FDA. *See generally* U.S. Defendants' Motion For Summary Judgment Due To Federal Preemption. U.S. prescribers (and patients such as Charles Bishop) were provided considerably more information relating to purported psychiatric risks than that set forth in the Core Data Sheet, or in other countries' local labels:

The Core Data Sheet included PRECAUTIONS stating that depression, psychotic symptoms, and rarely suicide attempts "ha[d] been **reported**" in patients treated with Roaccutane, and that **a causal relationship "ha[d] not been established**." (Core Data Sheet version 1.2, May 18, 2000)(emphasis supplied).

United States prescribers (and patients) were provided considerably more expansive warning, which included language – dictated by FDA – that Accutane "<u>may cause</u>" psychiatric adverse events.

Specifically, the 2000 Accutane U.S. label stated in bold print that:

- **Accutane may cause depression, psychosis and, rarely, suicidal ideation, suicide attempts and suicide.** Discontinuation of Accutane therapy may be insufficient; further evaluation may be necessary. No mechanism of action has been established for these events.

Additionally, the U.S. Defendants, in conjunction with the FDA, distributed supplemental materials to patients, containing additional warnings about the potential psychiatric risks associated with Accutane. Beginning in January 2001, the U.S. Defendants and the FDA implemented an Informed Consent/Patient Agreement to be used by prescribing physicians and a Medication Guide to be distributed by pharmacists with each Accutane prescription. The Informed Consent/Patient Agreement contained numbered paragraphs that the patient had to initial, including the following:

> **Do not sign this agreement if there is anything that you do not understand about all the information you have gotten about using Accutane ....**
>
> 4.     I understand that some patients, while taking Accutane or soon after stopping Accutane, have become depressed or developed other serious mental problems. Signs of these problems include feelings of sadness, irritability, unusual tiredness, trouble concentrating, and loss of appetite. Some patients taking Accutane have had thoughts about hurting themselves or putting an end to their own lives (suicidal thoughts). Some people tried to end their own lives. And some people have ended their own lives. There were reports that some of these people did not appear depressed. No one knows if Accutane caused these behaviors or if they would have happened even if the person did not take Accutane. Some people have had other signs of depression while taking Accutane (see # 7 below).

Initials: ____

5.    Before I start taking Accutane, I agree to tell my
health care provider if, to the best of my knowledge, I have
ever had symptoms of depression (see #7 below), been
psychotic, attempted suicide, had any other mental
problems, or take medicine for any of these problems.
Being psychotic means having a loss of contact with
reality, such as hearing voices or seeing things that are not
there.

6.    Before I start taking Accutane, I agree to tell my
health care provider it, to the best of my knowledge,
anyone in my family has ever had symptoms of depression,
been psychotic, attempted suicide, or had any other serious
mental problems.

7.    Once I start taking Accutane, I agree to stop using
Accutane and tell my provider right away if any of the
following happen. I:

- start to feel sad or have crying spells

- lose interest in my usual activities

- have changes in my normal sleep patterns

- become more irritable than usual

- lose my appetite

- become unusually tired

- have trouble concentrating

-  withdraw from family and friends

- start having thoughts about hurting yourself/myself
  or taking your/my own life (suicidal thoughts)

Initials: ____

A parent or guardian was also required to sign the Informed Consent/Patient

Agreement if the patient was a minor.  *See* Declaration of Eileen Enny Leach at ¶ 13,

attached at Ex. P. <u>This Informed Consent/Patient Agreement form was completed by both Charles Bishop and, his mother, Julia Bishop.</u> The Medication Guide, which was issued at the same time as the Informed Consent/Patient Agreement, also included an entire section about "mental problems and suicide" under "most important information I should know about Accutane." *See* Leach Decl. ¶ 14, Ex. P.[12]

In conjunction with the January 2001 implementation of the Informed Consent/Patient Agreement and Medication Guide, the U.S. Defendants prepared a "Dear Health Care Provider" letter which alerted health care providers and pharmacists to these new communications materials.

