# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

IN RE:

**ACCUTANE PRODUCTS LIABILITY**

**Case No.  8:04-md-2523-T-30TBM**
**MDL: 1626**

_____/

## <u>ORDER</u>

THIS CAUSE comes before the Court upon Defendants' Motion to Exclude General Causation and Labeling Testimony of Dr. Ronald Fogel (Dkt. #411) and Plaintiffs' Response thereto (Dkt. #444).  Upon review of the pleadings, memoranda, and attachments, the Court concludes that the Motion should be granted.

Plaintiffs contend that Accutane (an acne medication) causes inflammatory bowel disease (IBD) and psychiatric problems.  Their complaints have been divided into separate groups or tracks according to the type of injury alleged.  This Order deals only with the general causation issue of the IBD track cases.

"General causation is concerned with whether an agent increases the incidence of disease in a group and not whether the agent caused any given individual's disease." Michael D. Green, et al., *Reference Guide on Epidemiology*, in *Reference Manual on Scientific Evidence* 333, 392 (Federal Judicial Center, 2d. ed. 2000).  Dr. Fogel opines that Accutane is a cause of IBD.  The issue before this Court is whether the methodology Dr. Fogel employed in reaching this opinion  meets the legal standard of reliability set forth in Daubert v. Merrill Dow Pharmaceuticals, 509 U.S. 579 (1993).

IBD, as used by Dr. Fogel, refers to two diseases characterized by inflammation of the gastrointestinal tract: ulcerative colitis and Crohn's disease. Both are chronic conditions with periods of remission and exacerbation that generally occur and reoccur over a patient's lifetime. "Crohn's disease and ulcerative colitis are most commonly diagnosed in late adolescence and early adulthood, but the diagnosis may occur at all ages." Edward V. Loftus, Jr.[1], *Clinical Epidemiology of Inflammatory Bowel Disease: Incidence, Prevalence, and Environmental Influences*, 126 Gastroenterology 1504, 1507 (2004). The number of new cases, across all age groups, is 16 - 20 per 100,000 people. Dr. Fogel acknowledges that this number would be somewhat higher for a group in their late teens and early adulthood, the group that would most likely use Accutane to treat acne. (Fogel depo., Exhibit E to Defendant's Motion to Exclude at 179-180).

The exact cause or causes of IBD is unknown, but the scientific community has identified certain risk factors. According to Dr. Loftus:

> Despite years of investigation, the root causes of IBD are yet to be identified. Descriptive epidemiologic studies not only provide valuable information about the burden of illness, but highlight differences in incidents of IBD across age, time, and geographic region, suggesting that environmental factors can significantly modify the expression of these conditions. The strongest modifying factors identified thus far include family history of IBD, cigarette smoking, and appendectomy. Continued efforts at understanding how these factors influence the expression of IBD, and identifying new risk factors, are needed.

---

[1] Edward V. Loftus, Jr., M.D., Division of Gastroentrology and Hematology, Mayo Clinic, 201st Street S.W., Rochester, Minnesota 55905.

Loftus, *supra*, at 1512.  Additionally, Dr. Fogel lists the following additional risk factors from his review of the medical literature: prior history of infection, prior antibiotic use, oral contraceptive use, and use of non-steroidal anti-inflammatory drugs ("NSAIDS").  (Fogel depo., Exhibit E to Defendant's Motion to Exclude.)

In a recent medical review of IBD, Dr. William Shapiro, M.D., of the Scripps Clinic and Research Foundation, stated that the etiology of IBD is unknown, but the most important risk factor is family history.  See eMedicine-Inflammatory Bowel Disease:  Article by William Shapiro, MD, http://www.emedicine.com/emerg/topic106.htm (last updated July 13, 2006).

Notably, there is nothing in the medical literature that concludes Accutane causes IBD.  This is not fatal to Dr. Fogel's opinion of causation because this Court is not concerned with whether Dr. Fogel's opinion is correct, but only whether it is admissible under Daubert. To determine admissibility, the Court must first determine whether the witness is qualified to offer the opinion and then perform its "gatekeeping role" to ensure the expert's testimony is supported by sufficient data and reliable principles.  Daubert, 509 at 589.

## Qualifications

The first inquiry, whether Dr. Fogel is qualified, is not at issue.  He has been a practicing board certified gastroenterologist for over 25 years,  the Division Head of the Division of Gastroenterology at Henry Ford Hospital in Detroit, Michigan, a member of peer review panels, a lecturer, and an author of several articles and book chapters on gastroenterology.  Defendants only take issue with one part of Dr. Fogel's qualifications -

when Dr. Fogel relies on his own personal experience from his practice to support his opinions.  In that regard, Defendants point out that Dr. Fogel acknowledges he has had only one patient that has taken Accutane.  The Court concludes that Dr. Fogel is a well qualified gastroenterologist.

## Methodology

The Court now turns to the second issue, whether the opinion is supported by sufficient data and reliable principles.  An expert's methodology must be consistent with the "methods and procedures of science" rather than being founded on "subjective belief or unsupported speculation."  Daubert , 509 U.S. at 592.  When an expert relies on the studies of others, he must not exceed the limitations the authors themselves place on the study.  That is, he must not draw overreaching conclusions.  McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1245-1247 (11th Cir. 2005).

