**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

IN RE: ACCUTANE
PRODUCTS LIABILITY LITIGATION

_____/

MDL: 1626
Case No. 8:04-MD-2523-T-30TBM –
IBD TRACK LITIGATION

(APPLICABLE TO ALL REMAINING
IBD TRACK CASES)

_____

**HOFFMANN-LA ROCHE INC.'S AND ROCHE LABORATORIES INC.'S
MOTION TO EXCLUDE THE RE-ASSERTED
GENERAL CAUSATION TESTIMONY OF
RONALD FOGEL**

_____

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

PROCEDURAL BACKGROUND ....................................................................................... 2

LEGAL STANDARD ........................................................................................................... 5

ARGUMENT ........................................................................................................................ 5

I.      Dr. Fogel Relies on the Same Unreliable Methodology That This Court Excluded. ......... 6

II.     Dr. Fogel's Recent Testimony Magnifies the Concerns That Led to His Original
        Exclusion .................................................................................................................. 9

        A.      Unsupported Animal Analogies and Analogies to Other Retinoids ...................... 9

                1.      Animal Data .................................................................................... 9

                        a)      Improper Reliance On High-Dose Data ........................................ 10

                        b)      Failure to Review Other Animal or Human Data ......................... 11

                        c)      Unsupported Analogies to Other Retinoid Data ........................... 12

                2.      Vesanoid .......................................................................................... 15

        B.      Case Reports ................................................................................................. 16

                1.      Rechallenge Reports ....................................................................... 17

                2.      Analysis of Reporting Rate ............................................................ 19

        C.      Misconstrued Roche Documents ................................................................... 20

        D.      Hypothetical Mechanisms of Action ............................................................ 22

CONCLUSION ................................................................................................................... 24

124624v1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993)........................................................................................ passim

*Goldstein v. Centocor, Inc.,*
2009 WL 275322 (11th Cir. Feb. 5, 2009) ...............................................................5

*Hall v. United Ins. Co.,*
367 F.3d 1255 (11th Cir. 2004) ...............................................................................5

*In Re Accutane Prods. Liab. Litig.,*
511 F. Supp. 2d 1288 (M.D. Fla. 2007).................................................................2, 3

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999)..................................................................................................5

*Rand v. Hoffmann-La Roche Inc.,*
No. 07-18883, 291 Fed. Appx. 249, 2008 U.S. App. LEXIS 18623 (11th Cir. Aug 26, 2008) ...............................................................................................................3, 4, 5

OTHER AUTHORITIES

Rule 702...................................................................................................................7

124624v1

## INTRODUCTION

In 2007, the Court excluded Ronald Fogel's testimony as methodologically unreliable. This led to the entry of judgment against those inflammatory bowel disease ("IBD") plaintiffs whose cases had reached the expert designation stage. After the Eleventh Circuit affirmed, the Court directed the remaining IBD plaintiffs (whose cases had *not* reached the designation stage) to designate their general causation expert. These remaining plaintiffs recently responded by re-designating Ronald Fogel.

In his current incarnation, Dr. Fogel has retained the very same methodology that led this Court to exclude his opinions:  he has made no effort to research Accutane® and IBD since his exclusion ("other things . . . have taken priority"); he has not bolstered his methodology with any new lines of evidence (no "new lines of evidence . . . in [his] second report"); and he has not tested his methodology in any way or even attempted to subject it to peer review ("[n]o, I have not attempted to publish it"; no "attempt[] to test it"; "not subjected [his views] to any form of peer review").  Ex. A at 58:3 – 59:4, 84:16-20, 264:7-13.  Instead, his work since his opinions were excluded has consisted of (1) reviewing three new documents his lawyers gave him, which he admits he does not understand; (2) citing documents he admits he reviewed prior to his first report but which did not merit mention there; and (3) spending "more time reviewing" some of his original sources, "reading them more carefully" and "remember[ing] them better."  *Id.* at 243:18-20, 246:1, 249:11-14, 249:23 – 250:22; 66:4-16 .

Having faithfully adhered to his original defective methodology, Dr. Fogel's new opinions are equally subject to exclusion.  In fact, his most recent testimony more greatly exposes how far his methodology strays from basic scientific reliability, and how much it is improperly animated by litigation advocacy rather than scientific inquiry.  For these two reasons, Dr. Fogel's re-asserted opinions should be excluded.

## PROCEDURAL BACKGROUND

Various plaintiffs have sued Roche in federal court, claiming that Roche's acne medication Accutane caused them to develop inflammatory bowel disease. These cases have been consolidated in this Court as part of the Accutane multidistrict litigation.

Pursuant to this Court's scheduling orders, plaintiffs in nine earlier-filed IBD cases were required to designate experts. All designated Ronald Fogel as their sole general causation expert. Dr. Fogel purported to rely on several lines of evidence to establish that Accutane caused IBD: (1) animal data; (2) speculation about biological plausibility; (3) selected Roche internal documents; and (4) case reports. In each of these areas, Dr. Fogel hand-selected some data he characterized as favorable and ignored the larger body of evidence from which his hand-selected data came.

Even with this alleged data, Dr. Fogel admitted, as this Court noted, that he lacked "any scientific evidence demonstrating an increased risk of IBD among Accutane users over that of a comparable group of non-Accutane users":

> Q. Doctor, as you sit here today, you cannot tell me that there is a statistically significant increased risk of IBD among patients who have taken Accutane, can you?
>
> A. . . . The data is not available to conclude what the risk is.

[DE 580 at 26-27, published at *In Re Accutane Prods. Liab. Litig.*, 511 F. Supp. 2d 1288 (M.D. Fla. 2007) (quoting Fogel)].

