IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE: ACCUTANE PRODUCTS
LIABILITY LITIGATION

CASE NO. 8:04-MD-2523-T-30TBM
MDL 1626 – ALL CASES

_____/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO HLR, INC.'S
AND ROCHE LABORATORIES, INC.'S MOTION TO EXCLUDE
THE REASSERTED GENERAL CAUSATION TESTIMONY OF RONALD FOGEL**

The Plaintiffs' Steering Committee of MDL 1626 (hereinafter referred to as the "Plaintiffs"), by and through the undersigned attorneys, hereby responds in opposition to HLR, Inc.'s and Roche Laboratories, Inc.'s (hereinafter "Roche" or "Defendants") Motion to Exclude the Reasserted General Causation Testimony of Ronald Fogel. Defendants ask this Court to dismiss the opinion of Dr. Fogel without meaningful consideration of whether Dr. Fogel's further development of his opinion that Accutane (isotretinoin) causes inflammatory bowel disease ("IBD") addresses the concerns that caused the Court to exclude his testimony in other cases. Contrary to Defendants' contentions, the opinion set forth in Dr. Fogel's report disclosed by Plaintiffs on December 18, 2008 was formed using a sound methodology and reliable evidence.

Plaintiffs and Dr. Fogel are certainly aware of the Court's ruling determining that Dr. Fogel's earlier opinion fell below the standards of admissibility set out in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). *See* Exh. A to Defendants' Motion (Deposition of Ronald Fogel, M.D., January 22, 2009 (hereinafter "Fogel Dep.") at 262:24-263:4). In reconsidering and reformulating his opinion, however, Dr. Fogel has respectfully considered the concerns of the Court and sought to address those concerns with additional evidence and a fuller explanation of the rationale for his position. Plaintiffs request the Court give due consideration

to the new report and also provide the opportunity for Dr. Fogel to present his views through an evidentiary hearing, which he did not have an opportunity to do previously.[1]

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides "[f]or scientific expert testimony to be admissible, the expert must first be qualified to testify competently regarding the matters he intends to address." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1309 (11th Cir. 1999). After determining whether a witness is qualified, the court must continue to perform its "gatekeeping" role to ensure the expert's testimony is both reliable and relevant. *See Daubert,* 509 U.S. at 589 (1993). To be reliable, the testimony "must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." *Id.* at 590. The Federal Rules of Evidence and *Daubert* were intended to relax the traditional barriers to the admission of expert opinion testimony. *Id.* at 587-88. The focus should be on principles and methodology, not conclusions. *Id.* at 596.

The trial court's gatekeeper role is not meant to supplant the adversary system or the role of the jury. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596; *see also In re Melton,* 597 A.2d 892, 903 (D.C. 1991) ("the court should accord an expert wide latitude in choosing the sources on which

---

[1] In the case of *McCarrell v. Hoffmann-La Roche Inc. and Roche Laboratories Inc.,* the New Jersey Appellate Division has recently found the testimony of Plaintiff's causation expert in that case was properly admitted. *See* Exh. 1 (Slip Op., March 12, 2009). The New Jersey court presented a detailed analysis of the causation evidence underlying the expert's opinion and distinguished its ruling from that of this Court in part by noting that, unlike this Court, the trial court in *McCarrell* had the benefit of hearing the expert (albeit a different person) testify live, which gave the court "fuller opportunity to assess the reliability of the opinion." *Id.* at 85. An evidentiary hearing with live testimony from Dr. Fogel would give this Court that opportunity as well and should be provided prior to a ruling on this motion.

to base his or her opinions" and "may not substitute his or her judgment for the expert's as to what data are sufficiently reliable, provided that such reliance falls within the bounds of reasonableness"). There is a range in which experts might reasonably differ in issues of science and such conflicting evidence should be admitted to aid the jury in deciding those issues. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 153 (1999); *Ambrosini v. Labarraque,* 101 F.3d 129, 138-39 (D.C. Cir. 1996) ("there is nothing in *Daubert* to suggest that judges become scientific experts, much less evaluators of the persuasiveness of an expert's conclusion").

## ARGUMENT

Dr. Fogel's qualifications as a distinguished and experienced gastroenterologist with knowledge sufficient to serve as an expert on general causation in these cases has not been questioned by the Defendants or of concern to the Court in prior proceedings. Likewise, Defendants do not raise his qualifications as an expert in this latest attack. Rather, Roche again focuses on the methodology and science underlying Dr. Fogel's opinion that Accutane causes IBD. Roche's criticisms are misplaced as shown herein. While Roche erroneously assails Dr. Fogel and Plaintiffs as offering "sound-bites" and making "token efforts" to support their causation case, Roche does nothing more than lift sound-bites out of context from Dr. Fogel's deposition and report in an effort to distort the basis for his opinion.

