# EXHIBIT 1

```
                                                              1
 1            SUPERIOR COURT OF NEW JERSEY

 2                   LAW DIVISION

 3                   ATLANTIC CITY

 4     ---------------------------------------------

 5

 6   In re:  ACCUTANE LITIGATION        File No. 271

 7

 8     ---------------------------------------------

 9

10              Duane Morris, LLP

11              190 South LaSalle Street,

12              Chicago, Illinois

13

14              September 16, 2009

15              4:09 p.m.

16

17

18

19         VIDEOTAPED DEPOSITION OF

20            STEPHEN HANAUER, M.D.

21

22

23   REPORTED BY:  MARIA S. WINN, CSR, RPR, CRR

24

25
```

Page 2

```
 1   APPEARANCES:
 2
 3     On Behalf of the Plaintiff:
 4         MR. MICHAEL D. HOOK
 5         mhook@hookbolton.com
 6         Hook & Bolton, P.A.
 7         3298 Summit Boulevard
 8         Suite 22
 9         P.O. Box 30589
10         Pensacola, Florida 32503-1589
11         850-433-0809
12
13
14     On Behalf of Ranbaxy Pharmaceuticals, Inc.:
15         MR. THOMAS B.K. RINGE III
16         tbkringe@duanemorris.com
17         Duane Morris LLP
18         30 South 17th Street
19         Philadelphia, PA  19103-4196
20         (215) 979-1160
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES:  (Continuing)
 2
 3     On Behalf of Defendants Barr Pharmaceuticals,
 4     LLC and Barr Laboratories:
 5         MR. MICHAEL J. SUFFERN
 6         msuffern@ulmer.com
 7         Ulmer & Berne, LLP
 8         600 Vine Street
 9         Suite 2800
10         Cincinnati, Ohio 45202
11         (513) 698-5064
12
13
14     On Behalf of Defendant Hoffmann-La Roche, Inc.
15     and Roche Laboratories, Inc.:
16         MS. MICHELLE M. BUFANO
17         mbufano@gibbonslaw.com
18         GIBBONS P.C.
19         One Gateway Center
20         Newark, New Jersey  07102
21         (973) 596-4679
22
23
24
25
```

Page 4

```
APPEARANCES:  (Continuing)

  On Behalf of Defendant Mylan:
      EMILY J. HICKS, ESQ.
      ejh@pietragallo.com
      Pietragallo Gordon Alfano Bosick
        & Raspanti, LLP
      38th Floor, One Oxford Centre
      Pittsburgh, Pennsylvania 15219
      (412) 263-1821


  On Behalf of Defendant Thomas Brander, M.D.:
      MR. CHRISTOPHER L. NYWEIDE
      cnyweide@lbbs.com
      Livingston Barger Brandt Schroeder
      115 West Jefferson Street
      Suite 400
      P.O. Box 3457
      Bloomington, Illinois 61702
      (309) 828-5281


Also Present:
    MR. WALTER CWIK, Legal Videographer.
```

Page 5

```
                    I N D E X

WITNESS
  Stephen Hanauer, M.D.

EXAMINED BY                    PAGE
  Mr. Hook                     7, 65
  Mr. Ringe                    54
  Ms. Bufano                   56


HANAUER DEPOSITION EXHIBITS    PAGE
  Exhibit No. 1                21
  Exhibit No. 2                28
```

**Page 18**

Q  2006, okay. Now, the previous document, the sworn statement that you gave under oath in 2003, you obtained that from Mr. Wilson?
A  Correct.
Q  And you obtained that at whose request?
A  Well, I requested from Mr. Wilson on the -- I'm sure it was on the suggestion -- not suggestion, request or -- it was actually my recommendation to the attorneys at Ice Miller that they review this sworn testimony before they engaged me in consultation for Hoffmann-La Roche.
Q  Okay, and then did Ms. Pitcher tell you how to get a copy of that statement?
A  Yes.
Q  When she told you how to get a copy of that statement, did she tell you to communicate to Mr. Wilson that you were getting a copy and you were going to share that with Hoffmann-La Roche's attorneys?
A  No.
Q  Did Ms. Pitcher tell you that Mr. Wilson had refused to give Hoffmann-La Roche's attorneys a copy of that statement in the Mason case?
A  I don't believe so, but I don't remember the exact circumstances of why she did not have