---

[12] The text of this section reads in pertinent part:

**What is the most important information I should know about Accutane? ... Possible serious side effects of taking Accutane include *birth defects* and *mental disorders* ...**

**Mental problems and suicide.** Some patients, while taking Accutane or soon after stopping Accutane, have become depressed or developed other serious mental problems. Signs of these problems include feelings of sadness, irritability, unusual tiredness, trouble concentrating, and loss of appetite. Some patients taking Accutane have had thoughts about hurting themselves or putting an end to their own lives (suicidal thoughts). Some people tried to end their own lives. And some people have ended their own lives. There were reports that some of these people did not appear depressed. No one knows if Accutane caused these behaviors or if they would have happened even if the person did not take Accutane.

*All patients should read the section of the Medication Guide "What are the signs of mental problems?"*

**What are the signs of mental problems?**

Tell your provider if, to the best of your knowledge, you or someone in your family has ever had any mental illness, including depression, suicidal behavior, or psychosis. Psychosis means a loss of contact with reality, such as hearing voices or seeing things that are not there. Also, tell your provider if you take medicines for any of these problems. *See* Leach Decl. at ¶ 14, Ex. P.

There is simply record no evidence that the various U.S. labeling materials in place at the time Charles Bishop was prescribed and dispensed Accutane, were in any way influenced or otherwise "controlled" by the Swiss Defendants, through the Core Data Sheet or any other process.

## A. No Record Evidence Exists To Support The Imputation Of Liability To The Swiss Defendants

Whatever term of art is employed in the analysis – mere instrumentality, alter ego, agency – these theories of vicarious liability are all fundamentally founded on the concept of control, and specifically, for liability purposes, the actual exercise of control rising to the level of dominion. There is simply no record evidence of the actual exercise of operational control by these Defendants as to the issues germane to this case – a case involving allegations that Accutane was distributed in the United States with an attendant label which failed to adequately warn physicians of risks related to psychiatric disorders.[13]

Summary judgment in favor of a "parent" corporation faced with allegations of imputed liability is appropriate under Florida law where the plaintiff cannot establish all of the necessary bases for piercing the corporate veil. *See e.g., Cook v. Smith*, 2006 WL 580991 at *2 (M.D. Fla. 2006); *see also Mason v. E. Speer & Associates, Inc.,* 846 So.2d 529, 533-34 (Fla. 4th DCA 2003); *French v. F.F.O. Financial Group, Inc.,* 651 So.2d 727 (Fla. 1st DCA 1995). The propriety of summary disposition where veil piercing

---

[13] The Swiss Defendants would note that Plaintiff's regulatory/pharmacovigilence expert Cheryl Blume, PhD, provided non-specific testimony regarding the purported "overpromotion" of Accutane in the United States, though she did not have any knowledge as to whether such "overpromotion" had any link to a particular health care treater's decision to prescribe Accutane. In any event, the Swiss Defendants play no role in the sales/marketing of Accutane in the United States.

allegations are at issue, and unfounded, is widely recognized in federal and state courts. *See e.g., Smith v. United Recovery, Inc.*, 2007 WL 869065 (C.A.4 (W.Va.))(granting summary judgment for defendant parent/sister companies where plaintiff failed to establish the requisite degree of control); *International Union, UAW v. Aguirre*, 410 F.3d 297, 303 (6th Cir. 2005)(granting summary judgment where "plaintiffs have failed to show a genuine issue of material fact as to any of the three veil-piercing factors"); *Potash v. Port Authority of New York and New Jersey*, 279 A.D.2d 562, 563 (2d Dept. 2001)(granting defendants' motion for summary judgment which plaintiff failed to oppose with any evidence raising triable issue as to whether parent corporation so dominated subsidiary corporation as to warrant piecing subsidiary's corporate veil); *Katz v. N.Y. Tint Taxi Corp.*, 213 A.D.2d 599, 600 (N.Y.A.D. 1995) (granting summary judgment in favor of defendant sole owner and shareholder of co-defendant corporation where plaintiff failed to meet burden of establishing any basis for piercing corporate veil); *Sovereign Metal Corporation v. Ciraco*, 210 A.D.2d 75, 76 (N.Y.A.D. 1 Dept. 1994) (granting of summary judgment in favor of defendant parent corporation where nothing in plaintiff's pleadings or motion papers addressed necessary elements to pierce corporate veil). Courts are incredibly reluctant to pierce the corporate veil and will do so only under rare circumstances. *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003) (holding that the doctrine of piercing the corporate veil is the rare exception, applied in the case of fraud or certain other exceptional circumstances).