Further, to be reliable, the testimony "must be supported by appropriate validation - i.e., 'good grounds,' based on what is known."  Daubert, 509 U.S. at 590.  Scientific evidence is reliable if it is based on an assertion that is grounded in methods of science.  Id. at 590.  The focus is on principles and methodology, not conclusions.  Id. at 596.  In reviewing Dr. Fogel's report, this Court finds Dr. Fogel's testimony is not supported by sufficiently reliable data to be admissible under Daubert.

### Dr. Fogel's Methodology

Dr. Fogel points to four data sources to support his opinion:

(1)    analogies to animal and cell culture studies,

(2)     biological plausibility of possible mechanisms of actions,

(3)     Defendants' own internal documents purportedly expressing conclusions on

causation, and

(4)     case reports.

### 1.     *Animal and Cell Culture Studies*

Animal studies have certain advantages and disadvantages.  As explained in the

*Reference Guide on Epidemiology:*

> Animal studies have a number of advantages.  They can be conducted as true
> experiments, and researchers control all aspects of the animals' lives.  Thus,
> they can avoid the problem of confounding,[2] which epidemiology often
> confronts.  Exposure can be carefully controlled and measured.  Refusals to
> participate in a study are not an issue, and loss to follow-up very often is
> minimal.  Ethical limitations are diminished, and animals can be sacrificed and
> their tissues examined, which may improve the accuracy of disease
> assessment.    Animal studies often provide useful information about
> pathological mechanisms and play a complementary role to epidemiology by
> assisting researchers in framing hypotheses and in developing study designs
> for epidemiologic studies.
>
> Animal studies have two significant disadvantages, however.  First, animal
> study results must be extrapolated to another species -- human beings -- and
> differences in absorption, metabolism, and other factors may result in

---

[2] "Even when an association exists, researchers must determine whether the exposure causes the disease or whether the exposure and disease are caused by some other confounding factor.  A confounding factor is both a risk factor for the disease and a factor associated with the exposure of interest.  For example, researchers may conduct a study that finds individuals with gray hair have a higher rate of death than those with hair of another color.  Instead of hair color having an impact on death, the results might be explained by the confounding factor of age.  If old age is associated differentially with the gray-haired group (those with gray hair tend to be older), old age may be responsible for the association found between hair color and death.  Researchers must separate the relationship between gray hair and risk of death from that of old age and risk of death.  When researchers find an association between an agent and a disease, it is critical to determine whether the association is causal or the result of confounding.  Some epidemiologist classify confounding as a form of bias.  However, confounding is a reality -- that is, the observed association of a factor and a disease is actually the result of an association with a third, confounding factor.  Failure to recognize confounding can introduce a bias -- error -- into the findings of the study."  Green, et al., *supra*, at 369.

interspecies variation in responses. For example, one powerful human teratogen, thalidomide, does not cause birth defects in most rodent species. Similarly, some known teratogens in animals are not believed to be human teratogens. In general, it is often difficult to confirm that an agent known to be toxic in animals is safe for human beings. The second difficulty with inferring human causation from animal studies is that the high doses customarily used in animal studies require consideration of the dose- response relationship and whether a threshold no-effect dose exists. Those matters are almost always fraught with considerable, and currently unresolvable, uncertainty.

Green, et al., *supra*, at 345-346.

Dr. Fogel relies on certain studies of dogs, rats and cell cultures, but ignores the parts of those studies that do not support his opinion, particularly the dose relationship. He further draws conclusions not supported by the authors.

*Beagle Study*

One of the studies Dr. Fogel relies on, the one which comes closest to supporting his opinion, is a study of male beagle dogs.[3] The first problem in basing one's opinion on animal studies, i.e., the potential difference in the reaction of a substance in a human body versus the body of a particular animal, is ameliorated because the beagle study relied on by Dr. Fogel was performed by Hoffmann-LaRoche as a clinical trial. Clearly if Hoffmann-LaRoche conducted the study to substantiate Accutane's approval by the Food and Drug Administration (hereafter "FDA"), it thought the reaction of the beagle dogs would be sufficiently similar to humans to make the test results valid. The second problem, the dose-response relationship in the test, is not addressed by Dr. Fogel.

---

[3] The beagle study is found at Dkt. #471, Exhibit 1.

To prepare for the study, Hoffmann-LaRoche conducted a four week pilot study to determine an appropriate high dosage amount to use in the clinical trial. It then performed a six week study in which it administered Accutane orally, by capsule, to pure-bred beagle dogs for a period of six weeks with some dogs allowed a two week off-dose recovery period. The study involved four groups, each containing three male dogs. An additional two males and two females, each in the control and high dose groups, were assigned to a two week off-dose recovery phase following treatment. The following doses were administered:[4]

| | | |
|---|---|---|
| Group 1: | 0 mg/kg/day | (Control group) |
| Group 2: | 3 mg/kg/day | |
| Group 3: | 10 mg/kg/day | |
| Group 4: | 40 mg/kg/day | |

During the tests, daily observations were made of the dogs. Following completion of treatment or recovery, the animals were subjected to a detailed necropsy and various organs were collected and examined histopathologically. Intestinal irritation (watery/mucus containing feces) was noted during the tests at three, and more pronounced at 10 and 40 mg/kg/day. At the end of the tests, intestinal changes consisted of minimal to slight degeneration/exfoliation of the surface epithelium of the large intestine in some dogs receiving 10 and 40 mg/kg/day. This finding was not present in any of the 3 mg/kg/day dogs. And, this finding was not present in any dogs at the end of the 14-day treatment-free recovery period.

---

[4] The units of dose are expressed as an amount of substance per kg of body weight.