Following expert discovery and a *Daubert* hearing, the Court excluded Dr. Fogel's general causation testimony as methodologically unreliable. *See id.* The court carefully reviewed each line of evidence on which Dr. Fogel purported to rely and found them individually and collectively unreliable, given the large "gap between the data and the opinion he proffers." *Id.* at 27.

In conducting this review, the Court repeatedly noted the litigation-driven nature of Dr. Fogel's methodology.  For example, the Court commented on:

- Dr. Fogel's willingness to reach opinions without understanding the data on which he relies – "It is disconcerting, and perhaps telling, that Dr. Fogel did not make any independent inquiry as to the methodology." *Id.* at 15.

- Dr. Fogel's uninformed willingness to disregard careful limitations that scientists who actually understand the data have placed upon it – "He takes that step without having done the intensive review performed by Reddy and her fellow doctors." *Id.* at 25.

- Dr. Fogel's willingness to blame Accutane under any circumstance and in the face of all evidence to the contrary – "Dr. Fogel is of the opinion that Accutane causes IBD no matter what the dose, no matter how long it has been since the individual last took Accutane, and, seemingly, no matter what other background factors are present." *Id.*

The plaintiffs sought reconsideration of this ruling, which the Court denied, instead granting summary judgment in the cases for which Dr. Fogel had been designated as an expert. [DE 615, 616].  At the same time, the Court stayed pending the Fogel appeal the later IBD cases where no expert had yet been designated.  *Id.*

Seven days after hearing argument on the plaintiffs' Fogel appeal, a unanimous panel of the Eleventh Circuit affirmed this Court's "well-reasoned decision."  *Rand v. Hoffmann-La Roche Inc.*, No. 07-18883, 291 Fed. Appx. 249, 2008 U.S. App. LEXIS 18623 (11th Cir. Aug 26, 2008) (per curiam).

This Court subsequently directed the remaining IBD plaintiffs to designate a general causation expert by December 18, 2008.   [DE 672].   Plaintiffs responded by re-designating Ronald Fogel and serving a modified expert report (the "second report").[1]  *See* Ex. B.

---

[1] Plaintiffs' counsel were tellingly (1) unwilling to subject David Sachar – their expert in the New Jersey state court litigation – to exclusion by this Court, and (2) unable to find any other expert willing to opine that Accutane causes IBD.

3

On January 22, 2009, Roche deposed Dr. Fogel again.  *See* Ex. A.  At this deposition, it quickly became clear that Dr. Fogel had nothing new to offer beyond his original testimony.  He readily admitted that he used the same methodology and relied on the same lines of evidence as those which previously led to his exclusion.  *See id.* at 66:10-16, 84:16-20.

In addition, in discussing his individual lines of evidence, Dr. Fogel showed his methodology to be even more defective than was previously known.  For example:

- In his second report, Dr. Fogel attempted to increase his cited number of rechallenge reports from 13 (in his original report) to 23 (in his second report).  However, when examined about these numbers at his deposition, he conceded that he could only identify at most 9 such cases.  Ex. A at 174:16 – 176:18, 190:1-4.

- Dr. Fogel admitted that basic biological indicators of IBD were absent from the dog studies on which he relied.  Ex. A at 107:8 – 109:7, 111:15 – 112:17.

- Dr. Fogel claimed that several independent sources had concluded that Accutane causes IBD.  On examination, however, these sources proved not to be new, they did not address IBD, and they did not purport to reach any causal conclusion about Accutane and the gastrointestinal condition they discussed.  *See id.* at 73:3 – 75:4, 75:20 – 77:3, 79:1 – 80:25.  In an illustrative example, Dr. Fogel cited a table on "colonic injury" (not IBD) from the online "Bombay Hospital Journal," a journal about which Dr. Fogel admitted he knew nothing, which he had never before read, and which he added to his new report without examination when Plaintiffs' counsel Michael Hook fed him the citation – "I don't remember anything about the citation, no."  *Id.* at 79:1 – 80:7.

Moreover, Dr. Fogel conceded that – aside from his re-review of the old documents on which his prior rejected opinion was based – he relied on only three "new" documents.  *Id.* at 249:23 – 250:22.  Each of these documents was fed to him by counsel – there were none he "found independently without counsel pointing [him] to them."  *Id.* at 83:5-9, *see also id.* at 132:16 ("Material was shown to me by Mr. Hook.").  He then conceded a lack of basic knowledge about these documents.

- One of the new documents was the labeling for Vesanoid, another retinoid.  Dr. Fogel admittedly knows nothing about Vesanoid, the disease it treats, or the data on which its labeling is based.  Ex. A at 133:9 – 141:20.

4

- The other two new "documents" are excerpts from the testimony of two Roche experts, of which Plaintiffs' counsel gave Dr. Fogel a "few pages." *Id.* at 243:18-20, 246:1, 249:11-14. Dr. Fogel admittedly knew nothing about how these experts reached their opinions – he simply used the few-page excerpts to make sound-bite arguments. *Id.* at 53:12 – 54:9, 121:17 – 123:5.

Because Dr. Fogel's deposition reinforces and actually magnifies the basic shortcomings of his prior testimony, Roche brings this motion to exclude his reassertion of his earlier opinions.