In his report, Dr. Fogel sets out the methodology he followed in reaching his opinions and affirmatively states that "[t]he methodology I used in performing my analysis of the issues herein are the same as those I have utilized throughout my career in research, publishing peer review articles, and in actually serving as a peer reviewer for journals related to Gastroenterology." Fogel Report, December 2008 (hereinafter "Fogel Report") (attached as Exh. B to Defendants' Motion). He considered the following lines of evidence: 1) clinical trials; 2)

3

animal studies; 3) biological plausibility and mechanism of action; 4) case reports including the reports of cases of challenge/dechallenge/rechallenge; and 5) medical literature. These lines of evidence are completely consistent with those cited in the Reference Manual on Scientific Evidence as accepted and reliable data for use in determining general causation. *See Reference Manual on Scientific Evidence* (2d ed. Federal Judicial Center 2000) at 468-469 (citing literature, epidemiological and toxicological data, case reports and clinical experience as evidence for determining general causation).[2] Dr. Fogel has considered and addressed the Court's concerns with particular components of the evidence in his recent report. A summary of the considerations and the basis for relying on this evidence follows. If provided the opportunity to testify in an evidentiary hearing on Defendants' motion, Dr. Fogel will be able to explain his opinion as to the reliability of the evidence even more fully.

### A.   Validity of Reliance on Clinical Trial Data.

Unfortunately for this Court and the Plaintiffs, there has never been a clinical trial or case-control or epidemiology study with the end point being to determine if Accutane causes IBD. However, the absence of a study of this type is not fatal to Dr. Fogel's opinion that Accutane causes IBD.[3] *See e.g. Rider v. Sandoz Pharmaceuticals*, 295 F.2d 1194, 1198-1199

---

[2] In previous briefing, Plaintiffs have also noted that Dr. Fogel's consideration of these factors is in keeping with the widely accepted general causation methodology presented by Sir Austin Bradford Hill in *The Environment and Disease: Association or Causation?*, 58 Proceedings of the Royal Society of Medicine 295-300 (1965). *Reference Manual on Scientific Evidence* (2d ed. Federal Judicial Center 2000) at 376. In an example of the "sound-bite" attack on Dr. Fogel, Roche faults him for not knowing that the factors he and others consider in assessing general causation are identified by some as the Bradford Hill factors. Defendants' Motion at 7. Nonetheless, there is in fact overlap in the factors considered by Dr. Fogel and the Bradford Hill factors even though Dr. Fogel may not have realized it given his honest response that he was not fully familiar with what have been deemed the Bradford Hill criteria.

[3] Roche erroneously suggests that Dr. Fogel should have conducted a study of his own expending the time and money that Roche itself is unwilling to spend. Defendants' Motion at 8. As the one

(11th Cir. 2002) ("It is well-settled that while epidemiological studies may be powerful evidence of causation, the lack thereof is not fatal to a plaintiff's case. . . ."). The pre-marketing clinical trials conducted by Roche to obtain approval for Accutane were directed at efficacy and not at safety. As Dr. Fogel explains, the trials "were significantly underpowered" due to the "known toxicity this drug has on the human body, particularly the mucous membrane." Fogel Report at 3. Much as it might like to, Roche cannot rely on the pre-marketing studies as evidence of *no* IBD or gastrointestinal risk because the trials were not designed to unmask that risk. Moreover, Roche can point to no trial since the pre-marketing trials specifically designed to address the question. However, the studies provide early evidence of gastrointestinal impact.

Specifically, Dr. Fogel notes that only 523 patients participated in the early trials.[4] Fogel Report at 10. Dr. Fogel considered the incidence of IBD in the general population (10-25 per 100,000) in concluding that "one would not expect to see cases of IBD in such a small group." *Id.*; *see also* Fogel Dep. at 34:4-37:22 (discussing different data for different population groups) and at 160:13-20 (discussing significance of incidence rates). However, he notes a high degree of gastrointestinal effects were revealed by the study notwithstanding the small number of patients. With five cases removed from the trials due to gastrointestinal complications and

---

profiting from the sale of Accutane, and as the one holding the duty to warn of the risks of taking the drug, Roche is hardly in a position to complain about the absence of such studies.

[4] As noted in the cover letter accompanying his report (*see* Exh. B to Defendants' Motion), Dr. Fogel was provided with all documents on the Plaintiffs' Second Amended General Exhibit List (documents identified herein as P#) and Medical Literature List (documents identified herein as PML#), and on the Defendants' General Exhibit List, from the trial of *Mace, Sager, Speisman v. Hoffmann-La Roche Inc., et al,* Docket Nos. ATL-L-199-05-MT, ATL-L-197-05-MT, and ATL-L-196-05-MT, Superior Court, Atlantic County, New Jersey, which began in October and went into November of 2008. Copies of the lists of these documents are attached hereto as Exhs. 2, 3, and 4. Dr. Fogel drew the factual information on the initial trial from the December 7, 1981 Roche Special Submission to the FDA Dermatologic Drugs Advisory Committee (P26), a copy of which is attached hereto as Exh. 5.

twenty-one percent of participants experiencing gastrointestinal adverse events, Dr. Fogel found the clinical trial reliable evidence that "the drug altered the gastrointestinal tract." Fogel Report at 10.