**Page 19**

access to it. You know, frankly, it was my impression and understanding--and I think we may have discussed this briefly in the prior deposition once--that this was on the record. I had no notion that this was a private document, I presumed it was publicly available.
Q  Right. My question -- and I appreciate that. You've told me that, what you understood. My question is did Ms. Pitcher ever tell you that Mr. Wilson had in fact refused to provide Hoffmann-La Roche with a copy of that sworn statement?
A  I do not have any recollection that she did that, said that.
Q  Okay. So clearly by the year 2003, you have been retained by Hoffmann-La Roche and their attorneys in some form or capacity on issues regarding isotretinoin, correct?
A  Correct.
Q  And do you think at that point in time, it was just the two cases, the Freeman case and the McClain case, or were there other things you were asked to do?
A  I do not recall being asked to do anything further, and although I do recollect that

**Page 20**

there were other potential cases.
Q  And who had told you there were other potential cases?
A  I don't know specifically, but it would have been one of the attorneys for Ice Miller.
Q  Okay. In addition to the communication that we discussed, you also had, I believe, a meeting in your office with Hoffmann-La Roche and their attorneys, did you not?
A  Yes. I think I did, I'm sure I had a meeting. As I discussed in the 2006 deposition, I don't recall who was present.
Q  Okay. And that was to discuss the terms of your consulting agreement?
A  What do you mean by terms?
Q  To discuss the engagement of you as an expert witness on behalf of Hoffmann-La Roche?
A  Well, I believe that they were, in a sense, yes, but I don't know specifically what you mean terms. We didn't discuss terms of my, you know, fees or anything, but it was -- we discussed my impressions back at that time regarding Accutane and the literature at that time.
Q  When did you reach some agreement regarding the terms of your consulting, in terms

**Page 21**

of how much were you going to be paid and that sort of thing?
A  I believe that was in a contract with, or from Hoffmann-La Roche in 2004.
    MR. HOOK:  Go ahead and mark that, please.
        (Document marked as Hanauer Exhibit No. 1 for identification)
BY MR. HOOK:
Q  Doctor, I've handed you a copy of a consulting agreement that has been provided to me. Does that look familiar to you?
A  Yes.
Q  And that is a consulting agreement in which you agree to provide consulting services to Roche regarding Accutane; is that correct?
A  Correct.
Q  You are to be compensated at the rate of $500 per hour; is that correct?
A  Yes.
Q  Plus travel?
A  Yes.
Q  It also indicates that any proposed publication written by you as part of your services under the agreement or that relates to

**Page 22**

```
 1  work performed must be reviewed and approved in
 2  writing by Roche prior to your submission for
 3  publication. Do you see that?
 4      A   Yes.
 5      Q   And it also bears your signature?
 6      A   Correct.
 7      Q   July 27, 2004, correct?
 8      A   Correct.
 9      Q   And bears the signature of Frederick
10  Kentz, vice president of Hoffmann-La Roche,
11  August 20, 2004, correct?
12      A   Correct.
13      Q   Did you ever submit any publications to
14  Roche for their approval?
15      A   No.
16      Q   I was going to ask you at any time, and
17  your answer would be no?
18      A   Correct. I apologize, I should be more
19  patient.
20      Q   That's okay.
21          Whose idea was it to sign a consulting
22  agreement, was that something you proposed or
23  something that Roche proposed?
24      A   I'm certain that this is from Roche.
25      Q   Have you signed any other consulting
```

**Page 23**

```
 1  agreements with Roche?
 2      A   I may have signed a consulting agreement
 3  prior to this for unrelated matters pertaining to
 4  drug development and inflammatory bowel disease,
 5  but I don't have a specific recollection.
 6          I bring that up because there was a
 7  question of any payments from Roche, and I
 8  believed that any payments I received were
 9  pertaining not to this matter, if there were.
10  There may have been something, a relatively small
11  amount for a consulting on an advisory board or
12  drug development in previous years.
13      Q   So the consulting agreement was entered
14  into and I guess the year after you were
15  originally contacted by Hoffmann-La Roche?
16      A   Approximately, yes.
17      Q   And then for a period of the next year,
18  did you conduct any consulting work on behalf of
19  Roche that you can tell us about?
20      A   No, only when it came to the McClain
21  deposition, that's when I -- that's all I prepared
22  for them.
23      Q   Now, the McClain deposition, is that the
24  deposition that you have a copy in front of you?
25      A   Correct.
```