Furthermore, it is well established that under Florida law, a parent corporation will not be held liable for the actions of its subsidiary unless the plaintiff can establish <u>all</u>

of the elements necessary to pierce the corporate veil. *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114. In order to pierce the corporate veil, the Plaintiffs **must** establish **all** of the following: (1) fraud or wrongdoing committed by the parent through its subsidiary, (2) unjust loss or injury to a claimant, such as when the subsidiary is insolvent, <u>and</u> (3) control of the parent over the subsidiary to the degree that the subsidiary is deemed to be a "mere instrumentality" of the parent. *American Intern. Group, Inc. v. Cornerstone Businesses, Inc.*, 872 So. 2d 333, 337 (Fla. 2d DCA 2004)(quoting *Unijax Inc. v. Factory Insurance Association*, 328 So. 2d 448, 454 (Fla. 1st DCA 1976)). Plaintiffs have failed to meet this burden as to either of the Swiss Defendants.

### i. There Is Absolutely No Record Evidence That The Swiss Defendants Have Committed Fraud or Wrongdoing Through the U.S. Defendants

In order to pierce the corporate veil and impute liability to the Swiss Defendants under Florida law, Plaintiffs must establish that the subsidiary corporation was established for an <u>improper purpose</u>. *See Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114; *American Int'l Group, Inc.*, 872 So.2d 333 at 337 (citing *Federated Title Ins., Inc. v. Ward*, 538 So.2d 890, 891 (Fla. 4th DCA 1989)). Here, there can be no tenable argument that either of the U.S. Defendants was established for an improper purpose, or that the Swiss Defendants have committed fraud or wrongdoing through the U.S. Defendants which would justify disregarding the corporate structure of these entities. *See e.g., Hilton Oil Transp. v. Oil Transp. Co.*, 659 So. 2d 1141 (Fla. 3d DCA 1995)(holding despite the fact that (1) the wholly owned corporation did not observe corporate formalities; (2) the corporation had no capitalization; (3) the sole shareholder exercised

complete control over the corporation's board of directors, the corporate veil could not be pierced because claimant did not show corporation "was either organized for or being used as an instrument for fraudulent, illegal, or improper purposes."); *In re Hillsborough Holdings Corp.,* 166 B.R. 461 (Bankr. M.D. Fla. 1994)(improper conduct warranting piercing of corporate veil must be deliberate misconduct); *see also F. Hoffmann,* 130 Cal. App. 4th at 804 (noting there is "[no evidence] that the global Roche corporate structure is designed or conducted through trickery or deception.").

In this case, the undisputed record evidence establishes that the U.S. Defendants exist as fully capitalized pharmaceutical companies responsible for marketing pharmaceutical products – under FDA approval – in the United States, and, therefore, no argument of improper purpose has been, or could be, asserted on these facts.

### ii. Piercing The Corporate Veil Would Not Serve To Prevent Unjust Loss Or Injury To Plaintiffs

In addition to the above, Florida law requires Plaintiffs to demonstrate an unjust loss or injury in order to pierce the corporate veil. *See USA Interactive v. Dow Lohnes & Albertson, P.L.L.C.,* 328 F.Supp.2d 1294, 1310 (M.D. Fla. 2004). For example, Plaintiffs would have to demonstrate that the U.S. Defendants are insolvent and that piercing the corporate veil is necessary to prevent unjust loss or injury. *See American Intern. Group, Inc.,* 872 So. 2d at 337. Again, Plaintiffs have not even alleged, much less put on evidence, that dismissal of the Swiss Defendants (which is mandated for the numerous reasons, both in law and policy, discussed *supra*) would effect an unjust enrichment. To the extent this prong focuses on equity and policy concerns, equity overwhelmingly

favors dismissal of the non-manufacturer Swiss Defendants from this U.S. failure to warn case.