There were observable dose-dependent effects on the dogs.  That is, as the dosage was increased, symptoms increased.  That supports Dr. Fogel's biological plausibility theory that Accutane irritates the lining of the intestines, but dose-response also involves consideration of whether  there is some dose below which there are no effects, or no permanent effects.  None of the 3 mg/kg/day dogs had any degeneration of the surface of the intestines at the end of the study.  In fact, only some of the 10 and 40 mg/kg/day dogs had such findings, and no dogs had the findings after the two week recovery period.  The authors concluded that doses at or below 3 mg/kg/day would cause no adverse effect.  The dose prescribed for humans is .05 to 2 mg/kg/day[5]; less than the smallest dosage administered in the beagle study.  The fact that Dr. Fogel ignored the dose-response relationship undermines this conclusion.

Dose is critical to any evaluation of toxicity of a drug.  As Dr. David Eaton explains in his article[6] on toxic torts:

> Dose refers to the amount of chemical that enters the body.  The units of dose are typically expressed as an amount of substance per kg of body weight (mg/kg bw).  Thus, if a 132 lb woman (60 kg) absorbed 60 milligrams of a chemical in a glass of contaminated water, she would have a dose of 1 mg/kg bw.  Dose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect.  Indeed, the basic dictum of toxicology was stated by the Sixteenth Century Physician/Philosopher, Paracelsus, considered the "father of toxicology": *"All substances are poisonous--there is none which is not; the dose differentiates a poison from a*

---

[5] See labeling information, Exhibit C to Defendants' Motion for Summary Judgment on Adequacy of Warnings (Dkt. #477).

[6] "To help federal judges deal with *Daubert* issues in toxic tort cases, the Federal Judicial Center published several articles in the Journal of Law and Policy under the title 'Science for Judges I:  Papers on Toxicology and Epidemiology.'  12 J.L. & POL'Y 1 (2003).  The article entitled 'Scientific Judgment and Toxic Torts -- A Primer in Toxicology for Judges and Lawyers' by Dr. David Eaton provides valuable insight for understanding how to assess Daubert issues in these cases."  McClain, 401 F.3d at 1242.

*remedy.*"

David Eaton, *Scientific Judgment and Toxic Torts -- A Primer in Toxicology for Judges and Lawyers*, 12 J.L. & POL'Y 1, 11 (2003).

An expert who ignores the dose-response relationship casts suspicion on the reliability of his methodology. McClain, 401 F.3d at 1242. In McClain, the Eleventh Circuit discussed a portion of the Eaton article explaining the importance of dosage thresholds:

> In his article Eaton describes some key principles of toxicology that a court should consider in "any attempt to establish whether a chemical exposure was causally related to a specific adverse effect or disease in an individual." Foremost among these principles is the dose-response relationship.
>
> Dr. Eaton explains that the "relationship between dose and effect (dose-response relationship) is the hallmark of basic toxicology. "Dose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect." Often "low dose exposures-even for many years-will have no consequence at all, since the body is often able to completely detoxify low doses before they do any damage." Furthermore, "for most types of dose-response relationships following chronic (repeated) exposure, thresholds exist, such that there is some dose below which even repeated, long-term exposure would not cause an effect in any individual."

Id. (Citations omitted.)

Dr. Fogel offers no explanation why he relies on part of the beagle study to support his opinion that Accutane causes irritation, but ignores the result that the irritation was temporary, not permanent. He also has no explanation as to why his conclusion differs from the conclusion of the study itself, to wit: there is a dosage threshold below which there is no adverse effect once the drug is withdrawn. Most importantly, Dr. Fogel acknowledges he has done no analysis of whether a threshold dose of Accutane is required to cause IBD:

Q. You haven't done any analysis that deals with whether or not there is a threshold dose that's required to trigger that event, true?

A. I did not do that analysis, no, but that information wasn't available to even consider doing such an analysis.

Fogel dep., Exhibit E to Defendants' Motion to Exclude Specific Causation Testimony from Ronald Fogel (Dkt. #420) at 258:16-21.

The results of the beagle study and the author's conclusions do not support Dr. Fogel's opinion that Accutane causes a permanent condition, like IBD, at low doses.

*Rat Studies*

Dr. Fogel also uses two rat studies to support his conclusion. The rat studies, one done in Poland and another in Russia, were actually studies of high doses of vitamin A, not Accutane. The rat studies have three problems. First, they concern an animal that may or may not correlate to the human body; second, the chemical used is not the chemical in question; and third, the chemical was administered at very high doses with no regard for a dose where there might be no adverse effect. However, Dr. Fogel makes no attempt to overcome these varying and significant problems. He makes no effort to analogize the effect of high doses of vitamin A to the effect of Accutane on rats, much less on the human body. That is obviously important because, while Accutane is one of many "retinoids," i.e., a group of compounds derivative of vitamin A, the human body reacts to Accutane and vitamin A in different ways. See Newton v. LaRoche Laboratories, Inc., 243 F.Supp. 2d 672 (W.D. Texas 2002). The rat studies also used only very high doses of vitamin A with no effort to identify a no-observable-effect dosage. Obviously, there is a dose at which vitamin A has no adverse

effect.  It is a natural part of the human diet and some amount is necessary for the proper functioning of the human body.  For all of these reasons, the rat studies offer no support for Dr. Fogel's opinion.