## LEGAL STANDARD

The party offering expert testimony bears the burden of demonstrating that the testimony is admissible. *See, e.g.*, *Hall v. United Ins. Co.*, 367 F.3d 1255, 1261 (11th Cir. 2004). The court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993). "This Court's gate-keeping function is to ensure that opinions based on mere theory do not reach the jury." [DE 580 at 27]. To pass this gate-keeping review, parties must establish that their expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

## ARGUMENT

Dr. Fogel should be excluded for two related reasons. First, he admits that he has simply re-applied the same methodology that this Court and the Eleventh Circuit found were properly excludable. Second, his most recent testimony further exposes that his opinions flow from unreliable advocacy rather than from sound scientific principles. Far from diminishing the "gap between the data and the opinions he proffers," Dr. Fogel's recent testimony shows that gap to be even greater than he previously acknowledged. [DE 580 at 27]; *see also Goldstein v. Centocor, Inc.*, 2009 WL 275322 (11th Cir. Feb. 5, 2009) (unpublished), attached as Ex. C (affirming district court's exclusion of expert who relied on case reports, articles providing "limited

5

information," MedWatch reports, and individual plaintiff data, because "there is simply too great an analytical gap between the data and the opinion proffered")

I.      **Dr. Fogel Relies on the Same Unreliable Methodology That This Court Excluded.**

Dr. Fogel had almost two years to respond in a meaningful way to this Court's identification of critical defects in his previous causation opinion.  He similarly had two years to identify "sufficiently reliable data" to be admissible under *Daubert* and to support his "leap of faith" that Accutane causes IBD.  [DE 580 at 4, 27].

Instead of using this two years to develop a reliable methodology, Dr. Fogel has simply re-asserted the ***exact same methodology*** that the Court previously rejected as unreliable:

> Q.  Is it fair to say that ***your methodology has been consistent across your two reports***?
>
> A.  ***Yes***.
>
> Q.  And that's the methodology you've used throughout your career, that's your testimony?
>
> A.  Yes.
>
> Q.  So am I right in understanding that ***your second report employs the same methodology as your first report***, although you've cited new documents in it?
>
> A.  ***Correct***, I've either cited new documents or I've reviewed the documents in greater detail and remember them better.

Ex. A at 66:4-16 (emphases added).

Dr. Fogel specifically acknowledged that he has no "new lines of evidence" in his second report that did not appear in his first report.  *Id.* at 84:16-20 ("No.").  Nor has he identified new scientific literature.  *Id.* at 38:21 – 39:1 (no clinical studies); *id.* at 51:8-11 (no epidemiological studies); *id.* at 52:8-12 (no statistical analysis); *id.* at 57:19-23 (no new animal studies); *id.* at 57:24 – 58:2 (no new seminal papers).  Instead, he simply "read[] . . . more carefully" some of the documents this Court previously considered; he added some new citations to documents he

124624v1

had previously reviewed but determined were unworthy of citing in his first report; and he looked at three "new" documents that his lawyer gave him (the Vesanoid label and "a few pages" of testimonial excerpts from two Roche expert witnesses). *Id.* at 83:5-9, 249:23 – 250:22. As further discussed in Part II, these documents are individually unreliable. More fundamentally, though, this "more of the same" smattering is not enough to transform his previous testimony into the kind of scientifically reliable evidence required by *Daubert*, Rule 702, and this Court.

If anything, the passage of time has undermined even the prior methodological defense that Plaintiffs' counsel have offered for Dr. Fogel. Thus, he now admits his testimony has nothing to do with the Bradford Hill criteria, which his lawyers previously used to try to legitimize his views:

Q. Are you familiar with the Bradford Hill criterion?

A. Only in a superficial way.

Q. You've never purported to apply them here?

A. No.

*Id.* at 253:18-22.[2]

In addition, "causality assessments" constituted a major part of Dr. Fogel's earlier testimony, but he has now entirely jettisoned them because continued reliance on them "would

---

[2] Dr. Fogel's admission that he never even purported to apply the Bradford-Hill factors renders outrageous Plaintiffs' continued misrepresentations to the Court that Dr. Fogel was in fact applying Bradford-Hill. *See* Apr. 19, 2007 Daubert Hearing at 36:20-22, 37:18-21 ("The method which Dr. Fogel used, as I've explained before, is a Bradford Hill criteria"), 37:25 – 38:1, 38:11-13 ("[Y]ou measure the relationship between the drug and the adverse event through Bradford Hill, which is what Dr. Fogel did."); 38:23 – 39:1, 39:16-22, 41:13-15, 47:15-17, 52:17 – 53:3, 53:4-12, 56:2-4, 57:18-24 ("the Bradford Hill methodology which was used by Dr. Fogel has been around for ages, and it is the methodology which he used"); Pls.' Opp. to Defs.' Mot. to Exclude General Causation and Labeling Testimony of Ronald Fogel at 3, 6, 8, 9; Pls.' Mot. for Reconsideration of Defs.' Mot. to Exclude General Causation and Labeling Testimony of Ronald Fogel at 2, 7.

have taken more time and more thought" than he had to expend.  Ex. A at 255:2 – 256:21. ("Q. And you understand Judge Moody criticized your reliance on those?  A.  Yes.  Q.  Is that why you took that out of your report?  A.  Yes.").  His methodology has thus become more sparse even on its own terms than his already-excluded methodology.

Finally, faced with this Court's conclusion that his methodology failed *Daubert* review, Dr. Fogel did nothing during these past two years to satisfy the basic *Daubert* measures of a reliable methodology.  *See Daubert*, 509 U.S. at 593-94.  He still has not conducted original research in this area, Ex. A at 15:17-19; his views remain untested, *id.* at 58:6-8 ("Q.  Have you attempted to test it through some form of human or animal study or test tube study?  A.  No."); he still has not subjected his views to peer review or public reaction in any form, *id.* at 58:3-5 ("Q.  Have you attempted to publish the opinion contained in [your first report] since the date of [the report]?  A.  No, I have not attempted to publish it."); *id.* at 264:7-10 ("Q.  Have you presented your views on Accutane causing IBD in any public forum?  A.  No, I have not."); and he still cannot quantify any rate of error in his theory, *id.* at 59:19-23.  Tellingly, he has not even attempted to obtain funding for research to support his theory, because he has "had other things that have taken priority over that."  *Id.* at 59:2-4.