Dr. Fogel further considered the incidence of reported cases of IBD in the first year of Accutane marketing and determined that "the number exceeded that expected in the population of adolescents and young adults." *Id.* Factoring in the known rate of under-reporting, which is one to ten percent, Dr. Fogel determined that the "number of cases exceeded that in the population of adolescents and young adults . . .[and] was an unusual signal that deserved additional investigation." Fogel Report at 10; *see also* Exh. 6 (Script of the video testimony of Dr. Alan Bess, former Roche head of U.S. drug safety, played October 22, 2008, in *Mace, Sager, Speisman* (hereinafter "Bess Script"), at 293:21-294:21) (on rates of under-reporting).

While the early pre-marketing clinical trials were not designed to specifically address whether Accutane causes IBD, the secondary findings of the trials shed light on the issue and provide valid evidence of the type typically relied upon by experts to determine causality. As set out in his report, Dr. Fogel viewed the trial results in light of the incidence rate of IBD in the general population of adolescents and young adults, who are those most likely to be prescribed Accutane. He did so taking into account under-reporting of adverse events which cannot be ignored. The evidence and his conclusions go to the heart of the general causation question which " 'is concerned with whether an agent increases the incidence of disease in a group.' " Order of June 15, 2007 (Dkt # 580) (citations omitted). Whether Dr. Fogel is correct in his analysis has no bearing on whether his opinion is admissible. *Id.* The methodology of relying on clinical trial results to reach general causation conclusions, however, is undeniably valid.

## B.     Validity of Reliance on Animal Studies.

The Court previously found fault with Dr. Fogel's reliance on animal studies due to concerns about extrapolating the findings from those studies to humans, concerns over the higher doses used in animals, and concerns that Dr. Fogel ignored parts of the studies that do not support his opinion. Dr. Fogel addresses these concerns in his recent report. As noted, without a human case-control study or clinical trial (which would have to be designed to protect against the extreme toxic and teratogenic effects), it is necessary to look at animal studies for "observations that the drug causes changes that are consistent with disease pathogenesis. In the example of Accutane-induced IBD, one would look for evidence of Accutane-induced damage to the intestinal mucosa or for changes in immune function." Fogel Report at 5. Dr. Fogel explains appropriate extrapolation is "based on similarity of cell structure, organ function and energy metabolism." *Id.* As a highly qualified research and clinical gastroenterologist, Dr. Fogel is well-equipped to determine the extent to which the animal studies are relevant and reliable as evidence of causation in these cases. Further, Dr. Fogel notes that there "is not a body of clinical trial, or other epidemiology data which are contrary to available animal finding[s] that Accutane can trigger or cause IBD." *Id.* at 6.

The use of animals in the study of IBD generally is a subject with which Dr. Fogel is certainly familiar. *See* Fogel Dep. at 85:1-6, 92:11-15 (noting use of dogs to study human intestinal physiology); Fogel Report at 5-6, 9-11. "The value of the models is the insight they allow into the complex multi-faceted process and mechanisms that can result in chronic intestinal inflammation." Fogel Report at 9 (citations to medical literature omitted). He acknowledges in his report there are advantages and disadvantages to the use of animal models and one must be cautious in interpreting results. *Id.* With his admitted understanding of the drawbacks of animal

studies, Dr. Fogel explains his opinion is nonetheless supported by the isotretinoin animal studies because they show that "Accutane disrupts the epithelial mucosa" and may thereby cause IBD. Dr. Fogel is not alone in his view that disruption of the mucosal lining is a mechanism by which IBD is caused. *Id.* at 9-10.

Turning to the specific animal studies, Dr. Fogel explains in more detail the support they lend to his opinion. Focusing on three dog studies -- "A 55 Week Oral toxicity Study with Ro 4-3780 in Dogs," by Dr. J.J. Kamm, et al, June 19, 1979 (the "Kamm Study") (P144); "An Exploratory Oral Toxicity Study for the Comparison of Ro 4-3780 (13-Cis-Retinoic Acid) as a Beadlet or Oil Formulation in Dogs for Seven Weeks" by Dr. W. Niemann, et al, April 16, 1981 (the "Niemann Study")) (P145); and the Niederhauser study on 4-Oxo-13-cis-Retinoic Acid (Oxo-Isotretinoin), 2001 (the "Niederhauser Study") (P12B) – Dr. Fogel found evidence of damage to the gastrointestinal tract. His analysis, as set forth in his report, accounts for the high doses administered and thus addressed an express concern of this Court in prior proceedings. He does not ignore the dose relationship. He instead points to evidence that survives in spite of the fact that the dogs received higher doses than typically administered in humans.