**Page 24**

```
 1      Q   And you refer to that as the McClain
 2  deposition?
 3      A   Yes.
 4      Q   Would you look at the style of that
 5  deposition?
 6      A   Look at the?
 7      Q   The first page.
 8      A   Yes.
 9      Q   And does it say McClain or does it say
10  Mason?
11      A   It says Mason.
12      Q   Okay, and I think you told me you were
13  deposed by me on January 9, 2006?
14      A   Yes.
15      Q   Correct? And prior to that deposition, I
16  believe you met with Roche and their -- or Roche's
17  lawyers. Do you recall that?
18      A   Just prior, immediately prior.
19      Q   Right. You met with Mr. Moss?
20      A   I do not remember any of the names.
21      Q   Maybe if you look at the first or second
22  page of that deposition, if you go back, it will
23  have the appearances.
24      A   Okay.
25      Q   Actually flip back one page, it should
```

**Page 25**

```
 1  have the appearances on there.
 2      A   Yes, sir.
 3      Q   Take a look at those and see if you
 4  recognize any of the names.
 5      A   Well, I mean, what do you mean recognize?
 6      Q   Whether it refreshes your memory as to
 7  who they are or who they were, and if they don't,
 8  that's fine.
 9      A   It refreshes a meager memory from this
10  event.
11      Q   Okay, so you attended your deposition
12  with the full intention to discuss your review of
13  the McClain records on behalf of Hoffmann-
14  La Roche?
15      A   Correct.
16      Q   Because you were still a consultant for
17  Roche at that time?
18      A   Correct.
19      Q   Now, when I began questioning you in that
20  deposition, it turned more to your retention of
21  Roche and the circumstances surrounding your
22  retention as a consulting expert. Do you recall
23  that?
24      A   Yes, but I think it was a retention by
25  Roche.
```

26

1  Q  Right. Did I misstate something? I may
2  have --
3  A  Potentially.
4  Q  Let me restate it. When I actually took
5  your deposition, I began questioning you about
6  your retention by Roche as a consulting expert as
7  opposed to specific facts on the McClain case.
8  A  Correct.
9  Q  Now, up until this point in time, as best
10 as you can recall, Dr. Hanauer, did you ever have
11 any communications with any of your peers
12 regarding the issue of whether or not isotretinoin
13 or Accutane plays any role in the onset or
14 development or exacerbation of inflammatory bowel
15 disease?
16 A  When you say up until the time, do you
17 mean 2006, the time of that deposition?
18 Q  The time of that deposition.
19    THE WITNESS: Can I get the specific
20 question back, please?
21    (Question read)
22 A  I have no specific recollection of any
23 conversation, but I suspect that based on the 2003
24 experience with the review of Adam Mason's case
25 and preparations for the McClain, what I thought

27

1  was going to be a deposition regarding McClain, I
2  more likely than not spoke with some of my peers,
3  whether or not they had impressions or experience
4  with patients with inflammatory bowel disease and
5  Accutane.
6  Q  Let me see if I can be a little more
7  specific, okay.
8     And I'm asking you to go back to 2006,
9  what your memory was or what you had actually done
10 back in 2006.
11    Do you recall having any specific
12 conversations with Dr. Corey Siegel prior to
13 January the 9th, 2006 on the subject of
14 isotretinoin and inflammatory bowel disease?
15 A  Okay, I need some of your help with
16 dates, because I am aware of a publication by my
17 colleagues, Dr. Kane and Dr. Siegel, I don't
18 recall where we are in the timeframe.
19 Q  Okay.
20 A  So if you can use that as a point in
21 time, I can help you with those more specific
22 questions.
23    MR. HOOK: Let me go ahead and mark this
24    as Number 2, this is e-mails.
25