The entry of judgment in favor of the Swiss Defendants in no way affects the Plaintiffs in the prosecution of this U.S. failure to warn case. Plaintiffs are fully capable of seeking redress from the United States manufacturer and distributor of Accutane. Plaintiffs' inability to put forward any record evidence that they would suffer undue loss or injury is fatal to their attempt to impute liability to the Swiss Defendants.

### iii. *The Domestic Defendants Are Not The Mere Instrumentalities/Alter Egos or Agents Of The Swiss Defendants For Liability Purposes*

The Plaintiffs have failed to put forth sufficient record evidence to support the claim in pleading that the U.S. Defendants are the mere instrumentality, alter ego, or agent of the Swiss Defendants. *See Cook v. Smith,* 2006 WL 580991 at *2 ("No liability attaches to the parent for the wrongful conduct of the subsidiary unless the parent exercises control to the extent that the subsidiary exists as the parent's mere agent or instrumentality."); *see also, Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc.,* 262 F.Supp.2d 1334, 1359 (S.D. Fla. 1999)(quoting *Federated Title Insurers, Inc. v. Ward,* 538 So. 2d 890, 891); *Unijax,* 328 So. 2d 448. These various theories, however denoted, rest on the fundamental element of control. *See generally, Sonora Diamond Corp. v. Superior Court,* 83 Cal. App. 4th 523, 540-42 (Cal.App. 5 Dist. 2000) (noting although alter ego and agency are two separate concepts, both focus on control; whereas alter ego disregards the subsidiary's corporate form, agency does not but instead focuses on whether the subsidiary "is only a means through which the parent acts" [and does not include consideration of wrongdoing or injustice]; control is the key

characteristic of the agent/principal relationship and as a practical matter, the parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's *day-to-day* operations in carrying out that policy); *see also Calvert v. Huckins*, 875 F.Supp. 674, 679 (E.D.Cal.1995); *Rollins Burdick Hunter of So. Cal., Inc. v. Alexander & Alexander Servs., Inc., supra*, 206 Cal.App.3d at p. 9, 253 Cal.Rptr. 338 (Cal.App. 2 Dist. 1988); *American Intern. Airways v. Kitty Hawk Group*, 834 F.Supp. 222, 225 (E.D.Mich.1993); *Bellomo v. Pennsylvania Life Co.*, 488 F.Supp. 744,745 (D.C.N.Y.1980). Evidence of actual control, sufficient to satisfy any of these similar theories, is clearly lacking on this now developed record.

In order to pierce the corporate veil under Florida law, Plaintiffs must establish the subsidiary is a "mere instrumentality" of the parent. Florida courts have repeatedly noted that a mere instrumentality finding is "rare." *Eclipse Medical, Inc.*, 262 F.Supp.2d at 1359 (quoting *Federated Title Insurers, Inc.*, 538 So. 2d at 891); *American Intern. Group, Inc.*, 872 So.2d at 337; *Unijax.*, 328 So.2d at 453-54; *see also Brown v. Margrande Compania Naviera, S. A.*, 281 F.Supp. 1004, 1005-1006 (D.C.Va.1968) (liability rarely attaches to a parent and indiscriminate use of the "mere instrumentality" rule destroys the purpose of corporate law). This requires a showing that a parent exhibited "more than a high degree of control" over the subsidiary. *USA Interactive v. Dow Lohnes & Albertson, P.L.L.C.*, 328 F.Supp.2d 1294, 1311; *Dole Food Co. v. Patrickson*, 538 U.S. 468; *see also, United States v. Bestfoods*, 524 U.S. at 61-62. There must be evidence demonstrating: (1) 'direct intervention' in the subsidiary's affairs

(*Kingston Dry Dock Co. v. Lake Champlain Transportation Co.,* 31 F.2d 265, 267 (2nd

Cir. 1929)); (2) the 'act of operation' of the subsidiary's business (*Berkey v. Third Avenue*

*Ry. Co.,* 244 N.Y. 84, 155 N.E. 58, 61 (N.Y. 1926)); or (3) the actual exercise of control,

**not the mere opportunity to exercise control** (*Brown v. Margrande Compania Naviera,*

supra, at 1006).