Further, there are other studies, both of dogs and humans, that appear to be contrary to Dr. Fogel's opinions.  He fails to explain why these other studies have no significance or otherwise differentiate them from the ones upon which he seeks to rely.[7]

*Cell Cultures*

Dr. Fogel also refers to two studies of cell cultures[8] in which a retinoid other than Accutane affected epithelial cell proliferation in test studies.  "The problem with this approach is also extrapolation - whether one can generalize the findings from the artificial setting of tissues in laboratories to whole human beings."  Green, et al., *supra*, at 346.  That is, studies such as these necessarily remove the cells from the dynamic metabolic context in which the human body actually processes chemical compounds.

The two cell studies in question concern the effect of a certain retinoid (not Accutane) on cancer cells, not normal intestinal cells.  Dr. Fogel concedes that he has not analyzed whether vitamin A, Accutane, or another retinoid affects normal intestinal cells in the same way that it affects malignant or pre-malignant gastrointestinal cells.  This is not surprising since Dr. Fogel admits he is not an expert in retinoid chemistry or pharmacology.  (Exhibit

---

[7] See Exhibit "S" and "U" to Defendants' Motion to Exclude General Causation Testimony of Ronald Fogel (Dkt. #411).

[8]  Cell culture studies involve human or animal tissue or cells that are grown in laboratories and exposed to certain substances.

E to Defendant's Motion, 107:19-21.)  The authors of the study also acknowledge that vitamin A and its metabolites have a beneficial effect on the intestinal lining.  It is unclear what support, if any, these studies can offer for Dr. Fogel's opinion concerning Accutane.

2.    **Biological Plausibility**

Biological plausibility is a factor to be considered in determining general causation. However, a biological explanation without evidence of the mechanism by which it works is merely an unproven hypothesis, a theory.  As explained in the *Reference Guide on Epidemiology*:[9]

> Biological plausibility is not an easy criterion to use and depends upon existing knowledge about the mechanisms by which the disease develops.  When biological plausibility exists, it lends credence to an inference of causality.  For example, the conclusion that high cholesterol is a cause of coronary heart disease is plausible because cholesterol is found in atherosclerotic plaques. However, observations have been made in epidemiologic studies that were not biologically plausible at the time but subsequently were shown to be correct. When an observation is inconsistent with current biological knowledge, it should not be discarded, but the observation should be confirmed before significance is attached to it.  The saliency of this factor varies depending on the extent of scientific knowledge about the cellular and subcellular mechanisms through which the disease process works.  The mechanisms of some diseases are understood better than the mechanisms of others.

Dr. Fogel has developed a biological theory regarding how Accutane might cause IBD, but he acknowledges that, at this point, no one knows the exact biological mechanism by which IBD occurs.  In general, he thinks Accutane affects the mucosal integrity of the lining of the gastrointestinal tract and somehow makes it more susceptible to IBD.  In his report, at page 5, he describes it this way:

---

[9] Green, et al., *supra*, at 346.

> Environmental factors have been implicated in the pathogenesis of chronic Inflammatory Bowel Disease by three possible mechanisms including disrupting the mucosal barrier, initiating an inflammatory response and activating innate immune responses.
>
> A review of the literature identifies a number of mechanisms by which Isotretinoin (Accutane) can induce/exacerbate the course of patients with Inflammatory Bowel Disease. Isotretinoin alters the intestinal mucosa of treated animals, interfering with tissue growth. Treatment of male rats with vitamin A decreased the number of mitoses in the small intestine crypt glands decreasing crypt length and the number of epithelial cells lining the crypts. There is a reduction in goblet cells in crypts and villi, reducing the mucosal mucus barrier. Hypervitaminosis A (high doses of vitamin A) was associated the (sic) increased mucosal inflammatory cells with infiltration of lymphocytes and plasma cells. Beagles given 4-oxo-isotretinoin developed a bloody diarrhea and histologic damage to the intestinal mucosa. (Citations omitted.) These findings suggest that Isotretinoin and its metabolites damage the mucosa producing symptoms of mucosal inflammation. The loss of mucosal cells allows proximity of bacteria to the mucosal inflammatory cells.

Report of Dr. Fogel, Exhibit E to Defendants' Motion (Dkt. #411-13).

Dr. Fogel admits that none of his "three possible mechanisms" have been tested or proven. Fogel dep., Exhibit E to Defendants' Motion, (Dkt. #411-13) at 186:17-21 (increased permeability of intestinal mucosa theory: "That is correct, it has not been tested."); 210:5-8 (Apoptosis hypothesis "remains to be proven": "That is correct."). Dr. Fogel's acknowledgment is therefore consistent with the medical literature: "The mechanism by which Isotretinoin may cause IBD is unknown." Deepa Reddy, et al., *Possible Association Between Isotretinoin and Inflammatory Bowel Disease*, 101 Am. J. Gastroenterology 1569, 1571 (2006). Exhibit F to Defendants' Motion (Dkt. #411-10).

While Dr. Fogel's biological theory may be exactly right, at this point it is merely plausible, not proven, and biological possibility is not proof of causation. Dr. Fogel's theory

does not show the reliability of each step necessary to make the testimony admissible under

<u>Daubert</u>.  When a theory has not been verified by testing, it obviously has not been peer-

reviewed.  Without verification, Dr. Fogel's theory remains an educated guess.  It is not

generally accepted and has no known potential rate of error.  "If medical science does not

know the cause, then (the expert's) 'theory' of causation, to the extent it is a theory, is

isolated and unsubstantiated. . . . On its own terms, (the expert's) opinion includes

conjecture, not deduction from scientifically-validated information."  <u>Black v. Food Lion,</u>

<u>Inc.,</u> 171 F.3d 308 (5th Cir. 1999).