Dr. Fogel has merely repackaged his earlier defective opinions with smattered supplements that Plaintiffs' counsel have asked him to add.  *Id.* at 83:5-9 ("Q.  Have you found any new documents that you rely on in your report, in your second report that you found independently without counsel pointing you to them?  A.  No.").  Dr. Fogel's elevation of lawyer advocacy over scientific inquiry repeats his earlier "bias of wanting to reach a particular conclusion."  [DE 580 at 16].  Just as before, this bias and the defective methodology it has produced justify excluding his testimony.

**II.    Dr. Fogel's Recent Testimony Magnifies the Concerns That Led to His Original Exclusion.**

The Court excluded Dr. Fogel's opinions after carefully reviewing each line of evidence upon which he relied and finding each to be methodologically unsound.  Rather than curing these defects, Dr. Fogel's recent testimony – whether in his rehash of his earlier views, or in his limited attempt to cite new documents – actually magnifies the defects that led to his original exclusion.

**A.    Unsupported Animal Analogies and Analogies to Other Retinoids**

Dr. Fogel previously relied on limited animal data, often involving retinoids other than Accutane (Vitamin A and 4-oxo-isotretinoin).  Specifically, he relied on unidentified rat studies involving Vitamin A, two dog studies involving high doses of Accutane, and a pilot dog study involving 4-oxo-isotretinoin.

Dr. Fogel's most recent testimony on animal data and other retinoids only further confirms the Court's wisdom in finding it to be methodologically unreliable.  Dr. Fogel has offered no new animal data in his current report, instead standing on the earlier animal data this Court found to be unreliable.  In his words, Dr. Fogel has simply spent "more time reviewing those articles and reading them more carefully."  Ex. A at 243:18-20; *see also id.* at 57:19-23. Dr. Fogel's only new data regarding other retinoids consists of his uninformed reliance on the physician labeling for Vesanoid (yet another retinoid).  *See id.* at 133:9 – 135:3.

**1.    Animal Data**

This Court cited several ways in which Dr. Fogel's reliance on animal data was unreliable.  Each of these defects remains unchanged from his last report, and several of them have actually been magnified.

a)      <u>Improper Reliance On High-Dose Data</u>

<u>First</u>, the Court previously noted Dr. Fogel's improper reliance only on very high-dose animal data, to the exclusion of unfavorable human-dose data:  "high doses customarily used in animal studies require consideration of the dose-response relationship and whether a threshold no-effect dose exists."  [DE 580 at 5-6 (quoting Michael D. Green et al., *Reference Guide on Epidemiology*, Reference Manual on Scientific Evidence 333, 345-46 (Federal Judicial Center, 2d ed. 2000)].  Relatedly, the Court expressed concern about Dr. Fogel relying on data showing "irritation [that] was temporary, not permanent."  [*Id.* at 9].

These concerns have persisted, with Dr. Fogel admitting that he has no knowledge allowing him to translate his high-dose animal findings to human doses, and no knowledge about whether his animals absorb retinoids in the same way as humans.

Q.  Are you an expert in the – in how rat dosing or dog dosing corresponds to human dosing?

A.  No.

. . . .

A. . . . [W]e don't know what the absorption is, we don't know how much is lost in the feces, so **there are a lot of things that are unknown in order to be able to make that comparison**.

Q. You say, "We don't know."  Are you telling me science doesn't know that or that you personally don't know?

A.  **I don't know, and I wasn't able to find that information.**

Ex. A at 90:24 – 91:16 (emphases added).

While Dr. Fogel made a token effort in his second report to argue (against the data) that there might be some relevant findings in the lower dose dogs in one study, he quickly abandoned this claim at deposition, admitting that he did not see changes to the dogs' gastrointestinal tracts that were consistent with permanent human IBD.

10

Q.  And as to those conditions, do you see any difference in the rates for the 3 mg dogs versus the control dogs?

A.  No.

Ex. A at 111:15 – 112:17 (referring to gastrointestinal edema, red mucosa, gastrointestinal hyperemia, gastrointestinal hemorrhage, granuloma, and petechiae); *see also id.* at 107:8 – 109:7 (identifying several of these symptoms as consistent with IBD).

b)   <u>Failure to Review Other Animal or Human Data</u>

<u>Second</u>, the Court noted Dr. Fogel's methodologically unsound practice of simply ignoring animal and human data that did not help him.  [DE 580 at 11].  His most recent deposition merely confirmed this practice.

Dr. Fogel testified that, although he relies heavily on dog data in opining that Accutane causes IBD, he is unaware of dogs being used as a model for human IBD.  Ex. A at 85:16-17, 86:3-5 ("The dog model, I'm not familiar with work being done as a model of inflammatory bowel disease.").  At the same time, Dr. Fogel admitted that *he is aware* of other animals being used as a model for human IBD, but he apparently has not researched those models, reviewed other dog literature, or reviewed other animal data generally.  [DE 580 at 11 n.7 (noting this shortcoming)]; *see* Ex. A at 85:13-14 ("If you're studying inflammatory bowel disease, the murine model has been used a lot.").

Dr. Fogel disregards available human clinical data in the same manner.  Dr. Fogel is willing to rely on data showing reversible dog bleeding at super-high doses to prove that Accutane causes human IBD.  At the same time, he appears not to have reviewed "any studies where an Accutane group is compared to a control group to see whether adverse effects are occurring at a higher rate *in humans*."  Ex. A 119:19 – 120:3 (emphasis added) ("I did not do that for this second submission.").  Nor has he seen any studies that allow him to say that his

11

hand-picked animal findings "carried through to human populations."  *Id.* at 120:4-8 ("Not that I remember.").   The human clinical studies that exist show no differences in IBD or related gastrointestinal symptoms between humans taking Accutane and humans in a placebo group, so Dr. Fogel simply ignored them.  *See id.* at 117:23 – 119:3; Ex. D.

c)      <u>Unsupported Analogies to Other Retinoid Data</u>

<u>Third</u>, the Court noted Dr. Fogel's admitted inability to analogize between retinoids like Vitamin A and 4-oxo-isotretinoin on the one hand, and Accutane on the other hand.   In the Court's words, that inability "is obviously important because, while Accutane is one of many 'retinoids,' *i.e.*, a group of compounds derivative of vitamin A, the human body reacts to Accutane and vitamin A in different ways."  [DE 580 at 10].