First, the studies show a dose-dependent effect with the larger doses increasing the incidence of mucosal damage.[5] Fogel Report at 11. Second, in the Kamm Study, even the dogs in the low-dose group experienced substantial mucosal bleeding "at a greater rate than in the excipient or control groups." *Id.*; Exh. 8 (Kamm Study (P144) at ACC7010312, ACC07010359 (table showing the gastrointestinal toxic effects at a rate twice as high in the low dose group than in the control group)). Likewise, the Niemann Study demonstrated damage to the lining of the intestinal tract causing gastrointestinal hemorrhaging, "gross pathological lesions" and

---

[5] Roche itself acknowledges side effects of Accutane are dose-related. *See e.g.* Exh. 7 (1995 Accutane Package Insert at 9).

"hemorrhagic proctitis" in the dogs.   Exh.   9 (Niemann Study (P145) at RDR023563, RDR023579).

It is ironic that Roche continues to argue that the dog studies are not valid evidence on which an expert can rely to formulate an opinion that Accutane causes IBD.  The precise purpose of the studies was to determine what effects Accutane could have on the human body.  As the Court has acknowledged, Roche's reliance upon these studies in seeking FDA approval of Accutane indicates "it thought the reaction of the beagle dogs would be sufficiently similar to humans to make the test results valid."  Order of June 15, 2007 (Dkt 580).   In considering the relevance of an animal study, the source of the studies is clearly a factor, and, in the instant matter, the studies come from none other than Roche itself.  The fact that Dr. Fogel draws conclusions beyond those of Roche's views offers no absolute grounds for exclusion of his testimony. *See Wells v. Ortho Pharmaceutical Corp.*, 788 F.2d 741, 745 (11th Cir. 1986) (trial court acted within its discretion in accepting testimony of highly qualified experts despite their reliance on studies that were inconclusive on the ultimate causation issue).   In an evidentiary hearing, and at trial, Roche will have the opportunity to cross examine Dr. Fogel on his interpretation of the studies thereby allowing the Court to assess reliability of the evidence and ultimately allow the jury to weigh the evidence and its credibility.

Dr. Fogel's reliance on the dog studies is further supported by the testimony of one of Roche's own experts, Dr. Lorraine Gudas.  Dr. Gudas testified that 4-oxo-isotretinoin (or 4-oxo-Accutane), a primary metabolite of Accutane, was shown in the Niderhauser Study to cause dose-dependent gastrointestinal side effects.   Exh. 10 (*Mace, Sager, Speisman* Trial Tr., November 13, 2008, at 2932:18-2940:11) (Testimony of Dr. Gudas on P12-B); Exh. 11 (Niederhauser Study Investigator's Brochure) (P12B)).  Dr. Gudas went on to testify that people

who take Accutane have significant levels of 4-oxo-Accutane (isotretinoin) in their blood. Exh. 10 at 2954:24-2955:2. Tracking through the levels of 4-oxo-Accutane in the blood of people who have ingested Accutane as compared to the dogs in the study which were administered Accutane, Dr. Gudas agreed that people taking 60 milligrams of Accutane a day were left with more of this biologically active metabolite in their blood than the dogs in the study. *Id.* at 2955:3-2959:4. According to Dr. Gudas, it was this metabolite, 4-oxo-Accutane (isotretinoin), that caused the gastrointestinal damage in the dog studies. *Id.* at 2959:5-9. With higher levels of the offending metabolite remaining over time in humans who ingest Accutane than in the dogs who were injured by the Accutane metabolite, the significance and reliability of the dog studies as evidence that Accutane causes gastrointestinal injury is clear from Dr. Gudas' testimony and provides scientifically reliable support for Dr. Fogel's opinion that Accutane causes IBD.

Dr. Gudas' testimony also showed the dogs in the metabolite study experienced more than the temporary gastrointestinal irritation. Dr. Gudas acknowledged this report showed the dogs given the metabolite 4-oxo-Accutane (isotretinoin) experienced "degeneration" and "exfoliation of the surface epithelium of the small and large intestine, which was not a good thing. *Id.* at 2939:8-2940:4. Dr. Gudas further acknowledged that exfoliation and degeneration of the mucous membrane of the intestine could lead to irritation and inflammation in the intestine and an increased risk of IBD. *Id.* at 2946:24-2947:16.