28

    (Documents marked as Hanauer
    Exhibit No. 2 for identification)
BY MR. HOOK:
Q  Okay, have you seen this e-mail before?
A  I don't know.
Q  You are not sure whether you have seen it
before?
A  I'm not addressed, I don't think on any
of these, and there have been subsequent
discussions regarding statements that I may or may
not have said. So I can't remember if they were
actually pertaining to this e-mail.
Q  Okay, and I just want to be clear. You
are not sure you have ever seen this e-mail before
in which Dr. Kane states the following -- this is
an e-mail dated January 10, 2006, and let me just
stop right there. That would be the day after I
took your deposition that we have just been
referring to, on January 9, 2006; is that correct?
A  Yes.
Q  So the next day, Dr. Kane sent this
e-mail to Dr. Corey Seigel, Dr. Bruce Sands and to
Dr. Deepa Reddy in which he states, "Corey, I
shared our manuscript with Dr. Hanauer, as he is
currently defending a dermatologist who prescribed

29

Accutane to a young man who developed Crohn's
disease. Hanauer is concerned about the language
in our last paragraph as we used the term, quote,
'probably caused,' close quote, and then used the
word 'association' twice later on in the same
paragraph.
    "His point was that we have such limited
data regarding any of these cases, that using the
word, quote, 'cause,' close quote, could create a
lot of problems in the future. Thoughts? Susie."
    Did I read that correctly?
A  Yes, sir.
Q  Now, let me ask you some questions about
this. Does that help you time-wise? I was asking
you about whether you had any discussions, and I
started with Dr. Seigel. But does that help you
now time-wise, and a reference point for whether
or not you had discussions with any of your
colleagues about the issue of isotretinoin,
Accutane, or Accutane and inflammatory bowel
disease?
A  Well, again, I think that this is
consistent with what I said, that there were
discussions around that time, and very much aware
of this manuscript that Dr. Kane and Siegel and

## Page 30

1  Reddy had written.
2      Q   Well, let me ask you some questions, and
3  I started with Dr. Seigel. Did you have any
4  specific discussions with Dr. Seigel regarding the
5  article that was prepared by those authors prior
6  to its publication?
7      A   I may or may not have, I don't recall any
8  specifics of it.
9      Q   Do you know Dr. Bruce Sands?
10     A   Very well.
11     Q   Same question in connection with
12 Dr. Sands. Prior to the publication of the
13 article in which we referred to as the Reddy
14 article, or we can call it the Sands article, or
15 the Seigel article or the Kane article. Do you
16 recall whether or not you had any discussions with
17 Dr. Sands about the preparation of that article
18 before it was published?
19     A   I do not recall any discussions with
20 Dr. Sands regarding the preparation of that
21 article before it was published.
22     Q   Do you know Dr. Deepa Reddy?
23     A   I don't think I know Dr. Deepa Reddy.
24     Q   She has said she was also at the
25 University of Chicago and assisted Dr. Kane in the

## Page 31

1  preparation of the article, although she is not a
2  gastroenterologist.
3      A   Yeah, I think she -- I don't recall her.
4  She may have been a visiting resident who did
5  that, who was working with Dr. Kane. I don't know
6  her personally. I did not work with Dr. Reddy,
7  that I can remember. If it was, it was a very
8  brief encounter.
9      Q   Of course the last person that I
10 mentioned is Dr. Kane, and if this e-mail is
11 correct, it does appear that you and Dr. Kane did
12 have some discussions about the preparation of
13 this article prior to its publication?
14     A   Absolutely.
15     Q   Now, let me just ask you this. If you
16 read the first sentence of Dr. Kane's e-mail, it
17 says, "You are currently defending a dermatologist
18 who prescribed Accutane to a young man who
19 developed Crohn's disease." Is that correct?
20     A   I don't think it was correct, it was
21 defended.
22     Q   Okay.
23     A   This is in the present tense, and I don't
24 think it's correct, because the only defense that
25 I was supporting was of Dr. Counselman.