Likewise, Florida applies agency for <u>liability purposes</u>[14] only where the parent

exercises control over its subsidiary to the extent that the subsidiary manifests <u>no separate</u>

<u>corporate interests</u> of its own, and functions <u>solely to achieve the purposes of the parent</u>

corporation. *MeterLogic, Inc. v. Copier Solutions, Inc.,* 126 F. Supp. 2d 1346 (S.D. Fla.

2000); *Keys Jeep Eagle, Inc. v. Chrysler Corp.,* 897 F. Supp. 1437 (S.D. Fla. 1995). It is

axiomatic that imputation of liability must be premised upon "the [actual] exercise of

control, not the [mere] opportunity to exercise control." *Unijax,* 328 So. 2d at 454 (citing

*Brown v. Margrande Compania Naviera,* supra, at 1006).

Here, the summary judgment record lacks the sufficient evidence to demonstrate

that the Swiss Defendants in fact exerted <u>the requisite control</u> over the sale or labeling of

Accutane in the United States, especially as it relates to psychiatric warnings. As

previously stated, Roche Holding is not an operational company, and is merely a passive

holding company whose business consists solely of holding shares in other companies. It

---

[14] The Swiss Defendants are cognizant of the fact that this Court made certain determinations about the agency relationship between the Swiss Defendants and the U.S. Defendants for the purposes of establishing jurisdiction. DE 186. However, as discussed *supra,* the Swiss Defendants would respectfully submit that a different standard is to be employed – on a now fully developed record – at the summary judgment stage. . *See, e.g., Daimler-Benz Aktiengesellschaf,* 21 S.W.3d 707, 721; *see also Dorfman,* 2002 WL 14363 at *11 n.13. This Court recognized the inherently different standards employed when analyzing a motion to dismiss and a motion for summary judgment when it expressly declined to convert the motion to dismiss to a motion for summary judgment and, instead, held that the Swiss Defendants could reargue these defenses at a later date. DE 186 at 13.

does not exert **any** control over the U.S. Defendants, let alone the degree of control necessary under Florida law to create an agency-type relationship. *See generally Unijax,* 328 So.2d at 454 (citing *St. Petersburg Sheraton Corp. v. Stuart,* 242 So.2d 185 (Fla. 2d DCA 1970)(mere ownership is not a sufficient basis to justify disregarding the corporate structure); *Banegas v. United Brands Co.,* 663 F.Supp. 198, 201 (D.S.C. 1986) ("Ownership by one corporation of the stock in another corporation, either directly or through a subsidiary, is simply not a sufficient legal basis, in and of itself, to disregard corporate entities."). *Berger v. Columbia Broadcasting System, Inc.,* 453 F.2d 991 (5th Cir.1972), ("[T]o justify judicial derogation of the separateness of a corporate creature, an aggrieved party must prove something more than a parent's mere ownership of a majority or even all of the capital stock and the parent's use of its power as an incident of its stock ownership to elect officers and directors of the subsidiary.").

Although F. Hoffmann fully acknowledges a significant degree of coordination and cooperation as to certain drug safety matters, this type of routine coordination cannot, as a matter of law, equate to operational control sufficient to maintain a cause of action against F. Hoffmann under an agency-type theory in connection with this U.S. failure to warn case. The U.S. Defendants operate with a high degree of autonomy as to the final manufacture, sale, and distribution of Accutane in the United States. The summary judgment record demonstrates that the U.S. Defendants are exclusively responsible for (legally) and in fact carry out the reporting of adverse events to the FDA.[15] The U.S.