### 3.  **Admissions of causation within Defendants' own internal documents**

Dr. Fogel also bases his opinion of causation, in part, on Hoffmann-LaRoche

documents in which, he says, Defendants have admitted Accutane causes IBD.  If such were

true of this case, this Court could have saved a lot of time - this opinion would have been

unnecessary.

Dr. Fogel describes his reliance as follows:

I have reviewed documents that were produced by Hoffmann-LaRoche, Inc.
and Roche Laboratories including those documents attached to the deposition
of Dr. Martin Uber, Eileen Leach, Dr. Joseph Hahn, John McLane and Dr.
Alan Bess.  .  .  .  Those documents clearly acknowledge that Hoffmann-
LaRoche and Roche Laboratories, hereafter Roche, refer to Inflammatory
Bowel Disease as being causally related to the use of Accutane.  Roche's own
internal documents and analysis acknowledge that Roche has concluded that
its drug Accutane, is a known cause of Inflammatory Bowel Disease.
(<u>McClain</u> 002402; <u>McClain</u> 02397; <u>McClain</u> 002419; <u>McClain</u> 00069794).  In
fact, in every reported case, Roche either concluded that causality was
assessed as related to Accutane or unknown.  Roche's core data sheet, the
document that contains Roche's single medical and scientific opinion about

Accutane refers to Inflammatory Bowel Disease as an "effect" of Accutane. (HLR-PAL-045066)  The word "effect" literally means to cause something to develop.

Fogel report, Exhibit E to Defendants' Motion (Dkt. #411-13).

Contrary to Dr. Fogel's conclusion about these "admissions" by Hoffmann-LaRoche, this Court has previously determined that the causality assessments referred to by Dr. Fogel do not evidence Roche's conclusion that the adverse events reported were caused by Accutane.  Instead, they constitute a synopsis of complaints received by Roche from various reporters (a patient, parent, doctor, or attorney) regarding their subjective beliefs as to the causes of particular ailments.  They reflect the reporter's opinion as to causality and do not necessarily contain information regarding the patient's medical history, family medical history, or information concerning other risk factors of IBD.  By previous Order (Dkt. #506), this Court has ruled that these documents may not be used by Dr. Fogel to support his opinion in testifying before the jury, and, at this point, are not admissible into evidence.

It is disconcerting, and perhaps telling, that Dr. Fogel did not make any independent inquiry as to the methodology used by Hoffmann-LaRoche in creating the assessments.  He had no idea how they were created, why they were created, or in what context the words were used in the documents.  He merely accepted them at face value because they refer to "causality:"

Q:    Talking about the Roche documents that you say Roche concluded Accutane causes inflammatory bowel disease.  What did you do to investigate what that label on that column meant?

A:    I did not do any further investigations.

Q:      So it said highest causality.  Did you ask for the coding manual that would have told you what highest causality meant?

A:      No, I did not.

 . . .

Q:      Did anybody give you the coding manual for the adverse event forms that lead to the generation of those tables?

A:      No.

 . . .

Q:      So you didn't need to know the methodology by which those boxes were checked or what they meant, did you?

A:      I did not look that up.

Q:      Okay.  All right.  Do you have any information about the methodology that's used at Roche to make any assessment of causality of adverse event reports?

A:      I have no information about Roche methodology.

Q:      So you didn't receive any manuals, guidelines or other documents that provide guidance to Roche employees about making assessments with regard to adverse event reports, true?

A:      No, because it strikes me if somebody says that something is causally related then it's causally related.

(Dkts. 408, Ex. 23 at pp. 252-253, 255, 411-6).

Dr. Fogel's willingness to reach conclusions based on documents that he does not understand indicates a bias of wanting to reach a particular conclusion.  It casts suspicion on whether he blindly followed a scientific trail until reaching a conclusion, or whether the conclusion came first and then a trail was identified.  At any rate, these documents do not

support an opinion on causation.

As this Court stated in its earlier opinion, an unbiased review of the assessments may support a conclusion that there is an association between Accutane and IBD. But "*an association is not equivalent to causation.*" Green, et al., *supra*, at 336. (emphasis in original). In fact, just such a review was made in 2006. The authors concluded: "[i]n a subgroup of patients, isotretinoin might serve as a trigger for IBD." Reddy, et al., *supra*, at 1569. This conclusion may serve as a basis for forming an hypothesis, but certainly does not equate with causation.

Under <u>Daubert</u>, the reasoning or methodology underlying the testimony of an expert must be scientifically valid. <u>See</u> <u>Daubert</u>, 509 U.S. at 593-94. Moreover, the proposed testimony must "derive from the scientific method; good grounds and appropriate validation must support it." <u>Id</u>. at 590. Any testimony elicited from Dr. Fogel or any of Plaintiffs' experts regarding the causality assessments will lack this scientific validity. The "causality assessments" do not support an opinion of causation.

### 4. **Case reports**

Lastly, Dr. Fogel relies on anecdotal consumer complaints ("adverse event reports" or "case reports") reported to Roche or the FDA, or in a magazine to the medical community. However, these reports concern events that occurred without any medical controls or scientific assessment. "Uncontrolled anecdotal information offers one of the least reliable sources to justify opinions about both general and individual causation." <u>McClain</u>, 401 F.3d at 1250. The reports are unreliable as proof of causation because, in general, the events were

not observed in such a way as to rule out coincidence or other potential causes.