Dr. Fogel continues to acknowledge that he lacks any ability to analogize between Accutane and other retinoids.  *Compare* [DE 580 at 11] ("Dr. Fogel admits he is not an expert in retinoid chemistry or pharmacology.") *with* Ex. A at 231:12 – 232:5 (admitting that he is not an expert on retinoid pharmacology, the chemical structure of different retinoids, how retinoids convert into one another, or dosing comparisons across retinoids).   In addition, he has made specific admissions regarding the other retinoids that rules them out as a legitimate part of a reliable methodology.

Regarding Vitamin A, Dr. Fogel has now conceded that his rat Vitamin A studies do not show that Accutane causes IBD.  Ex. A at 269:21-22 ("Q.  Not to show that Accutane causes IBD?  A.  That is correct."); Ex. B at 13 ("The role of the vitamin A references in the rat is solely to demonstrate that a dietary nutrient, can damage the intestinal lining.  This information is not intended to provide a mechanism by which isotretinoin causes IBD.").  Nor has he undertaken even the most basic study of Vitamin A that would allow him to determine that Vitamin A data is relevant to Accutane, proving himself entirely ignorant of:

12

124624v1

- Vitamin A's toxicity profile.  Ex. A at 87:25 – 88:2 ("Q. Are you familiar with the complete literature on vitamin A toxicities? A. No."); *id.* at 88:13-24 ("Q.  Do you have the basis to answer the question are there toxicities that Accutane possesses that vitamin A does not possess?  A.  I don't have a basis to answer that.  I would – I mean ***based on a superficial knowledge of, you know, what's given to people, I would say that there are differences in toxicity***.") (emphasis added).

- How Vitamin A dosing compares to Accutane dosing.  *Id.* at 88:25 – 89:6. ("No, I haven't done that.").

- How Vitamin A's absorption in the GI tract compares to Accutane.  *Id.* at 133:4-8 ("No, I've not made a systematic study.").

Regarding 4-oxo-isotretinoin, Dr. Fogel's lawyer gave him 4 pages of testimony from Lorraine Gudas, Roche's expert retinoid pharmacologist, which Dr. Fogel attempted to use to overcome his own ignorance regarding 4-oxo-isotretinoin.  But Dr. Gudas' testimony relates only to the amount of 4-oxo-isotretinoin that ends up in the animals' blood streams – it provides no information as to whether dogs might metabolize the same dosage of Accutane differently from humans, as Dr. Fogel admitted:

Q. Okay.  And Dr. Gudas, you agree with me, didn't speak to how those dog results extrapolated to humans?

A. No, but from Dr. Gudas' testimony, I concluded that the actual dose in humans is equivalent to – is certainly much greater than 10 mg/kg, probably closer to somewhere between 20 and 40 mg/kg, just based on the concentrations of 4-oxo-isotretinoin.

Q.  Have you ever studied – have you ever looked at 4-oxo studies involving humans?

A.  No.

Q.  And so do you know if these animal 4-oxo studies translate through into the human 4-oxo studies?

A.  I did not review that material.

*Id.* at 245:8-24.   Dr. Fogel similarly admitted that he has no independent knowledge of the metabolic processes in a dog, nor did he attempt to replicate or understand Dr. Gudas's 4 pages

13

of testimony.  Ex. A at 93:10-13 ("That I don't have information on."); *id.* at 121:21 – 123:5. This is simply yet another example of Dr. Fogel taking data he admittedly does not understand and has not replicated, and using the data to argue the exact opposition conclusion that was reached by the sponsor of the data.  [*See* DE 580 at 25 (criticizing Fogel for reaching conclusions contrary to those reached by the scientists who actually understand the relevant data:  "He takes that step without having done the intensive review performed by Reddy and her fellow doctors.")].

Dr. Fogel completely undermined any reliable use of data involving other retinoids, and in the process conclusively demonstrated the litigation-driven nature of his opinions, when he admitted that he cannot conclude that *any* other retinoid causes IBD.

Q.  Does vitamin A cause inflammatory bowel disease?

A.  Not as far as I'm aware.

Q.  Does Vesanoid cause inflammatory bowel disease?

A.  I have not seen any reports to that effect.

Q.  Can you point me to any other retinoid that causes inflammatory bowel disease?

A.  I haven't done the complete review of all the retinoid literature in inflammatory bowel disease.  In the reviews that I have done I haven't seen any reports.

. . . .

Q.  Okay. Does 4-oxo isotretinoin cause IBD?

A.  I don't know any literature to say that it does or doesn't.  As far as I know, it's not been studied.

Ex. A at 253:6-17, 268:16-19.   This testimony shows that Dr. Fogel is willing to rest his Accutane opinion on snippets of data about related compounds, even though he admits the data on the related compounds does nothing to establish that they cause IBD.  Such a methodology cannot withstand *Daubert* scrutiny.

124624v1

2.      **Vesanoid**

Dr. Fogel's one bit of "new" evidence in this area consists of his reliance on the Vesanoid physician labeling.[3]   Vesanoid is a distinct retinoid that is used to treat acute promyelocytic leukemia ("APL"), a serious form of cancer that causes bleeding throughout the body, including in the gastrointestinal tract.   The Vesanoid labeling notes simply that "GI hemorrhage" was observed, that it is "common in patients with" leukemia, and that it is reported in the labeling "regardless of drug relationship."  Ex. E (Vesanoid labeling).