As shown by the testimony of Roche's own expert, the dog studies are reliable pieces of the evidence amassed to show that Accutane can cause IBD. The internal Roche scientists reported "gross anatomic lesions" in the dogs' gastrointestinal systems (that is, lesions visible to the naked eye). The findings noted by Dr. Fogel, along with the analysis of Roche's own Dr. Gudas, show that Accutane and its metabolites render serious damage to the intestinal mucosa.

The doses used in the dog studies showed that that the damage can occur even at low doses and for the metabolite 4-oxo-isotretinoin at doses lower than what humans would be exposed to at recommended Accutane dosage levels. As Dr. Fogel further explains, healing of the mucosal injuries caused by Accutane use "does not prevent the subsequent development of the disease." Fogel Report at 12.   He does not, therefore, ignore the study conclusions that the observed impact in the dogs might be temporary or reversible (an unsubstantiated finding that is unsubstantiated given the dogs were sacrificed at the end of the studies).   Rather, based on his knowledge stemming from extensive clinical and research experience with IBD, he finds these conclusions fail to undermine his opinion.

Dr. Fogel also revisited his previous review of rat studies using Vitamin A and confirmed that the rat model is one that has been used by researchers to study colitis. *Id.* at 13; Fogel Dep. at 85:25-86:2 (use of rat to study acute toxicity, inflammatory response and restorative function). The rat study provides support for his opinion in that it demonstrates Vitamin A can damage the intestinal lining. *Id.*  The case law is clear that expert reliance on studies involving similar drugs is admissible in pharmaceutical cases. *See e.g. Kennedy v. Collegen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998) (admitting expert testimony relying in part on evidence of similar drugs); *see also Newton v. Roche Laboratories, Inc.*, 243 F. Supp.2d 672, 678, n. 4 (W.D. Tex. 2002) (despite finding that the unqualified and ill-prepared expert did not survive *Daubert*, the court recognized comparison of Vitamin A and Accutane and research on retinoids as "potentially relevant to the causation issue in this case"); *Golod v. Hoffman- LaRoche*, 964 F. Supp. 841 (S.D.N.Y. 1997) (admitting evidence of another retinoid). Vitamin A is a retinoid as is isotretinoin and thus falls into the same class of drugs as Accutane. *See* Exh. 12 (*Mace, Sager, Speisman* Trial Tr., November 12, 2008, at 2703:23-2704:7) (Testimony of Roche's expert Dr. Lorraine Gudas).   Dr.

11

Fogel points to the rat studies, recognizing the evidence from them is supportive and not alone definitive. It is, however, the evidence taken as a whole that forms a reliable basis for his opinion.

The reliability and relevance of the animal studies is reinforced by additional evidence on another metabolite of Accutane, all-trans-retinoic acid (ATRA) or tretinoin, which is marketed by Roche as Vesanoid for the treatment of promyelocytic leukemia (APL). As Dr. Fogel notes, the drug is known to cause severe gastrointestinal bleeding and diarrhea in humans and even hemonecrosis or "death" of the colon. *See* Fogel Report at 11, *see also* Exh. 13 (Vesanoid label at 10) and Exh. 14 ("All-*trans* retinoic acid-induced vasculitis and hemonecrosis of the ileum in a patient with acute promyelocytic leukemia" Leukemia, April 1999, 13(4):647-648). ATRA has been found to cause vasculitis, which in turn is implicated in the development of IBD and can be caused by isotretinoin. *See* Exh. 14 at 648, and Exh. 15 (1986 Roche Report by Peter Schifferdecker (P36)) (stating "a possible role of ROACCUTAN" for vasculitis with related gastrointestinal manifestations including bleeding).

Dr. Fogel's reliance on the animal studies as contributing support for his opinion that Accutane causes IBD is valid in that he recognizes the knowledge gained from the studies, while valuable, has limitations. *See e.g.* Fogel Dep. at 91:3-4 ("the purpose of the dog and rat studies is to identify possible toxicities"). Dr. Fogel found the dog and rat studies provide proof of the gastrointestinal toxicity of Accutane. The Niederhauser 4-oxo-Accutane (isotretinoin) dog study is further proof as to the toxic effect of Accutane on the intestines especially when viewed in light of the known impacts of isotretinoin and its metabolites on the human gastrointestinal tract.