## Page 32

1      Q   Well, let me ask you this. Did you ever
2  tell Dr. Kane at any point in time that you had
3  been retained by Hoffmann-La Roche on the issue of
4  Accutane and inflammatory bowel disease?
5      A   I don't know if I specifically told her
6  that I was involved with Hoffmann-La Roche, but I
7  think that the discussions around the -- are
8  certainly related to legal matters that I was
9  aware of.
10     Q   Okay, I'm not quite sure I understand
11 that. Let me see if I can drill down a little bit
12 on that, because I'm just trying to find out --
13     A   Maybe I can help you.
14     Q   Okay.
15     A   I think it was obvious that there were a
16 number of cases that I had been exposed to at that
17 time from Hoffmann-La Roche, as well as even at
18 this time in 2006. If anyone looked up on the
19 internet Accutane, they would see many legal
20 references within it.
21         So I don't doubt that my discussions with
22 Dr. Kane were with recognition that the use of
23 Accutane was going to be a legal issue, or there
24 were legalities regarding it and suits regarding
25 it.

## Page 33

1      Q   So I guess getting back to the original
2  question, you don't recall telling Dr. Kane that
3  you had been a consultant for Roche on the issue
4  of Accutane?
5      A   I don't remember whether I specifically
6  said that I was retained by Roche, but I certainly
7  would have implied to her that I was involved with
8  legal matters regarding Accutane.
9      Q   And her interpretation, at least stated
10 here in her e-mail, is that you are defending a
11 dermatologist, a doctor, as opposed to Hoffmann-
12 La Roche?
13         MS. BUFANO: Objection to the form of the
14 question.
15     A   Again, that was the setting of the Mason
16 case. You know, that was my -- I don't know
17 whether this statement that she is referring to --
18 it certainly wasn't made on January 10th, which
19 is the day after our deposition. And it's not, I
20 don't think, temporally possible that our
21 deposition was on January 9th in the evening and
22 that this note, the e-mail, was sent on
23 January 10th at 8:00 o'clock in the morning,
24 that I had seen Dr. Kane in between that change in
25 deposition -- not change, that deposition and when

Page 38

MR. HOOK: Okay, that's the first I've heard that date, and you are right. So let me --

MR. RINGE: But today is certainly within the period of our consultation.

MR. HOOK: Let me just, how did we arrive at a date of August 15, 2008?

MR. RINGE: Because that's very close within a week or two of our initial contact with Mr. Hanauer in which we obtained his services to consult and consulted with him.

MR. HOOK: Does the witness know the date? Because I need that formally in the record somehow, I guess, the stipulation.

MR. RINGE: Subject to a confirmation that we can make to you by an e-mail later, but I think that's within a week or two of the actual date, which we could supply at some later time.

MR. HOOK: Okay.

BY MR. HOOK:

Q   Okay, Dr. Hanauer, you heard Mr. Ringe say that the generic defendants, the generic manufacturers of isotretinoin had retained your services at or near August 15, 2008. Does that

Page 39

sound about right to you?

A   Yes.

Q   So let me ask you this. You said that your opinions in the sworn statement with those in 2006 were the same. Were those opinions that you expressed in your sworn statement still your opinions up until August 14th, 2008?

A   Yes.

Q   Doctor, you expressed an opinion that Accutane can aggravate the underlying condition of inflammatory bowel disease in certain individuals. Do you recall giving that in your sworn statement?

A   Yes.

Q   Did you express that opinion at any point in time to Dr. Kane?

A   I have no specific recollection, but I have no doubts that I may have.

Q   Same with regard to Dr. Seigel?

A   Less confidence in discussions with him.

Q   Dr. Sands?

A   I may or may not have discussed it with Sands. Less likely that I did, but it was not before the 2006 date, before the publication. I don't believe I had any discussions with Dr. Sands before the publication, and I don't really

Page 40

remember any after, except just, it would only have been in passing.

Q   Have you ever expressed that opinion to any of your other colleagues at any point in time?

A   I have no specific recollections, but I would not doubt that in discussions with my colleagues regarding individual patients that we may or may not have seen or were treating, that we had some discussions about that.

Q   Doctor, do you recall expressing your opinion prior to August 14 -- excuse me. Let me restate the question.

Doctor, do you recall expressing your opinion prior to January the 10th, 2006, that Accutane has an effect on the epithelial cells in which it causes erosions in the lining cells of the digestive tract?