---

[15] The U.S. Defendants maintain Standard Operating Procedures for the handling of drug safety information. *See e.g.* Local Drug Safety Standard Operating Procedures, ACC 508-518; ACC 536-589; ACC 591-602; ACC 620-635; ACC 697-714; ACC 717-720; ACC 768-831; ACC 843-860; ACC 893-

Defendants (in collaboration with the FDA) have exclusively crafted the pertinent local Accutane labeling. No facts have been developed that indicate that the Swiss Defendants have a "veto" power over U.S. labeling, and Plaintiffs' allegations to the contrary have turned out to be baseless as to this product in this country with this label.[16]

At bottom, the U.S. Defendants exercise broad discretion and market products (including Accutane) in a manner they see fit to comply with the governing regulatory scheme, and not in the blind pursuit of the singular interests of the Swiss Defendants. *See also F. Hoffman-La Roche,* 130 Cal. App. 4th at 803 ("It likewise appears that the operational activities of neither U.S. Roche defendant were in furtherance of F. Hoffman's [sic] business, but rather each of them advanced its own pharmaceutical business . . ."). Plaintiffs' allegations of "control" in the abstract simply do not withstand scrutiny when tested by the full discovery record. Plaintiffs cannot establish this or any other basis for imputing liability to the Swiss Defendants.

### III. SUMMARY JUDGMENT SHOULD BE ENTERED AS TO ROCHE HOLDING LTD AS IT HAS NO INVOLVEMENT IN THE MANUFACTURE OR SALE OF ACCUTANE AND MERE OWNERSHIP IS INSUFFICIENT TO IMPUTE LIABILITY

As set forth above, Plaintiffs have put forward no actual case of direct or vicarious liability as to the either of the Swiss Defendants in this U.S. failure to warn case. To the extent Plaintiffs' allegations can be construed as an argument that Roche

---

1076; ACC 1264-1290; ACC 1332-1333; ACC 1334-1354; ACC 1426-1469; ACC 1471-1490; ACC 1491-1495; ACC 1496-1500; ACC 1532-1916; ACC 1917-2305.

[16] This Court previously noted testimony attributable to Dr. Huber that the Drug Safety Committee could exercise "veto" power on medical and scientific issues. (See Order DE 198 @ p.6) Two points of clarification: (1) Dr. Huber's testimony was in response to questioning as to whether business had input into labeling (i.e. safety could override business concerns)[*See* Ex. F at 321:22-322:9], and (2) there is absolutely *no record evidence* that the Drug Safety Committee – or any other organ of the Swiss Defendants – has ever exercised any "veto" power relating to U.S. labeling of Accutane, ever.

Holding bears vicarious liability premised on its mere ownership of the U.S. Defendants, those arguments are facially deficient, and Roche Holding is entitled to judgment as a matter of law. *See Unijax.,* 328 So.2d at 454 (citing *St. Petersburg Sheraton Corp. v. Stuart,* 242 So.2d 185) (holding that mere ownership is not a sufficient basis to justify disregarding the corporate structure).

Roche Holding Ltd is a holding company whose business consists of holding shares in its subsidiaries. *See* Eisenring Cert. ¶ 3; Ex. C. Roche Holding Ltd has no involvement in any scientific, regulatory, or drug safety operations or decisions relating to Accutane. *See* Eisenring Cert. at ¶¶ 5-10. Roche Holding Ltd does not manufacture, process, distribute, or market Accutane, or any ingredient thereof, or otherwise place it into the stream of commerce. *Id.* ¶¶ 11, 16. Roche Holding Ltd does *not* make decisions regarding Accutane® drug safety, science, or regulatory compliance; and does *not* make personnel, marketing, and/or management decisions for or on behalf of either Hoffmann-La Roche Inc. or Roche Laboratories Inc. *Id.* ¶¶ 6-11, 16, 22.