Dr. Fogel points to certain types of case reports that he contends are sufficient to support an opinion of causation - "challenge-dechallenge" case reports. As Dr. Fogel states in his report:

> Throughout the literature and other materials such as MedWatch reports submitted to the FDA by Hoffmann-La Roche, and ADVENT there are numerous reports of what is typically referred to as challenge-dechallenge-case reports. In these cases, if an individual begins experiencing signs or symptoms of Inflammatory Bowel Disease, and is subsequently taken off Accutane, when the symptoms abate or subside, that situation is generally referred to as a challenge-dechallenge analysis. Strong evidence that Accutane causes Inflammatory Bowel Disease is derived from challenge-dechallenge situations which have been reported throughout the literature. (H/B 012305; McClain 003277; Isotretinoin-Induced Inflammatory Bowel Disease in an Adolescent; Diane E. Reniers and John M. Howard; *The Annals of Pharmacotherapy*, 2001 October, Volume 35.)

Report of Dr. Fogel, Exhibit E to Defendants' Motion (Dkt. #411-13) at pp. 6-7. The challenge/dechallenge reports relied upon by Dr. Fogel are in the record at document number 502-2, 3 and 4.

### Document 502-2

Document number 502-2 is a report by Denise Reniers, a staff pharmacist, and John Howard, M.D., of a 17-year old boy who took Accutane for five months and then, one week after cessation of Accutane, had onset of rectal bleeding. However, because the patient experienced no symptoms while taking Accutane for five months, this technically is not a challenge/dechallenge report. Once the symptoms began, the patient's condition worsened in spite of treatment and he was diagnosed with IBD. Ultimately, a subtotal colectomy and

ileostomy was performed. The authors concluded that "[g]iven his negative family history for IBD and the strong temporal relationship between the acute onset of ulcerative colitis and recent treatment with Isotretinoin, the drug is a probable cause of his diagnosis according to the Naranjo[10] Probability Scale." The authors acknowledged, however, that their search of the medical literature revealed several reports of Accutane use in patients with a history of IBD with no adverse results as well as other reports that Accutane use was thought to have induced or exacerbated IBD. These conflicting results might indicate that the IBD reports are coincidental, i.e., the result of background risk.

*Document 502-3*

Document 502-3 is a report from March of 1993 concerning an 18-year old man who experienced rectal bleeding while doing floor gymnastics. The patient had been on Accutane for three months. He had no fever, abdominal pain, altered bowel habit, tenesmus or extra intestinal symptoms. Accutane was withdrawn and the rectal bleeding stopped three weeks later. Accutane was resumed after four months, but again ended three months later because of occasional stools containing mucus followed by new episodes of minor rectal bleeding on defecation. Histological examination of rectal biopsies indicated slight mucusol inflammation. Symptoms resolved one month after withdrawal from Accutane treatment. Eighteen months later, the patient was well with no evidence of IBD. The patient was diagnosed with acute colitis (not IBD) and the reporters thought that a causal relationship to

---

[10] Naranjo CA, et al. *A Method for Estimating the Probability of Adverse Drug Reactions.* ClinPharmacol Ther 1981; 30: 239-45.

Accutane was probable because of the lack of existence of other known causes.  The authors cautioned however, that "[i]n the absence of specific reliable supplementary investigations implicating Isotretenoin as the causal agent, the 'semiological imputability' could not be rated higher that S2 (possible)."

*Document 502-4*

Document 502-4 is a letter to the editor of a magazine.  The author of the letter, Dr. Michael B. Brodin, M.D., thought an earlier letter by Dr. Stephen Schleicher minimized the problem of Accutane being a potential cause of IBD.  In his letter, Dr. Brodin reports about one of his patients, a 26-year old woman, who, prior to taking Accutane, had frequent bouts of diarrhea that she attributed to various food intolerances.  Nine days after beginning Accutane therapy, she experienced cramping, abdominal pain, and bright red blood rectally.  Two days later diarrhea ensued and the medication was discontinued.  Symptoms, however, got worse instead of better.  She developed a fever and appeared acutely ill.  A sigmoidoscopy was performed by a gastroenterologist and she was diagnosed with severe proctitis with active bleeding up to ten centimeters, whereas above this level there was minimal inflammation.  She was treated with steroid enemas and oral sulfasalazine and did well with complete resolution of the problem.  Dr. Brodin stated that the onset of proctitis (not IBD) seemed to be linked to the taking of Accutane, but acknowledged that one could not be certain.

The letter does not describe the content of Dr. Schleicher's earlier letter "minimizing the problem" of Accutane and its association with IBD.  It appears that it may refer to a

report by Dr. Schleicher mentioned in document 502-2 in which Dr. Schleicher reported his experience with prescribing Accutane for cystic acne in a 19-year old man with a three year history of ulcerative colitis (IBD). During a five month course of Accutane and on one year follow-up after completion of the treatment course, the patient had experienced no exacerbation of ulcerative colitis.