Although Dr. Fogel relied on this labeling to testify that Accutane causes IBD, he conceded a complete lack of knowledge about Vesanoid or its labeling:

- He did not review the Vesanoid clinical data on which the labeling was based to form a judgment about whether it suggested a causal link between Vesanoid and gastrointestinal bleeding.  Ex. A at 134:1-5; 136:1-5.

- He admits that he knows of no Vesanoid **IBD** data, and that the labeling refers to GI hemorrhage data that is "[n]ot necessarily IBD."  *Id.* at 139:14 – 140:2; *see also id.* at 134:6-11 ("Have you studied whether any of the cases of GI bleeding associated with Vesanoid turn out to be IBD?  A. When I did a literature search looking for that, I could not find anything.").

- He knows nothing about bleeding rates for APL, and he does not know whether Vesanoid bleeding is caused by Vesanoid or the disease it treats.  *Id.* at 134:12-21 ("Are you aware that GI bleeding is a common adverse event for that disease?  A.  I would not be surprised, but I haven't reviewed the literature on that disease.").

Instead, as with his other analysis, he simply found a sound-bite that superficially supported his views and jumped to a conclusion without any meaningful, scientific inquiry.  His methodology does not require him to look to the same drug or the same gastrointestinal effect, and he need not

---

[3] In this regard, Dr. Fogel's opinions have now caught up with his lawyer's advocacy.  At the last Fogel hearing, Plaintiffs' counsel argued that Dr. Fogel relied on Vesanoid but then conceded on questioning from the Court that he did not.  Apr. 19, 2007 Tr. at 46:15 – 47:15.  Counsel has now cured this gap.

review the actual scientific data.   The unexamined sound-bite gives him enough to blame Accutane.

### B.       Case Reports

Case reports, including rechallenge reports, are often incomplete, making them an unreliable basis for causation opinions.   Dr. Fogel has now admitted this fact with respect to Accutane case reports, conceding that his case reports did not always contain data sufficient to allow him to either diagnose IBD on the one hand, or, on the other hand rule out alternative causes he would need to consider.   *See* Ex. A at 177:12-16 ("Not with a reasonable degree of certainty");   *id.* at 179:1-6 ("No.");   *id.* at 179:17-21 ("In this case there's just too much information missing to reach any conclusion.");   *id.* at 205:3-12 ("Q.   From these MedWatch reports . . . are you confident to a reasonable degree of medical certainty that you have all the information you want about these factors, you'd want to be able to rule out antibiotic use, NSAID use, oral contraceptives, smoking?  A.  I don't have all of that information.").

In addition to this defect in relying on case reports, the Court previously found Dr. Fogel's reliance on case reports generally, and rechallenge reports more specifically, to be unreliable because of the impossibility of eliminating chance results in these reports.  [DE 580 at 21 (they "are entitled to little weight");  *id.* at 24 ("one would expect some of those [rechallenge] cases to occur coincidentally")].   Dr. Fogel has still not responded to this defect by conducting any form of quantitative analysis of the case report rate.  Ex. A at 52:13-18.   Instead, he now claims to have recounted the number of rechallenge cases, and thereby increased his claimed number of such cases from 13 to 23, and he claims to rely on "a few pages" of testimony from a Roche witness which he claims constitutes an analysis of the case reporting rate.   Neither claim is consistent with a reliable methodology.

16

1.      **Rechallenge Reports**

Dr. Fogel has finally conceded that Accutane rechallenge reports can arise by chance, given that IBD is a cyclical disease and Accutane is administered to the age group that has the highest background rates of IBD:  "That is true."   *Id.* at 157:3-15; *see also* [DE 580 at 24 ("[G]iven the episodic nature of IBD, one would expect some of those cases to occur coincidentally after Accutane is given and the disease to subside when Accutane is withdrawn.")].  Yet he still claims that rechallenge cases are "[o]f particular importance for the demonstration of causality," Ex. A at 157:3-9, even though he admittedly has conducted no analysis on the rate at which such reports arise other than counting the gross number of such reports.  *See id.* at 157:16-19.

As before, Dr. Fogel has simply set for himself a "magic number" of rechallenge reports necessary to conclude causation, albeit his magic number has migrated from 3 to 5 such reports. *Compare* Ex. F (First Report) at 7 ("If there are at least three of those reported events, strong and compelling evidence of causation becomes apparent.") *with* Ex. A at 160:2-9 ("Five would make it very suspicious.").  Dr. Fogel applies his magic number without regard to the size of the population from which the rechallenge reports originated:

> Q.  And does it make any difference if it's five reports amongst 500 users or five reports among 5 million users?
>
> A. . . . Five in 1,000 is still significant, it's still significantly different from zero.
>
> Q.  What about five in 5 million?
>
> A.  Again, that's different from zero.

Ex. A at 160:2-22.  This willingness to find causation automatically from five rechallenge reports – regardless of whether they appear among 1000 or 5 million users – is strikingly unreliable and again falls fundamentally short of a valid analytical or statistical analysis.[4]

As this Court previously concluded, simply counting the number of rechallenge reports is not a reliable methodology.  ***But Dr. Fogel faltered even in this simple counting exercise.***  He claims in his second report to have identified 23 rechallenge reports, 10 more than in his first report.  The 10 additional rechallenge reports were fed to Dr. Fogel by Plaintiffs' counsel, a fact that became evident when Dr. Fogel was only able to identify 16 such reports at his deposition.  *Id.* at 169:24 – 170:2 ("Q. . . . My question is how did you find the references represented in the 10 new reports?  Is that something that Counsel gave you?  A.  I believe so, yes."); *id.* at 174:5-10 ("Q.  Okay.  So by my count, you've cited 16 rechallenge reports, is that right?  A.  Yes.  Q. Do you know where the other seven you cite in the report come from?  A.  No.").  He then agreed that 3 of these remaining 16 reports were duplicates, and he admitted that he could not conclude whether 4 more reports actually involved IBD.  *Id.* at 174:16 – 176:18, 190:1-4, 177:12-16, 179:1-6, 179:17-21, 187:25 – 188:12.  Dr. Fogel thus admitted – remarkably – that his hard count of rechallenge reports was 9, *4 less* than the amount he cited in his first report.  *Id.* at 190:1-4 ("Q.  So if you take out those four reports just as a matter of math, you would agree with me that we're down to nine rechallenge reports?  A.  I will [give] that to you.").