C.      **Validity of Reliance on Biological Plausibility and Mechanism of Action.**

With his knowledge of gastroenterology and IBD in particular, Dr. Fogel finds there to be a biologically plausible basis for his opinion that Accutane causes IBD.  As explained in his report, "[t]he pathogenesis of IBD involves genetic predisposition, immune deregulation and environmental exposures."  Fogel Report at 14.  The evidence he has studied (animal studies, class effects of similar drugs, medical literature, case reports, challenge/dechallenge/rechallenge data) as to the effect of Accutane consistently demonstrates that Accutane damages the intestinal mucosa such that it can lead to IBD.  His report explains the basis for his biological plausibility evidence and notes "Inflammatory Bowel Disease (ulcerative colitis and Crohn's disease) is not considered idiopathic.  The diseases result from inappropriate and ongoing activation of the mucosal immune system driven by the presence of normal luminal flora" with increased risk for genetically predisposed patients and those exposed to environmental triggers.  Fogel Report at 7-8.  His views are backed by other scientists.  *See e.g. id.* at 7-8, 14 (citing medical literature supporting position that damage to mucosal lining of the intestines and immune response results in IBD).

Defendants attack Dr. Fogel's position on biological plausibility as only an unproven theory or hypothesis.  Yet, by the very definition of biological plausibility, it is not necessary that it be definitively proven.   Biological plausibility has been described as that which is "consistent with existing knowledge."  *Reference Manual on Scientific Evidence*, at 378.  The observed damage to the intestinal mucosa in the animal studies and the adverse effects evident from case reports along with consistent views expressed in the medical literature provide sound basis for the views of Dr. Fogel.  As he explains:

> I'm not sure hypothesis is the correct word.   I think based on medical knowledge, we know that disruption – that changes in mucosal permeability

and disruption of the mucosal barrier in individuals with an enhanced immune system develop [the] disease. So it's – I think that these are facts that drive medical research both in the further definition of the pathogenesis of inflammatory bowel disease as well as treatment.

\* \* \*

I cannot tell you conclusively the mechanism by which Accutane causes inflammatory bowel disease, but we don't know how Accutane works, either, in terms of improving acne.

\* \* \*

My most likely contender is disruption of mucosal membrane and permeability.

Fogel Dep. at 218:16-24; 219:10-13; 219:17-18.

Dr. Fogel's position on the likely mechanism of action by which Accutane causes IBD may not have been proved to a scientific degree of medical certainty but that is not the standard for admissibility. *See e.g. Wells v. Ortho Pharmaceutical Corp.*, 788 F.2d at 745 (11th Cir. 1986); *Rider v. Sandoz Pharmaceuticals*, 295 F.2d 1194, 1198-1199 (11th Cir. 2002). Sufficient knowledge exists on the etiology of IBD for a highly qualified gastroenterology expert to opine on the biological plausibility of Accutane causing IBD given the evidence at hand.

It is also critical to note positions taken by Roche and its drug safety officials, which Dr. Fogel considered in reaching his opinion. For example, Roche admits that it cannot point to the mechanism through which Accutane successfully treats acne. *See* Exh. 7 (1995 Accutane Package Insert at 3). Additionally, Roche had internally concluded as of June 1994 that "in patients with ileitis, enteritis or colitis in the active phase of the disease ROACCUTANE[6] is basically contraindicated." Fogel Report at 13; Exh. 16 (Accutane document titled "General Data" dated June 30, 1994 at FHLR-WieR-079835) (P576). The conclusions of Dr. Henri Lefrancq, a Roche scientist, that "it is reasonable to assume that the drug has the same effect on

---

[6] Roaccutane is the European trade name for Accutane.

the intestinal mucosa as on the other muscosae in the body such as the oral or nasal mucosae" are incorporated into this internal Roche report. *Id.* at FHLR-WieR-079913; *see also* Exh. 17 (Memorandum from Dr. Lefrancq, February 2, 1994 at FHLR108254).   Dr. Lefrancq also concluded Accutane "may induce or aggravate a preexisting colitis." *See id.* at FHLR108255.

Roche's gastroenterologist causation expert, Dr. Lloyd Mayer, has testified that a contraindication means the risk of taking a drug outweighs its benefits, but he told his patients with IBD it was safe for them to take Accutane because the label did not include a contraindication for IBD.   Exh. 18 (*Mace, Sager, Speisman* Trial Tr., November 10, 2008, at 2387:8-2389:3).   Had the warning included a contraindication for IBD, Dr. Mayer would have advised patients *not* to take it because to him a contraindication means "A causes B." *Id.*, at 2387:8-2389:3; 2514:14-16.   This express evidence of causation through the admitted need for an IBD contraindication for Accutane users found in Roche's own documents and from Roche's causation expert is additional and new support for Dr. Fogel's opinion that Accutane causes IBD. The opinion, and its biological plausibility, are consistent with medical knowledge and with the findings of Roche's own experts.