A   I recall having reviewed parts of the sworn statement of 2003, that that was a statement.

Q   Okay, was that your opinion in 2006?

A   Yes.

Q   Was that your opinion on August 14th, 2008?

A   Yes.

Page 41

(Brief interruption)

BY MR. HOOK:

Q   Doctor, did you ever express that opinion to Dr. Kane at any point in time in your discussions with her regarding isotretinoin and inflammatory bowel disease?

A   I don't recall discussing any specific mechanisms.

Q   Same question in connection with Dr. Seigel?

A   Correct.

Q   And same question with regard to Dr. Sands?

A   Correct.

Q   Doctor, do you recall giving an opinion in your sworn statement that Accutane has a direct cause or direct impact on the epithelial lining within the gastrointestinal tract, and that is more than just a mere association?

A   Yes.

Q   Was that your opinion on January 9th, 2006?

A   Yes.

Q   Was that your opinion on August 14, 2008?

A   Yes.

11 (Pages 38 to 41)

Page 42

1  Q  Doctor, did you ever express that opinion
2  to Dr. Kane prior to January the 9th, 2006?
3  A  I do not believe that I had any
4  discussions regarding specific mechanisms with
5  her.
6  Q  Same question in connection with
7  Dr. Seigel.
8  A  Same answer. I don't recollect any -- I
9  don't believe that I had any. It's more than I
10 don't recollect. I do not believe I had
11 discussions regarding specific mechanisms with any
12 of the authors.
13 Q  And same question -- okay, I was going to
14 say the authors. You said the authors. That
15 obviously would include Dr. Sands, correct?
16 A  Correct.
17 Q  Doctor, do you recall in your sworn
18 statement that you were of the opinion that
19 Accutane may contribute to causation and may
20 contribute to the perpetuation of inflammatory
21 bowel disease?
22 A  Yes.
23 Q  Was that your opinion on January 9, 2006?
24 A  Yes.
25 Q  Did you ever tell Dr. Kane that opinion

Page 43

1  prior to January 9, 2006?
2  A  I don't know if I specifically said that
3  opinion, but I suspect that there were discussions
4  regarding the associations or contributions, if
5  you will.
6  Q  Was that also your opinion on August 14,
7  2008?
8  A  Yes.
9  Q  Doctor, do you recall giving your opinion
10 in your sworn statement that Accutane or
11 isotretinoin can be a contributing factor in the
12 development of inflammatory bowel disease?
13 A  Yes.
14 Q  Was that your opinion on January 9, 2006?
15 A  Yes.
16 Q  Did you ever express that opinion to
17 Dr. Kane, Dr. Seigel or Dr. Sands prior to
18 January 9, 2006?
19 A  To me, these are all essentially the same
20 questions, because they would have been discussed
21 in the same context. So I don't recall discussing
22 any specific mechanisms regarding this, rather
23 that there may be an association and it was in the
24 context of whether we needed to stop therapy in
25 patients who were taking Accutane or -- it was

Page 44

related to clinical questions.
Q  Right. Getting back to my specific
question though, do you recall ever expressing to
any of those authors prior to January 9, 2006,
that Accutane or isotretinoin may be a
contributing factor in the development of
inflammatory bowel disease?
A  In the general context, I would say yes,
just as the way we've discussed. And also,
because Dr. Kane had shared her manuscript with
me, so I'm confident that some discussions
regarding the basis of the association that they
reported was possible.
Q  Doctor, was that your opinion that
Accutane or isotretinoin can be a contributing
factor to the development of inflammatory bowel
disease on August 14, 2008?
A  Yes.
Q  Doctor, in your sworn statement, do
you recall having the opinion that in certain
subgroups, Accutane may be a cause of inflammatory
bowel disease?
A  May I review the context of that
statement, please?
Q  Sure, page 113.