Certainly, Roche Holding should not be penalized for engaging in investment activities – that is what holding companies do, as noted by a California appellate Court faced with essentially the same arguments asserted by these Plaintiffs:

> With respect to Roche Holding, there was no evidence that this entity is, or conducts itself as, anything other than a true passive holding company that globally invests in pharmaceutical subsidiaries, including the two U.S. Roche defendants here, with no exercise of operational control whatsoever over these subsidiaries. Ownership or control of a subsidiary by a parent corporation, without more, is insufficient to subject the parent to jurisdiction in the state where the subsidiary does business. (*Cannon Mfg. Co. v. Cudahy Co.* (1925) 267 U.S. 333, 336, 45 S.Ct. 250, 69 L.Ed. 634; *Sonora, supra,* 83 Cal.App.4th at pp. 540-541, 99 Cal.Rptr.2d 824.) Where, as here, the evidence establishes that the business of the foreign holding company is mere passive investment, the exercise

of jurisdiction based on a theory of agency is wholly improper. (*Sonora, supra,* 83 Cal.App.4th at p. 543, 99 Cal.Rptr.2d 824.) Thus, the trial court erred with respect to its exercise of jurisdiction over Roche Holding because Wertheimers did not meet their burden of proving that this entity is other than a passive parent holding company, which merely invests in pharmaceutical subsidiaries and exercises the normal and expected incidents of ownership such as the setting of general and executive corporate policy. *F. Hoffman-La Roche,* 130 Cal.App.4th at 801-802.

As Plaintiffs cannot come forward with any evidence indicating that <u>Roche Holding Ltd</u> either (1) had direct involvement with the manufacture, sale, or labeling of Accutane, or (2) exerted any modicum of control over the Domestic Defendants, Roche Holding Ltd is entitled to summary judgment. *See e.g., Joiner v. Ryder System Inc.,* 966 F.Supp. 1478 (C.D. Ill. 1996)(holding that even where the holding company exerted "general" control over its subsidiaries by approving their budgets and major capital expenditures, adopting general and long-term strategic policies, and establishing a Task Force to improve safety, et cetera, it was nevertheless improper to pierce the corporate veil as there was no evidence that the holding company interfered with the day-to-day management or operations of any of the subsidiaries).

<u>CONCLUSION</u>

Plaintiffs effectively ask this Court to create new substantive law as to the liability standards for foreign affiliates of domestic pharmaceutical companies. The Swiss Defendants' respectfully submit that such extension is not warranted in this case based on these facts. Basing such an extension of liability on a nonexistent legal theory risks discouraging efforts to ensure coordination, consistency and accuracy in worldwide safety evaluation. As noted by the Court in *F. Hoffmann,* extension of liability beyond the current state of the law in U.S. failure to warn cases would "lead to balkanization of

drug safety data, thereby reducing their completeness, accuracy, and consistency, and the speed and efficacy with which the data becomes available to drug regulators around the world. There are sound policy reasons for the encouragement, rather than penalization, of worldwide, coordinated efforts by global drug companies to gather and report as much accurate information as possible concerning drug safety." *Id.* at 805. There is no justification on the now fully-developed summary judgment record for attributing either direct or imputed liability to the Swiss Defendants in this U.S. failure to warn case. Plaintiff cannot maintain any of the causes of action purportedly alleged in the Complaint, whether sounding in negligence, strict liability, design defect, breach of warranty,[17] or misrepresentation, and, accordingly, the Swiss Defendants are entitled to entry of judgment as a matter of law.

---

[17] The Swiss Defendants adopt and incorporate the U.S. Defendants' argument that Plaintiff lacks privity to bring claims for breach of any express or implied warranties. *See, e.g., Kramer v. Piper Aircraft Corp.*, 520 So.2d 37 (Fla. 1988). These arguments hold doubly true as the "warranties" in question (i.e. the U.S. labeling) are those of the U.S., and not the Swiss, Defendants.

I HEREBY CERTIFY that on May 15, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

WICKER, SMITH, O'HARA, MCCOY,
GRAHAM & FORD, P.A.
Attorney for F. Hoffmann-La Roche Ltd
and Roche Holding Ltd
515 E. Las Olas Boulevard
SunTrust Center, Suite 1400
P.O. Box 14460
Ft. Lauderdale, FL 33302
Phone: (954) 847-4800
Fax: (954) 760-9353


By: /s/ Dennis M. O'Hara
      Dennis M. O'Hara
      Florida Bar No. 148434
      dohara@wickersmith.com
      Jordan S. Cohen
      Florida Bar No. 551872
      jcohen@wickersmith.com