A review of the three case reports cited by Dr. Fogel reveals why these descriptions of individual experiences must be viewed with such great caution - the difficulty of eliminating "chance" as the cause of the onset of symptoms. When viewing an isolated event, it is almost irresistible to conclude that what happens shortly after the event must have been caused by the event. But merely because symptoms occur a short time after a person takes a drug does not mean the drug caused the symptoms. As the Court in McClain pointed out, "drawing such a conclusion from temporal relationships leads to the blunder of the *post hoc ergo propter hoc* fallacy." McClain, supra., at 1243. The Court went on to explain:

> The *post hoc ergo propter hoc* fallacy assumes causality from temporal sequence. It literally means "after this, because of this." Black's Law Dictionary 1186 (7th ed.1999). It is called a fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship. As the Court of Appeals for the District of Columbia explained in a similar context: "[i]n essence, the requirement of 'adequate documentation, in scientific literature' ensures that decision makers will not be misled by the *post hoc ergo propter hoc* fallacy - the fallacy of assuming that because a biological injury occurred after a spill, it must have been caused by the spill." Ohio v. U. S. Dept. of the Interior, 880 F.2d 432, 473 (D.C.Cir.1989).

The Eleventh Circuit has pointed out the obvious - that challenge/dechallenge reports are still case reports and are entitled to little weight in supporting an opinion on causation:

Finally, in reaching his opinions that Metabolife 356 in fact caused each of the Plaintiff's injuries, Hakim claims to have used a "challenge/de-challenge/re-challenge" methodology. To explain this methodology during the *Daubert* hearing, Hakim testified that while treating Plaintiff Thornburg he noticed a pattern. When she took Metabolife 356, she had strokes, but when she did not take it, she did not have strokes until she started it again. In essence, the stroke occurred during the challenge stage when she took the drug. The de-challenge occurred when she came off the drug and did not have a stroke, and the re-challenge occurred when she started taking the drug again and had another ischemic event. But this theory had a serious flaw.

In April of 2000, Hakim decided that Metabolife had caused Thornburg's strokes and told her to stop taking it. In June of 2000, after being off Metabolife for two months, she had another ischemic event. In other words, according to his challenge/de-challenge/re-challenge theory, she had another ischemic event during the de-challenge phase. During the hearing, Hakim attempted to explain away that inconsistency by saying that the ischemic event during the de-challenge phase occurred because of the lingering effects of ephedrine. To bolster this opinion he resorted to another medical analogy -- the analogy of alcohol causing liver damage. Nothing in the evidence, however, supports the dubious analogy that the ephedrine causes strokes and heart attacks like alcohol causes cirrhosis of the liver.

Further, "[t]he temporal connection between exposure to chemicals and an onset of symptoms, standing alone, is entitled to little weight in determining causation." *Moore*, 151 F.3d at 278. It is also subject to the problem of assuming what the witness is trying to prove. This pitfall will most likely arise when, as here, there are not scientific controls in place.

As this court explained in *Rider*, "de-challenge/re-challenge tests are still case reports and do not purport to offer definitive conclusions as to causation." 295 F.3d at 1200. Their value is directly related to the degree of scientific control used in the testing. Because there were insufficient controls employed in Hakim's crude challenge/de-challenge/re-challenge methodology, and Hakim's own testimony established that Thornburg suffered ischemic events when she was not taking Metabolife 356, this methodology does not provide the necessary indicia of reliability to his final opinions on causation.

<u>McClain</u>, 401 F.3d at 1254-1255.

General causation concerns whether a particular chemical increases the incidence of disease in a group.  The incidence must be considered in comparison to the rate of disease that the group would have experienced even without exposure to the chemical.

> A reliable methodology should take into account the background risk.  The background risk is not the risk posed by the chemical or drug at issue in the case.  It is the risk a plaintiff and other members of the general public have of suffering the disease or injury that plaintiff alleges *without* exposure to the drug or chemical in question.  The background risks include all those causes of the disease, whether known or unknown, excluding the drug or chemical in question.
>
> . . .
>
> Thus, in evaluating the reliability of the experts' opinions on general causation, it would help to know how much additional risk for heart attack or ischemic stroke Metabolife consumers have over the risk the general population faces.

McClain, at 1243-1244.

There has not been any such statistical analysis comparing a group of persons taking Accutane to a non-Accutane group to determine whether there is any increase in the occurrence of IBD.  Since Accutane's approval in 1982 through 2000, nearly 20 million prescriptions [11] of Accutane for approximately 12 million people[12] worldwide were written. Given the incidence of IBD in the general population which, according to Dr. Fogel, is 16-20 per 100,000 persons, one would expect an incidence of IBD occurring in 1,920 to 2,400 persons in an average population of 12 million.  Twenty-five percent of IBD cases are

---

[11] Reddy, et al., *supra*, at 1571, Exhibit F to Defendants' Motion (Dkt. #411-10).

[12] Michelle Meadows, *The Power of Accutane: The Benefits and Risks of a Breakthrough Acne Drug*, FDA Consumer, March-April 2001, at 18, 19, available at http://www.fda.gov/fdac/features/2001/201_acne.html., Exhibit A to Defendants' Motion (Dkt. #411-2).

diagnosed before patients are twenty years of age.[13]  Since Accutane users tend to be adolescents and young adults, one would expect the incidence to be even higher for a group of Accutane users even if Accutane were not a cause of IBD.  Moreover, given the episodic nature of IBD, one would expect some of those cases to occur coincidentally after Accutane is given and the disease to subside when Accutane is withdrawn.