Even as to his remaining 9 rechallenge reports, Dr. Fogel once again shows his willingness to blame Accutane whenever it is linked with what he believes to be IBD, without

---

[4] Beyond establishing an arbitrary threshold of five rechallenge reports, Dr. Fogel never even considered the possibility of a *negative* rechallenge (when a patient restarts Accutane but *does not* experience IBD).  Ex. A at 158:13-23 ("[H]ave you done an analysis of those [negative rechallenge] case reports?  A.  No. . . That would be very interesting information, but it doesn't change the conclusion.").

the need for any analysis of the data.  Thus, in one rechallenge example, he counted a report as a rechallenge report based on the "reporter's *suspicion* that the patient may have put themselves back on Accutane," even though he admitted "that ***the reporter is expressing some uncertainty about that fact***."  *Id.* at 192:11-18 (emphases added).  Yet he discarded the conclusion of another reporter – a gastroenterologist – who said a report was "not related" to Accutane.  *Id.* 193:7-10. Data nuances do nothing to deter Dr. Fogel from his always-Accutane opinion.  [*Cf.* DE 580 at 25 (faulting Fogel for his always-Accutane views:  "Dr. Fogel is of the opinion that Accutane causes IBD no matter what the dose, no matter how long it has been since the individual last took Accutane, and, seemingly, no matter what other background factors are present.")].

### 2.   Analysis of Reporting Rate

Plaintiffs' counsel attempted to have Dr. Fogel respond to the Court's concern about his failure to rule out chance case report results by giving Dr. Fogel "a few pages" of deposition testimony from a Roche expert regarding the number of cases of IBD in patients taking Accutane.  Ex. A at 249:12-14.  This witness (Dr. Mayer) concluded that there was no statistically significant difference between the group of Accutane patients who develop IBD and the IBD rate in the non-Accutane population.  Dr. Fogel disagrees with the expert's conclusion but seeks to sound-bite the expert's testimony without have independently analyzed his data.

Q.  You haven't replicated [Dr. Mayer's] work, you don't know what prevalence rates he used or incident rates he used, correct?

A.  Correct, we discussed that before. The answer is no.

Q.  You don't know how he counted his reports of IBD and whether you'd agree with that count or not?

A.  That is correct.

*Id.* at 267:5-20; *see also id.* at 53:12 – 54:9 ("***I do not know his methods***.") (emphasis added).[5]

Dr. Fogel's conclusory distortion of another expert's data is not the kind of statistical analysis that this Court indicated would be necessary before case reports could be considered as evidence of a causal relationship.  As this Court cautioned, "When an expert relies on the studies of others, he must not exceed the limitations the authors themselves place on the study.  That is, he must not draw overreaching conclusions."  [DE 580 at 4].

### C.    Misconstrued Roche Documents

The Court expressed concern about "Dr. Fogel's willingness to reach conclusions based on [internal Roche] documents that he does not understand."  [DE 580 at 16].  Dr. Fogel has retained this practice in his second report, relying on an additional Roche document that he saw before his first report but which did not merit mention in that report.  Ex. A at 144:9-25 ("[S]ometimes you see something and you just get overwhelmed by the information and don't necessarily note it.").

Specifically, Dr. Fogel claims in his second report that "Roche has internally concluded that Accutane is contraindicated with inflammatory bowel disease," which he claims supports his causation hypothesis.  Ex. B at 13.  To support this contention, Dr. Fogel relies on a single bullet point in an internal memorandum that states:  "in patients with ileitis, enteritis, or colitis in the

---

[5] Had Dr. Fogel replicated Dr. Mayer's analysis, he would have seen that Dr. Mayer applied an artificially low estimate of IBD rates in the general population to generate an anticipated number of chance IBD reports among the background population.  Whereas Dr. Mayer applied a background rate of no more than 3 per 100,000, Dr. Fogel has previously admitted that the background rate of IBD in the general population is 16-20 per 100,000.  Ex. G (Dec. 13, 2006 Dep.) at 179:19 – 180:11.  During his recent deposition, he tried to claim the existence of new data suggesting a lower rate.  Ex. A at 35:23 – 37:13.  But when counsel obtained this "new data" at a break in the deposition and showed it to Dr. Fogel, he was forced to admit that the new data was the same as the old – it showed background rates of 22 per 100,000.  *Id.* at 149:5 – 152:21.

124624v1

active phase of the disease, Roaccutane is basically contraindicated."  Ex. A at 144:3-8; 146:7-12

(admitting he did not rely on "anything else in this document").

Repeating the defects that led the Court to reject his earlier reliance on Roche documents,

Dr. Fogel concedes that he knows nothing about the origin of this document, including why it

was generated, who wrote it , or whether the author had medical training.  *Id.* at 145:1-17.

Without this basic level of information, this document cannot be a scientifically reliable piece of

evidence and certainly is not evidence of "a type relied upon" by comparable experts.  *See Soldo*,

244 F. Supp. 2d at 545-46.  As before, Dr. Fogel's reliance on a document he does not

understand "casts suspicion on whether he blindly followed a scientific trail until reaching a

conclusion, or whether the conclusion came first and then a trail was identified."  [DE 580 at 16].