### D.      Validity of Reliance on Challenge/Dechallenge/Rechallenge and Case Reports.

Dr. Fogel again looks to case reports of IBD developing with Accutane use and particularly notes those in which IBD symptoms resolved upon withdrawal of Accutane and then reoccurred with rechallenges.   Fogel Report at 14-16.   The Court's concern that this evidence is scientifically unreliable has been considered by Dr. Fogel.   First, the incidence of IBD reported in Accutane users as compared to the background rate of IBD in the general population is significant when under-reporting of adverse events is taken into account.   *See* Exh. 19 (Excerpt from Tr. of FDA Presentation, OSE Analyses of Hepatic Adverse Events, Allen Brinker, M.D.,

December 14, 2006, Anti-Infective Drugs Advisory Committee in Joint Session with the Drug Safety and Risk Management Advisory Committee at 342) (estimated rates of adverse event reporting is 1 to 10 percent). Second, in Dr. Fogel's view, the large number of reports mitigates concerns that the observed gastrointestinal impact in Accutane users is merely coincidental.

As noted, Dr. Lloyd Mayer, Roche's gastroenterology expert, testified without regard to the established fact that adverse events are under-reported that Roche records showed 350 cases of IBD in Accutane users, a number he found consistent with the 320 cases that would, in his view, be expected in the general population. Exh. 20 (Mayer Dep., October 2, 2008, at 66:20-71:8). Yet, when under-reporting is accounted for Dr. Mayer's number of IBD reports would soar to between 3,500 and 35,000, taking it well above the expected rate in the general population. Dr. Fogel, therefore, did analyze the number of case reports in light of the background rate of IBD in the general population. He did so using rates of under-reporting of which the pharmaceutical industry, FDA and even Roche (*see* Exh. 6 (Bess Script at 294:2-21) are fully aware, and the analysis of Dr. Mayer.

The vast number of case reports, and within those the significant number of challenge/dechallenge/rechallenge cases, reinforces the evidence that Accutane causes IBD. Dr. Fogel acknowledges the potential for coincidence of the positive rechallenge given the propensity of IBD to wax and wane, but explains: "If you have many cases, then that becomes a less likely explanation. Plus, if you have the other information that we've talked about, the animal studies, then you – *if you look at all the information together*, then that would suggest that there is causality." Fogel Dep. at 157:10-15 (emphasis added).

Additionally, it is recognized that even one challenge/dechallenge/rechallenge case is evidence of causation. *See* Exh. 6 (Bess Script at 276:3-15) (aware of instances in which one

positive rechallenge was enough to document causation). Dr. Fogel opines as well that one challenge/dechallenge/rechallenge case "becomes an end of one control clinical trial." Fogel Dep. at 154:7-9. In preparing his report, Dr. Fogel examined twenty-three MedWatch reports indicating a positive rechallenge for Accutane users and IBD.[7] Fogel Report at 14-15; Exh. 21 (MedWatch reports (P7-7V)). In Dr. Fogel's judgment, when you start to see in the range of five, one can find a causal relationship. Fogel Dep. at 160:2-9. Explaining further, Dr. Fogel states:

> We're talking about an effect in a select population. If you had a pure population of people who are predisposed to inflammatory bowel disease and five in 100 got the disease, that would be very strong evidence. Five in 1,000 is still significant, it's still significantly different from zero.

Fogel Dep. at 160:15-20. He also testified that:

> [I]f you had a case where someone received Accutane, developed the disease, developed bloody diarrhea, the Accutane was stopped, the symptoms persisted, and then eventually healed, the Accutane was given again because of a flare of acne, and they then developed the symptoms again, then that would be evidence to me that that's etiologic.

*Id.* at 163:13-19. In those cases, based on his years of experience in treating and researching IBD, he would rule out chance. *Id.* at 163:23-164:5. There are many of those very types of cases among the MedWatch reports and case reports Dr. Fogel reviewed and cites in his report.

Case reports are unquestionably among the lines of evidence typically relied upon in considering issues of causation. *Reference Manual on Scientific Evidence*, at 469. While case reports have limitations, they are recognized evidence "when considered in light of other information available." *Id.* at 475; *see also McClain v. Metabolife International, Inc.*, 401 F.3d

---

[7] Defendants may have quibbled with the number, the analysis and relative strength of individual reports in deposition questioning, but even if the critiques are valid, which Plaintiffs dispute, Defendants could not negate the absolute fact that Roche has received far more than one positive rechallenge report on Accutane and IBD.

1233, 1254 (11th Cir. 2005) (case reports may support other evidence of causation).  Dr. Fogel did not look at the case reports in isolation.  He considered the reports, especially those showing positive rechallenge, in conjunction with other information from clinical trial data, animal studies, biological plausibility, and medical literature and found the case reports contribute support to his opinion that Accutane causes IBD.  *See* Fogel Dep. at 154:10-22.