Page 45

Do you see that, Doctor, the question
began on Line 15 and your response on Line 21, "In
certain subgroups, it may be a cause."
Do you see that?
A  Yes.
Q  Was that your opinion back on January 9,
2006, that in certain subgroups, Accutane may be a
cause of inflammatory bowel disease?
A  Well, this was in 2003, it was a
statement. So I don't -- I certainly made that
statement, but I believe that it was in the
context of, in certain individuals, it could be a
contributing factor to the cause.
So the discussion was very much -- you're
saying cause and I'm trying to say contribution.
So yes, I said this, but the context was, in
certain individuals, certain subgroups, it's going
to contribute more. My statement was cause, but I
believe that the context of that discussion is
along the lines that we've been saying, that it
is a -- it may be a contributing factor, and
certainly it is going to be a greater contributing
factor in some individuals versus others, and we
do not know who those specific individuals are or
how to identify them.

12 (Pages 42 to 45)

46

1 Q Okay, for the record, let's just make it
2 clear. Your response to the question on Line 21,
3 would you read what it says?
4 A "In certain subgroups, it may be a
5 cause."
6 Q Okay, was that your opinion on January 9,
7 2006?
8 A With the modification that I've made,
9 that, again, that it was my opinion that Accutane
10 may have contributed to the development of
11 inflammatory bowel disease, and in certain
12 individuals--this is the same context--that there
13 may be more or less likelihood of the potency of
14 that contribution.
15 Q Are you saying that Accutane could be a
16 trigger for inflammatory bowel disease?
17 A I would accept that statement, in certain
18 individuals who are disposed to develop
19 inflammatory bowel disease.
20 Q And was that your opinion on August 14,
21 2008?
22 A Yes.
23 Q Doctor, in your sworn statement, were you
24 of the opinion that Accutane can aggravate or
25 worsen inflammatory bowel disease in patients that

47

1 have IBD?
2 A Yes.
3 Q Was that your opinion on January the
4 9th, 2006?
5 A Yes.
6 Q Was it your opinion on August 14, 2008?
7 A Yes.
8 Q In your review of all of the material
9 that you had looked at up through January 9, 2006,
10 did you ever see a document in which Roche had
11 internally contraindicated Accutane for
12 inflammatory bowel disease?
13     MS. BUFANO: I object to the form of the
14 question.
15 A I do not recollect seeing any such
16 document.
17 BY MR. HOOK:
18 Q Doctor, do you recall in your sworn
19 statement having the opinion that, in connection
20 with causation of inflammatory bowel disease, that
21 there are factors in the susceptible population
22 that can contribute to the cause, and I mentioned
23 NSAIDs, and I suspect that Accutane may be one of
24 those.
25 A Yes.

48

1 Q Was that your opinion on January 9, 2006?
2 A Yes.
3 Q Was it your opinion on August 14, 2008?
4 A Yes.
5 Q Have you ever had any discussions with
6 Dr. Kane subsequent to the publication of the
7 article?
8 A Yes.
9 Q How recently?
10 A Within the year, within the months, I
11 was aware that she was deposed and -- yeah, I was
12 aware that she was deposed, so I must have had
13 some discussions with her.
14 Q The opinions that you have expressed here
15 today and back in 2003 and 2006 and 2008, have you
16 shared those with Dr. Kane at any point in time?
17 A The opinions that we discussed, you mean
18 that you asked me about?
19 Q Yes.
20 A No.
21 Q Have you had any discussions with
22 Dr. Sands about isotretinoin and inflammatory
23 bowel disease?
24 A Subsequent to the publication, I may have
25 asked him his subsequent thoughts, but you know,

49

1 we may have had a brief discussion, but there was
2 no detailed discussion.
3 Q Okay. So did you ever share any of the
4 opinions you expressed in your statement, those
5 that you had in 2006, those that you continued to
6 have up to August 14, 2008, did you ever share
7 those with Dr. Bruce Sands?
8 A I think in the context that began my
9 opinions, that certain individuals may have
10 symptoms or it may be a trigger, I would not deny
11 that I ever discussed that. I don't have a
12 specific recollection about it.
13 Q Same question in connection with
14 Dr. Seigel. Have you had discussions with
15 Dr. Seigel about the opinions that we've been
16 discussing today?
17 A I don't have any specific recollections,
18 but I would not deny having discussed any of those
19 opinions with him.
20 Q Have you ever talked with Lloyd Mayer?
21 A Yes.
22 Q About Accutane and inflammatory bowel
23 disease?
24 A Yes.
25 Q When did you talk with him about that?

13 (Pages 46 to 49)