Rather than review a few case reports, Reddy and her colleagues[14] reviewed all adverse event reports received by Roche or the FDA during the years 1997-2002.  They found 85 cases of IBD reported to have been associated with the use of Accutane.  Their conclusion was that Accutane was "perhaps acting as a trigger for IBD in properly predisposed individuals, or unmasking symptoms in those with pre-existing but sub-clinical disease."  Reddy, et al., *supra*, at 4.  Even though the authors did not conclude that Accutane caused IBD, only that it was "perhaps" acting as a trigger, they still cautioned about how the underlying data should be interpreted:

> Although these data are interesting, our results should be interpreted with caution.  The peak age of onset of IBD is young adulthood (footnote omitted), also the most common time that Isotretinoin is prescribed.  Although the temporal relationship between Isotretinoin use and onset of IBD is convincing in many of the reported cases.  It is impossible to be certain that this is not coincidence.  In addition, patients may have had sub-clinical symptoms of IBD prior to the use of Isotretinoin, but sought medical care only after becoming aware of an association between the two.

---

[13] M. Oliva-Hemker, More Than a Gut Reaction: Extraintestinal Complications of IBD, 16 Contemp. Pediatrics 45 (1999).

[14] Reddy, et al., *supra*.

> MedWatch is a respected source for post-marketing surveillance data; however, it has its limitations. By the nature of data reporting and open accessibility to both patients and health care providers, the quality of the data is unconfirmed. We had access only to information presented in the MedWatch report, without the ability to obtain further details.

Id., Exhibit F to Defendants' Motion (Dkt. #411-10).

While Reddy and her co-authors could not, and did not, conclude that Accutane caused IBD, Dr. Fogel does just that. He takes that step without having done the intensive review performed by Reddy and her fellow doctors. Further, Dr. Fogel is of the opinion that Accutane causes IBD no matter what the dose, no matter how long it has been since the individual last took Accutane, and, seemingly, no matter what other background factors are present. He states that he might find Accutane as the cause of IBD even if it was used for only one or two days (Fogel Locke dep., 36:25-37:4, attached as Exhibit F to Defendants' Motion to Exclude Specific Causation testimony) or perhaps even if only "one pill" were used (Fogel Cannady dep., 74:8-75:11, Exhibit G to Defendants' Motion to Exclude Specific Causation Testimony of Ronald Fogel).

For example, Plaintiff Mary Farr had not taken Accutane for two years and ten months when she had an onset of symptoms. She had a positive bacteria culture upon her initial presentation, had smoked half to a full pack of cigarettes for approximately ten years, had taken oral contraceptives for almost six years, and had taken antibiotics and other medications linked to abdominal symptoms. Still, Dr. Fogel is of the opinion that Accutane was the cause of her Crohn's disease.

Q.    Okay. With that in mind, would you agree then that essentially when you got the file in Ms. Farr's case, once you determined that she took Accutane and got Crohn's, that at that point it's your opinion that the most likely cause of her Crohn's is Accutane?

A.    Correct.

Fogel Farr dep. at 95:16-21 (Exhibit D to Defendants' Motion to Exclude Specific Causation Testimony of Ronald Fogel.)

Plaintiff Andrew Messick had been off Accutane for over seven years, his mother had ulcerative colitis, and he had taken antibiotics closer in time to his development of ulcerative colitis than Accutane. While Dr. Fogel admitted that he could not exclude antibiotics completely, he was still of the opinion that Accutane was the cause of Mr. Messick's IBD.

Q.    On what scientific basis can you rule out that antibiotics did not play a role in Mr. Messick's ulcerative colitis?

A.    I can't exclude it completely, but in my opinion, based on my experience, I'm more inclined to attribute to the Accutane than to the antibiotics.

Fogel Messick dep. at 96:15-20 (Exhibit L to Defendants' Motion to Exclude Specific Causation Testimony of Ronald Fogel).

Dr. Fogel's opinion of causation goes far beyond that of Reddy and her co-authors. And Dr. Fogel takes this next great step, finding causation, without any scientific evidence demonstrating an increased risk of IBD among Accutane users over that of a comparable group of non-Accutane users.

Q.    Doctor, as you sit here today, you cannot tell me that there is a statistically significant increased risk of IBD among patients who have taken Accutane, can you?

A.    . . . The data is not available to conclude what the risk is.

Fogel dep. at 185:8-14 (Exhibit E to Defendants' Motion to Exclude General Causation Testimony of Ronald Fogel).

## **CONCLUSION**

General causation concerns whether a drug increases the incidence of disease in a group over what that group would have experienced without having been exposed to the drug. It is significant that, where Accutane is concerned, there have been no studies showing that Accutane increases the incidence of IBD over what would be expected to occur in a similar group had Accutane never been taken. There have been tests that indicate Accutane can irritate the lining of the intestines. There have been case reports indicating an association between Accutane and IBD. But association is not causation. Association is grounds for forming an hypothesis, or theory, that is subject to being proven. This Court's gate-keeping function is to ensure that opinions based on mere theory do not reach the jury.

As this Court stated earlier, Dr. Fogel's opinion may very well be correct. His conclusions may be proven true. But at this point there is a gap between the data and the opinions he proffers. Others, such as Reddy and her co-authors, have refused to take this leap of faith which is not yet supported by the scientific evidence.

This Court determines that Dr. Fogel's testimony does not satisfy the requirements of Daubert or Federal Rule of Civil Procedure 702. Therefore, Defendants' Motion to Exclude the General Causation Testimony of Dr. Fogel (Dkt. #411) is GRANTED. It appears to the Court that this ruling renders all of the IBD track cases subject to summary judgment in favor

of the Defendants.  The parties are given twenty (20) days from the date of this Order to advise this Court in writing why summary judgment should not be entered.

      **DONE** and **ORDERED** in Tampa, Florida on June 15, 2007.


                                  JAMES S. MOODY, JR.
                                  UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\MDL-Accutane\MONICA exclude causation.dkt 411.wpd