In addition, the document on its face does not even support Dr. Fogel's misconstruction

of it as a secret Roche conclusion on causation.  Two pages earlier in the document, the author

notes that colitis is listed "as a possible **<u>Side Effect</u>**" in the Swiss labeling "but not as a

**contraindication**" because of the "contradictory" data of possible aggravation in some cases but

not others.   Ex. H (emphases in original).  The statement on which Dr. Fogel relies simply

summarizes that patients with ileitis, enteritis, or colitis ***in the active phase*** (meaning current

symptoms of rectal bleeding, abdominal pain, or diarrhea ) should not use Accutane, which is the

exact admonition in place since 1984 in the Accutane Warnings:   "Patients experiencing

abdominal pain, rectal bleeding, or severe diarrhea should discontinue Accutane immediately."

Ex. A at 24:10-19.  Indeed, when pressed to defend his interpretation that this single bullet point

meant something other than simply "you shouldn't use Accutane if someone shows rectal

bleeding, abdominal pain, or diarrhea," Dr. Fogel could not do so:  "I don't know one way or the

other because, you know, the language isn't entirely clear."  Ex. A at 153:17-25.

At bottom, then, Dr. Fogel rests his opinion on a single phrase plucked out of a document given to him by Plaintiffs' counsel – a phrase that he remarkably admits "isn't entirely clear" but to which he nevertheless ascribes a dire reading even though such a reading is directly contradicted by the document two pages earlier.   Dr. Fogel's selective reading of internal documents is just the kind of unreliable methodology uniformly rejected by courts around the country.   *See* [DE 580 at 14-17]; *Soldo*, 244 F. Supp. 2d at 545 ("Experts' reliance on phrases plucked from corporate documents . . . does not provide scientific evidence of causation."); *Miller*, 196 F. Supp. 2d at 1086-87 (reliance on pre-selected evidence from interested parties, to exclusion of other relevant, reliable evidence, is inconsistent with reliable methodology).

### D.   Hypothetical Mechanisms of Action

As this Court noted the first time it considered and rejected Dr. Fogel's causation opinion, "a biological explanation without evidence of the mechanism by which it works is merely an unproven hypothesis, a theory."   [DE 580 at 12].   Dr. Fogel's continued unsupported speculation regarding possible mechanisms of action still cannot form a reliable scientific basis for a causation opinion.

As before, Dr. Fogel is still unable to distinguish between which of his many "mechanism of action" theories is most likely to account for his claim that Accutane causes IBD. He has a theory he "would favor" even though he admits that "[w]e don't know which one is the most likely mechanism," and when asked which is the "least likely hypothesis," he responded in Fogelian fashion:  "I haven't thought about that."  Ex. A at 226:3-14.

It is now clear why Dr. Fogel is unable to distinguish between his competing hypotheses – he has simply read about them in someone else's work (the Reddy article) and done nothing to understand them.  *Id.* at 224:24 – 225:5 (agreeing that his opinion regarding biological plausibility is a "direct quote" of the Reddy article).  The Reddy article stated (and Dr. Fogel

22

copied) the following: "Retinoids stimulate natural killer T-cell, disturb epithelial tissue growth, proliferation or maturation, disrupt glycoprotein synthesis, and influence apoptosis."  *Id.* at 224:24 – 225:5.   When pressed to explain the meaning of this sentence he copied, Dr. Fogel failed to display even a rudimentary understanding of the data underlying it:

- *natural killer T-cells*:  "I don't know which article they refer to . . .  I don't know which species . . . I did not review those papers."  *Id.* at 227:18-25.

- *disruption of glycoprotein synthesis*:  "I don't know what their reference is for that."  *Id.* at 226:15-21.

- *apoptosis*:  "I don't know which reference they used."  *Id.* at 227:5-13.

- *proliferation or maturation*:  "As cited there, no."  *Id.* at 227:1-4.

Even for the studies Dr. Fogel reviewed or could remember, he had to admit:

- *None involved Accutane.*  *Id.* at 225:9-15.

- *There is no human data*.  *Id.* at 221:1-7 ("In humans, no, but there is animal data").

- *He has to extrapolate from these non-specific gastrointestinal findings to full-blown IBD.*  *Id.* at 230:19 – 231:11.

In short Dr. Fogel acknowledges that he "cannot tell you conclusively the mechanism by which Accutane causes inflammatory bowel disease."  *Id.* at 219:10-11.   In place of actual mechanistic evidence, he relies on the theoretical postulation of others which he neither has reviewed nor understood.   His attempt to prop up his conclusions with these second-hand theories must again fail:  "If medical science does not know the cause, then the expert's theory of causation, to the extent it is a theory, is isolated and unsubstantiated."  [DE 580 at 14].

## CONCLUSION

For the foregoing reasons, Dr. Fogel's general causation testimony should be excluded in its entirety, and the remaining IBD cases pending in this MDL should be dismissed.

Respectfully submitted,

s/Rafael Cruz-Alvarez

| | |
|---|---|
| Michael X. Imbroscio | Edward A. Moss |
| Paul W. Schmidt | Florida Bar No. 057016 |
| Covington & Burling LLP | Email:  emoss@shb.com |
| 1201 Pennsylvania Avenue NW | Rafael Cruz-Alvarez |
| Washington, D.C. 20004 | Florida Bar No. 989861 |
| | Email:  ralvarez@shb.com |
| | Shook, Hardy & Bacon, L.L.P. |
| Dated:  February 24, 2009 | Miami Center, Suite 2400 |
| | 201 South Biscayne Boulevard |
| | Miami, FL 33131-4332 |
| | PH:  (305) 358-5171 |
| | FAX:  (305) 358-7470 |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 24th, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all attorneys of record.

s/Rafael Cruz-Alvarez

24

124624v1