### E.      Validity of Reliance on Medical Literature.

One step in determining general causation is "to demonstrate that the medical and scientific literature provides evidence that in some circumstances the exposure under consideration can cause the outcome under consideration."  *Reference Manual on Scientific Evidence,* at 469.  Dr. Fogel has undertaken this step and found a body of authoritative, peer-reviewed medical literature on which to rely.  Of significance, he cites to the identification of Accutane as a trigger for "reactivation of quiescent IBD" in one of the leading gastrointestinal textbooks.  Fogel Report at 9-10 (citing Yamada, et al, Textbook of Gastroenterology, 4th ed., Vol 2, at 1803, 1815 (excerpt attached as Exh. 22) (PML341)).

Other medical literature relied upon by Dr. Fogel includes the article by Deepa Reddy, et al, "Possible Association Between Isotretinoin and IBD", Am Jrl of Gastroenterology (2006) Vol. 101 (ML5) (copy attached as Exh. 23).  While the Court previously found that Dr. Fogel had stretched his view beyond that of the Reddy article authors, the article is unquestionably consistent with Dr. Fogel's biological plausibility opinion in recognizing the "diverse biologic activity" of retinoids, "including natural killer T-cells, disturbed epithelial tissue growth, disruption of glycoprotein synthesis" and stating "[b]y these or other mechanisms, isotretinoin is perhaps acting as a trigger for IBD in properly predisposed individuals, or unmasking symptoms in those with preexisting but subclinical disease."  *Id.* at 1571.  Even if the article is not

interpreted to support the ultimate conclusion that Accutane causes IBD, it is reliable evidence of components of that opinion.

Throughout his report, Dr. Fogel cites to medical literature to back his assertions and show that his opinion is based on much more than conjecture. He relies on medical literature that reports specifically on cases evidencing a causal relationship between Accutane and IBD as well as on literature showing the reliability of other evidence he draws from, such as the animal studies and biological plausibility. Taken together, the evidence, backed by the medical literature, provides reliable grounds for his opinion that Accutane causes IBD.

### POTENTIAL SUPPLEMENTATION

As set forth in Plaintiffs Motion to Compel, filed in this Court on March 17, 2009, it has come to light that Defendants have failed to produce all discoverable documents and information on the science of Accutane. Following a hearing in the New Jersey Mass Tort on this issue on March 18, 2009, the New Jersey Court entered an order granting a motion to compel all email correspondence of certain Roche drug safety officials as a means for the court to investigate the integrity of document production in this case.[8] Exh. 24 (New Jersey Order, March 18, 2009). Plaintiffs reference the motion to compel filed in this Court rather than repeat herein the details of the admitted production failures on the part of Roche. It is highly likely that the New Jersey investigation will reveal additional evidence relevant to the issue of causation. Plaintiffs and Dr. Fogel therefore seek the right to supplement the causation case with any additional evidence produced through the New Jersey efforts or from relief that might be granted through the motion to compel pending in this Court.

---

[8] The transcript of this hearing will be submitted for the Court's consideration when available.

## CONCLUSION

Plaintiffs respectfully request that Defendants' motion to exclude the reasserted general causation testimony of Dr. Ronald Fogel be denied.  Dr. Fogel, who the Court has acknowledged is a well-qualified gastroenterologist, stands by his opinion that Accutane causes IBD even after careful consideration of the Court's critique of his methodology.  Respectfully, after reviewing the Court's decision to exclude his initial opinion, Dr. Fogel submits that he may not have presented his views clearly or in sufficient detail in his previous effort.  Fogel Dep. at 262:20-263:4.

So far, Dr. Fogel has only had the opportunity to express his views through the confines of a written report and cross-examination by Defendants.  Plaintiffs respectfully request that the Court provide Dr. Fogel and Plaintiffs the opportunity to present their causation case through an evidentiary hearing prior to ruling on this motion.  The Court would then be in the position to rule with all evidence, set out as it would be at trial, through direct testimony with cross-examination and a more complete presentation of underlying basis for the opinion.  Plaintiffs submit that such a hearing would augment the grounds set forth herein and further establish the basis for denial of Defendants' motion.  *See City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 565, n. 21 (11th Cir. 1999) (*Daubert* hearings "are almost always fruitful uses of the court's time and resources in complicated cases").

I HEREBY CERTIFY that on March 20, 2009, I electronically filed the foregoing Plaintiffs' Response in Opposition to HLR, Inc.'s and Roche Laboratories, Inc.'s Motion to Exclude the Reasserted General Causation Testimony of Ronald Fogel with the Clerk of the

Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

KRUPNICK, CAMPBELL, MALONE,
BUSER, SLAMA, HANCOCK,
LIBERMAN & McKEE, P.A.
Attorneys for Plaintiffs
700 S.E. 3 Avenue
Courthouse Law Plaza, Suite 100
Ft. Lauderdale, FL  33316
(954) 763-8181
mryan@krupnicklaw.com

BY: */s/ Michael J. Ryan*
    Michael J. Ryan
    Florida Bar No.  975990